**United States District Court**
**District of Nebraska**

Rodney Johnson,

   Plaintiff,

  v.

CITY OF OMAHA; BROOK BENCH and
MATT KALCEVICH, in their individual
and official capacities; and STEVEN
SLATER and KARI VASQUEZ, in their
individual capacities,

   Defendant.

Case No. _____

**Complaint**
**(42 USC § 1983)**

## I.  Introduction

1.1  Rodney Johnson owns BFW'S Fleet Wash, LLC (BFW), a single member
Limited Liability Corporation located in North Omaha that has been providing cleaning
services in Eastern Nebraska for twenty-eight years. BFW normally employs twenty to
thirty workers and has successfully performed dozens of public and private cleaning
contracts in Omaha and Lincoln. The company is named after Johnson's mother, Bessie
Johnson. Rodney Johnson is Black.

1.2  All Johnson has ever asked when bidding public contracts is for the equal
protection the law requires, for both BFW and other contractors. He asks only that the
rule of law be followed.

1.3  In July 2019 officials employed by the City of Omaha Parks Department
publicly requested proposals from qualified vendors to provide custodial services for the
City's parks and recreational facilities. BFW is a qualified vendor and was interested in
the contract.

1.4  In bidding for the custodial services contract, Johnson was treated anything
but fair, and afforded anything but equal protection by the City officials. Either because
he demanded compliance with the law during the bidding process; because he filed a
taxpayer lawsuit alleging the City deviated from the law when awarding an unrelated
contract for garbage disposal; or because he is Black, Omaha Parks Department officials
acting under color of law consistently ignored applicable laws and City ordinances to

1

provide its preferred bidder, who is White, an unfair advantage and to prevent BFW from winning the bid.

1.5   When the City was ultimately forced by Johnson to award BFW the contract, after a bidding and re-bidding process that lasted over a year, City officials named herein immediately concocted a four-part "Janitorial Plan" to terminate the contract regardless of how BFW performed its obligations. After arbitrarily terminating BFW almost immediately, the City awarded the contract to its preferred bidder, BMI Janitorial Group (hereinafter, "BMI").

1.6   The City's conduct violated BFW's rights protected by the United States Constitution.

## II.   Parties

2.1   Plaintiff is Rodney Johnson (hereinafter, "JOHNSON"), a resident business owner, homeowner, and taxpayer residing and conducting business within the corporate limits of the City of Omaha, Nebraska. He is the sole owner of BFW, a cleaning company that has been bidding jobs with the City of Omaha since 2013.

2.2   Throughout the bidding process for the custodial services contract, JOHNSON and BFW had sufficient experience and resources in the commercial custodial business to accomplish the City's custodial requirements, specifications and expectations related to the contract at issue; was ready and able to compete in a fair bidding process for cleaning contracts offered by the City; and submitted bids conforming to the City's Request for Proposal (RFP) and Request for Bids (RFBs).

2.3   Plaintiff has standing.

2.4   Defendant City of Omaha ("CITY") is a city of the "metropolitan class" under Neb. Rev. Stat. § 14-101 and "a body corporate and politic" with the power to sue and be sued. The City's policy-level officials, including but not limited to Parks and Recreation Directors, were personally involved in and directed the deprivation of JOHNSON's Constitutional rights as alleged herein.

2.5   Defendant Brook Bench ("Director BENCH") is a policy-level decision-maker employed as Director of the City's Parks Department ("City Parks") throughout the bidding process alleged herein. He began his term as Director December 14, 2013. BENCH is sued in his official and individual capacities.

2.6   Defendant Matt Kalcevich ("Director KALCEVICH") is a policy-level decision-maker employed as Director of the City's Parks Department ("City Parks"). He

began his term as Director December 14, 2020. Kalcevich is sued in his official and individual capacities.

2.7    Defendant Steven Slater ("Coordinator SLATER" or "SLATER") is and, at all times relevant, was the Contractual Services Coordinator for the City of Omaha Parks Department. Slater's duties included maintaining and supervising contractual agreements, including the cleaning services contracts at issue, and supervising performance of contractual agreements, including the contractual agreements at issue. Coordinator SLATER is sued in his individual capacity.

2.8    Kari Vasquez ("Coordinator VASQUEZ" or "VASQUEZ") is and, at all times relevant, was the Parks Department's Community Center Facility Coordinator for the City of Omaha. Working with SLATER. Her duties included maintaining and supervising the contractual agreements at issue. VASQUEZ is sued in her individual capacity.

2.9    At all times relevant herein, BENCH, SLATER and VASQUEZ combined, conspired and coordinated their efforts in furtherance of denying JOHNSON equal protection of the law. After BENCH resigned, KALCEVICH joined the efforts of SLATER and VASQUEZ as the new Director.

2.10    At all times relevant herein, BENCH, KALCEVICH, SLATER and VASQUEZ acted either with evil motive or intent, or with reckless or callous indifference to JOHNSON's federally protected rights

2.11    JOHNSON requests an opportunity to add additional Parks Department officials as Defendants after a reasonable opportunity for initial discovery.

### III.    Jurisdiction

3.1    Plaintiffs' claims arise under the laws of the United States, including 42 U.S. §1983. This Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.

### IV.    Custodial Services Contract Bidding Process – First Bid

4.1    The Fourteenth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964 and Article I, §30 of the Nebraska Constitution prohibits City officials, including each of the named Defendants from discriminating based upon race in the award of bids. Under like provisions, City officials, including the named Defendants, are obligated to act in accordance with due process, to afford all bidders equal protection of the laws, and to refrain from acting in retaliation for a bidder's exercise of his First Amendment rights.

4.2     On July 31, 2019 the Douglas County Purchasing Agent, on behalf of the City's Parks, Recreation, and Public Property Department ("Parks Department"), issued a Request for Proposal (RFP) from qualified vendors to provide custodial services for the City's parks and recreational facilities.

4.3     Prior to issuing the RFP, City Parks officials, including SLATER, had knowingly and unlawfully expended public funds by repeatedly extending the custodial contract with RTG rather than opening the job to a public bidding process after 6 years, as required by §§ 5.16 and 5.17 of the City's Charter.

4.4     After deciding to open the contract to public bidding as required, Parks officials including SLATER directed issuance of an RFP, rather than a Request for Bid (RFB) with a specifically described scope of work, in an effort to facilitate continued defiance of laws designed to ensure an equitable process affording equal opportunity to qualified bidders. By issuing an RFP, the City designed a more subjective process, providing it more latitude to recommend awarding the contract to its preferred bidder and evade review of its conduct.

4.5     By issuing an RFP, Parks Officials including SLATER could determine which bids would be referred to a committee for evaluation.

4.6     Six vendors submitted proposals in response to the City's RFP. The six vendors identified were:

        4.6.1   RTG Building Services ("RTG")

        4.6.2   BFW

        4.6.3   BMI

        4.6.4   ABM

        4.6.5   Jani King Omaha

        4.6.6   Nifty Clean, LLC

4.7     The bids of ABM and Jani King were not responsive because they were not certified participants in the City's SEB program. The bid submitted by Nifty Clean, LLC's bid, which was much higher than other bidders, and much higher than the previous provider, was declared too high by SLATER.

4.8     That left RTG, BFW and BMI.

4.9    RTG was the incumbent contractor for the previous seven years under a contract paying RTG approximately $311,920.00 over its last 12-month period. RTG submitted a conforming RFP bid proposal totaling **$496,620.00** annually.

4.10    BMI was the City's preferred contractor. BMI submitted a *non-conforming* RFP bid proposal to provide the services at the cost of **$223,920.00** annually, a bid so low it immediately caused concerns among city officials reflected by email correspondence.

4.11    On Aug 21, 2019, BFW submitted a bid offering the company's cleaning services at **$297,499.98** annually. Through either neglect or malfeasance, SLATER misreported BFW's bid as $318,000.

4.12    BFW had submitted the lowest conforming bid.

4.13    On August 28, 2019, JOHNSON delivered a resident taxpayer demand letter to the President of Omaha's City Council, Chris Jerram in care of the Omaha City Clerk's office.

4.14    JOHNSON's taxpayer demand was unrelated to BFW or the RFP for parks and recreation cleaning services.  In his taxpayer demand, JOHNSON demanded repeal of Ordinance No. 41925, which awarded a contract for solid waste collection to FCC Environmental Services based upon the violation of bidding procedures.

4.15    Neither BFW, nor any business in which JOHNSON had an interest, submitted a bid proposal for the solid waste contract. As a taxpayer and as an individual, JOHNSON alleged the ordinance contravened provisions of § 5.16 of the City's Charter. The request was pending in the City's Law Department before being denied on September 26, 2019.

4.16    Parks officials knew JOHNSON was the sole member of BFW when reviewing and considering BFW'S bid.

4.17    They also knew JOHNSON was Black.

**A. The City's RFP Violated SEB Program's Preference for Tier I Candidate.**

4.18    Contrary to Omaha Municipal Code (hereinafter, "OMC") Sec. 10-200.3(d), which establishes Tier I and Tier II vendors certified in the City's Small and Emerging Business program, Parks officials including BENCH, SLATER and VASQUEZ determined that Tier II bidders would be given preference over Tier I bidders during the bid evaluation process.

4.19    Under the City's SEB program, businesses are categorized as Tier I and Tier II based on the location of their headquarters and the location of their employees. Contractors qualify as Tier I rather than Tier II by agreeing to maintain their principal place of business in areas of the city with higher levels of poverty which correspond to higher population concentrations of Black Omahans and other people of color.

4.20    JOHNSON and BFW met this incentive in 2013 by establishing BFW's place of business at 5203 North 53rd Street in Omaha. Since September 5, 2013, BFW has been awarded certification by the City's Human Rights & Relations Department as a Tier I ESB contractor in the City's SEB Program established by the City's Municipal Code of Ordinances Chapter 10, Division 5.

4.21    The city publishes a Certification Directory listing all SEB Certified businesses, their status as a Tier I or Tier II vendor, their Ethnic Origin and Gender, and other information.

4.22    At the time the RFP was issued, there were eleven Certified Tier I ESB's listed in the SEB Program Directory's "Janitorial" category.

4.23    At the time BFW submitted its bid proposal, BFW was listed as a Certified Tier I ESB in the City's SEB  Directory. The directory correctly listed BFW's ethnic origin and gender as "Black/African American" and "Male".

4.24    RTG was a Certified Tier II ESB listed in the SEB Directory as "Hispanic".

4.25    BMI was listed in the SEB Directory as a Certified Tier II ESB contractor and listed the Ethnic Origin and Gender of BMI as "White" and "Female". The business is located at 423 S. 162nd Street in Omaha. The directory lists Dan Beckman as the Contact Person for BMI. Beckman is a white male, the company's owner, and runs the day-to-day operations of BMI. As alleged below, Beckman was the City's contact person for BMI and Parks officials frequently communicated with him regarding the contract. There is no known female with any significant involvement in the operation of BMI's business. BMI's SEB certification date is listed as August 8, 2019, after the City's RFP was issued.

4.26    OMC Section 10-200, provides, "It is necessary and expedient, and it is hereby declared necessary and expedient, to require the inclusion of certain provisions in contracts with the city to promote and encourage the creation of business opportunities for emerging and small businesses of the city, to compete for city contracts; and to

6

promote equality of access to city contracts. Further, the objective of this ordinance is to enable the establishment of incentives, savings, funding and other methods to engage emerging and small businesses."

4.27    Consistent with this ordinance, the City's SEB Participation Utilization Form included in the City's July 31, 2019 RFP, affirmatively stated: "It is the policy of the City of Omaha that Small and Emerging Small Businesses shall have the maximum practicable opportunity to participate in City of Omaha projects. Consequently, the requirements of the Small and Emerging Small Business Program ordinance apply to this solicitation. … The City of Omaha has given preference to the above-referenced category of participants in the preparation of these contract documents according to the provisions of OMC 10-200.3(d)."

4.28    The City's SEB ordinance also provides Certified Tier I Emerging Small Businesses (ESB's) priority when awarding bids. OMC 10-200.3(d), provides: "Provided that an adequate number of certified entities are available, the solicitation or request for proposal will give priority to certified Tier I and/or Tier II small businesses and/or emerging small businesses. "Priorities" are set forth as follows: if there is an adequate number of Qualified and Certified ESBs, first priority shall be given to Tier I ESBs; if not, then the next priority will be given Tier II ESBs; if there are not an adequate number of ESBs, then priority shall go to Tier I small businesses and then to Tier II small businesses."

4.29    As such, the priority created by Ordinance and the RFP provided preference for ESB's over Small Business's, and for Tier I ESB's over Tier II ESB's.

4.30    Of the three bidders qualified under the SEB program, only BFW was listed as a Certified Tier I ESB "Black/African American" owned business. BFW's bid proposal conformed with the requirements of the RFP, Accordingly, Omaha City Ordinances provided BFW priority over all others except other Tier I ESB bidders.

4.31    BENCH, SLATER, VASQUEZ and other City officials knew the information alleged in the foregoing paragraph at the time it directed release of the RFP solicitation document.

4.32    Despite Omaha Municipal Code Sec. 10-200.3(d), and BFW's status as a Certified Tier I ESB contractor, Parks officials including BENCH, SLATER and VASQUEZ expressly established preference for a Certified Tier II ESB contractor.

4.32.1 The RFP expressly stated a preference for a Certified Tier II ESB contractor; and disqualified all Certified Tier I contractors from award consideration.

4.32.2 Electronic communications from Parks Department officials reveal RTG, a Certified Tier II ESB, was allowed by SLATER to participate with the Parks Department in drafting the 2019 RFP's bid specifications.

4.32.3 When JOHNSON requested an extension of his bid on behalf of BFW, he was informed his bid was removed from consideration on the basis it did not meet the RFP requirements because BFW was not a Tier II contractor.

4.32.4 SLATER attempted to justify its preference for a Tier II contractor in an email sent to the City's Legal Department,

4.33    After drafting and publishing the RFP specifications, the City established an Evaluation Committee to evaluate bid proposals forwarded to it by SLATER. Members of the Committee would use an objective process to evaluate multiple bidders and render scores to assist SLATER in fairly determining the best bid.

4.34    With BENCH'S knowledge and approval,

4.35    Contrary to the foregoing law, SLATER forwarded, with BENCH'S knowledge and approval, only two bid proposals to the Committee for evaluation: BMI (though it was a Tier II ESB), and RTG (though its bid price was 37% higher than BFW's bid).

4.36    SLATER made the determination to forward only the proposals of BMI and BFW only after JOHNSON filed the taxpayer demand alleged in paragraphs 4.13 through 4.15 above herein.

4.37    SLATER'S decision forced BFW to petition Parks officials for the opportunity to have its bid proposal evaluated and its management interviewed by the Evaluation Committee.

4.38    After being evaluated by the Committee, BFW's bid proposal received the highest-ranking evaluation score of 85.5 points and quoted a price 4.6% lower than what the City was paying its previous contractor.

4.39   BFW's bid should have been accepted immediately:

4.39.1 It was a Certified Tier I ESB contractor.

4.39.2 Its bid conformed to the RFP specifications

4.39.3 Its bid was the lowest of any responsive bids submitted by a Certified Tier I ESB provider.

4.39.4 Its bid scored highest in the objective evaluation.

4.39.5 No City official articulated a legitimate basis to withhold awarding BFW the bid.

4.40   Instead, Parks officials including BENCH and SLATER continued to consider BMI's non-conforming bid proposal in violation of the RFP solicitation document and additional bid award procedures.

4.41   There existed no rational basis for this disparate treatment.

**B. The City's Parks Department Considered and Supported BMI's bid proposal despite the fact it was non-conforming.**

4.42   In addition to being a Tier II contractor with lower priority than BFW, a Tier I ESB contractor, BMI's bid proposal was non-conforming.

4.43   Article III, § A, of the RFP stated, in part "Proposals that do not conform to the mandatory items as provided in the proposal instructions will not be considered."

4.44   The RFP's proposal instructions also stated in part "PROPOSALS MUST MEET THE FOLLOWING REQUIREMENTS TO BE CONSIDERED VALID. PROPOSALS WILL BE REJECTED IF NOT IN COMPLIANCE WITH THESE REQUIREMENTS."

4.45   The RFP's Submittal Requirements bidding instructions stated in part: "Vendor should submit one (1) original, two (2) copies, and two (2) electronic copies (CD or Flash, Drive, editable format) of their entire proposal. Proposals, including CD/flash drive, must be submitted, and received in the Omaha City Clerk's Office by the proposal opening date and time. All attachments must be completed and returned with proposal."

4.46   The City utilizes Douglas County Purchasing Department Custodial Services Parks Facilities Bid Tabulation indicated that BMI's bid submissions did not comply with the RFP's bid proposal's mandatory Submittal Requirements instructions.

4.47   BMI's bid failed to conform with these requirements because BMI did not submit the paper and electronic copies required. Under the terms of the RFP, the bid should have been denied out of hand. Those are the rules.

4.48   It can be inferred from their continued consideration of BMI's bid proposal that Parks officials, including the named Defendants, knowingly and intentionally acted to deny JOHNSON equal protection of the laws because he is Black, to ignore laws requiring priority be given to Tier I ESB bidders, and to arbitrarily, capriciously and unlawfully punish JOHNSON for his unrelated taxpayer demand concerning the award of the solid waste disposal contract to FCC.

**C.  City's Parks Officials publishes Notice of Intent to award the contract to BMI**

4.49   Despite BMI being a Tier II ESB contractor submitting a non-conforming bid proposal, City Parks issued with BENCH'S approval and at the behest of SLATER a Notification of Intent to Award a contract to BMI on or around November 4, 2019.

4.50   On January 7, 2020, the City Law Department submitted for the City Council's consideration Ordinance 42122 – "An ordinance to approve an Agreement with BMI Janitorial Group in the total amount of $680,760.00, for custodial services at various Recreational Facilities in the City of Omaha through the year 2022, with the option to extend for either an additional three (3) year term, or three (3) one-year terms."

4.51   In response, both RTG and BFW filed formal bid protests with the City Clerk's office opposing approval by the City Council of the Parks' Department's award of the contract to BMI.

4.52   On January 14, 2020, the City Council conducted public hearing on Ordinance No. 42122. During the hearing, multiple opponents to the Parks Department's recommendation made arguments pointing out the BMI's bid proposal was non-compliant and, under the RFP's rules, could not be considered a qualifying bid. Despite the bid being in violation of the rules, Parks officials assisted by Assistant County Attorney Ryan Wiesen spoke in favor of awarding the contract to BMI nonetheless, suggesting the language was new or conflicting or otherwise hard to comply with.

4.53    Opponents of the ordinance presented records garnered by request for public records made by JOHNSON. Specifically, opponents provided public records showing the language relied upon to reject all bids had, in fact, been included in City published RFP's for years and, throughout the course of their use, had been complied with at a high rate. The opponents demonstrated the RFP's language is not new and has never been considered "conflicting" or the subject of debate.

4.54    Upon conclusion of the January 28, 2020, hearing, the City Council denied the City Parks Department's recommendation to award the contract to BMI.

### D. The City's Parks Department arbitrarily reject BFW's Lowest Conforming Bid to Order Re-Bid

4.55    After the City Council properly rejected award of the bid to BMI, City Parks officials, including BENCH and SLATER. continued on its course of denying fair consideration of BFW's lowest conforming bid from a Tier I ESB contractor.

4.56    BENCH, SLATER and City Law officials awaited making a decision on whether the project would be re-bid to hear from Beckman regarding whether BMI intended to appeal. During this time, SLATER advised Beckman as to the procedures to file an appeal. Liz Leddy, an administrative assistant to the City Council, offered Beckman assistance from her personal attorney.

4.57    During this time, Parks officials including BENCH and SLATER made no attempt to contact or negotiate with BFW though it was a Certified Tier I ESB contractor and had submitted a conforming bid proposal which received the highest-ranking evaluation score from the Evaluation Committee and quoted the lowest price of any conforming bidder.

4.58    Instead, within hours of the Council's rejection of BMI Coordinator SLATER drafted language for letters rejecting all bids and sent it by email for approval to Deputy City Attorney Michelle Peters. On January 29, 2020, Director BENCH sent a letter to all bidders notifying them all bids would be rejected and the project would be re-bid.

4.59    The letter stated, "Dear Mr. ___ _This letter is to serve as written notice that all proposals submitted for the Request for Proposals - Custodial Services for City of Omaha Parks Facilities have been rejected by the Omaha City Council due to conflicting criteria in the required document specifications. This project will be re-bid in the near

11

future. We appreciate your interest and participation in the proposal process. Respectfully, Brook Bench, Director".

4.60    In response to an email query from ABM's owner regarding the letter notifying the owner all bids would be rejected, SLATER also falsely wrote, "the Omaha City Council rejected all proposals for [the RFP] due to conflicting language in proposal instructions regarding which documents were required to be submitted with proposals and which documents were optional."

4.61    The statements by BENCH and SLATER that all proposals submitted for the RFP had been rejected by the Omaha City Council due to conflicting criteria in the required document specifications was false. The City Council had not rejected BFW's bid based on purported conflicting criteria. The Council had not rejected it at all.

4.62    By failing to award the contract to BFW and directing a re-bid, Parks officials BENCH and SLATER violated OMC Sec. 10-200.3(d), requiring the Parks Department to coordinate with HRR to determine if an ESB can complete a bid and to provide Tier I ESB's priority.

        4.62.1 This did not happen.

4.63    By failing to award the contract to BFW and directing a re-bid, Parks officials and SLATER also violated OMC Section 10-107.

4.64    Section 10-107 provides that such contracts "shall be awarded to the lowest and best bid" and, "[i]f the department recommends awarding a contract to aa bidder other than the apparent low bidder, the department shall notify in writing the low bidder that such bid is not being recommended, the reason(s) why the bid is not being recommended, and that a resolution is being forwarded to the city council for approval of another bidder.

        4.64.1 Such notice was not provided to BFW.

        4.64.2 No legitimate reasons could have been provided.

4.65    By denying all bids and ordering a re-bid, the department also violated OMC Section 10-110, which allows rejection of all bids for this contract only; 1) "because the bids received are over budget," or 2) "because circumstances have changed".

12

4.65.1 Neither of these circumstances existed.

4.65.2 Director BENCH did not send written notice to all bidders that the City would reject bids until the City Council declined approval to award the contract to the City's preferred vendor, BMI.

4.65.3 Director BENCH did not cite the RFP bid proposal price quotes as being over budget or that the circumstances requiring the custodial services required for its Parks facilities changed.

4.65.4 Director BENCH had previously reviewed the RFP bid proposals and determined that all bids should not be rejected.

4.65.5 Director BENCH determined that an award recommendation was an appropriate action.

4.65.6 Contrary Section 10-110 of the Municipal Code, Director BENCH did not provide written notice to BFW of the reason(s) for the rejection or email a copy of the required notice to the City Council or the City Clerk. He could not have cited legitimate reason.

4.66    By failing to award the contract to BFW and directing a re-bid, Parks officials including BENCH and SLATER violated the City's Purchasing Department Policy Manual, which stipulates, in part, "The resulting contract from an RFP will be awarded to the vendor who has been deemed **responsible**, **responsive** to the requirements outlined in the RFP, received the **highest-ranking** scores, and whose services and/or products have been determined by the Selection Committee to be the **most advantageous** to the City."

4.66.1 BFW is a responsible vendor who has successfully served the City in the past. No official contended otherwise.

4.66.2 BFW's bid proposal was responsive to the RFP requirements. No official     contended otherwise.

4.66.3 BFW's bid proposal received the highest-ranking proposal evaluation scores.

4.66.4 Of the two qualified vendors submitting conforming bids, BFW's bid proposal was clearly the most advantageous. BFW's bid was consistent with the amount paid to the incumbent bidder and 37% lower than RTG's.

13

4.67    City officials including BENCH and SLATER knew of, disapproved of, and were angered or frustrated by JOHNSON'S taxpayer demand related to the solid waste disposal contract awarded to FCC. The demand served as motivation to deny BFW's initial bid on the cleaning contract.

4.68    There was no rational basis to deny BFW's initial bid.

4.69    By violating the foregoing requirements and by rejecting BFW's bid based on lack of bad faith, favoritism, ill will, fraud, collusion, prejudice or advantage to BMI, or through undue influence, the CITY, BENCH and SLATER acted arbitrarily and capriciously.

4.70    By violating the foregoing requirements, City officials including SLATER provided BMI a second chance to win award of the contract.

4.71    The arbitrary rejection of JOHNSON's bid caused him actual injury, including economic damages, as well as personal humiliation, damage to his reputation, mental anguish and suffering.

## V.    Custodial Services Contract Bidding Process – Second Bid

5.1    In February 2020, after his bid proposal had been rejected despite being the lowest conforming bid from a Tier I ESB vendor, JOHNSON sent several requests for public records regarding the bidding process initiated in August 2019.

5.2    Because the public records requests concerned communications involving BENCH, SLATER and other Parks officials, many Parks officials were aware of the requests, including BENCH, SLATER and VASQUEZ.

5.3    On March 18, 2020, the Parks officials published through the Douglas County Purchasing Department a Request for Bid (RFB) and Bid Sheet entitled "City of Omaha Custodial Services for Park Facilities (Re-Bid)" (hereinafter, "First Re-Bid"). The Bid Solicitation Period for the First Re-Bid was from March 18, 2020, until April 29, 2020.

5.4    Prior to drafting the RFB, SLATER solicited from Beckman his preferences for the specifications set forth in the RFB.

5.5    Prior to issuing the RFB, SLATER told Beckman it was coming out.

5.6     Prior to issuing the RFB, SLATER provided Beckman legal advice and named lawyers who may help.

5.7     BENCH knew SLATER was communicating and coordinating with Beckman regarding the bid.

5.8     The Re-Bid RFB required bidders to provide a "BID BOND OR CERTIFIED CHECK REQUIRED IN THE AMOUNT 5% OF THE TOTAL AMOUNT FOR THE ITEM OFFERED IS $20,000 OR MORE."

5.9     The RFB for the First Re-Bid included a bid clause prohibiting communication between potential vendors and City of Omaha employees, except for communication sent by email to bidquestions@douglasCity-ne.gov. The RFB further provided, "Violation of these conditions may be considered sufficient cause to reject a vendor's bid and/or selection irrespective of any other condition."

5.10    The Re-Bid RFB also included a  provision requiring vendors to supply commercial vacuums and industrial floor scrubbers to store at each City Parks facility to be cleaned. BFW met this requirement.

5.11    Like the 2019 RFP solicitation, six potential vendors submitted bids. The six were:

      5.1.1  BFW

      5.1.2  Nifty Clean (Nifty)

      5.1.3  "RTG" a/k/a LP Building Services Group

      5.1.4  BMI

      5.1.5  Inveterate Solution

      5.1.6  Browns Commercial Cleaning, LLC (BCC)

5.12    BMI and Inveterate Solution submitted insufficient bid security and their bids were not read or recorded due to their noncompliance with the RFB's submittal requirement.

5.13    BCC's bid was limited to carpet cleaning at the Parks facilities and therefore non-conforming.

5.14    Accordingly, the First Re-Bid generated complete and responsive bids from three responsible bidders:

      5.1.7   BFW bid $327,096.00 inclusive of a RFB solicited Value Engineering Cost Proposal (VECP) aimed at combatting COVID-19.

      5.1.8   RTG bid $308,000.00

      5.1.9   Nifty bid $365,900.00

5.15    Under the VECP offered by BFW, BFW would provide additional sanitizing services aimed directly at the COVID-19 virus, but not required by the RFB, at a reduced cost. Parks officials including SLATER did not acknowledge, investigate or credit the VECP when reporting BFW's bid amount.

5.16    Under the SEB Program requirements. BFW had an award priority over bids that were submitted by non-Tier I ESB vendors. Accordingly, though RTG submitted a responsive bid of $308,000.00 as a Tier II ESB, SEB Program requirements establish RTG's priority as lower than BFW's priority as a Tier I contactor.

5.17    Parks officials, including BENCH, SLATER, VASQUEZ and Tracy Stratman knew City Ordinances required awarding the bid to BFW.

5.18    Instead of awarding the contract to BFW, Parks officials including BENCH and SLATER continued their fight to see that BMI would be awarded the bid.

5.19    The efforts began by mistabulating the BFW bid.

5.20    On April 16, 2020, SLATER wrote the following to Director BENCH:

With the latest Custodial Services bid occurring in the middle of the COVID-19 pandemic, we believe it would best to reject the current bids and have the project rebid a second time. There was *confusion over the change in bid bond requirements* from the proposal (RFP) to the bid (RFB), along with concerns raised by potential bidders of the accessibility of our closed facilities to help prepare their bids. With all the issues the pandemic has caused everyone, we believe it would be in the best interest to have the project rebid a second time. If everyone is okay, I will notify Purchasing and prepare a bid rejection letter for Michelle to review and have Brook." (*emphasis* added).

16

5.21    After the City Law Department rejected SLATER's proposal as **"an effort to accommodate [BMI],"** Parks Manager Tracy Stratman wrote the following to SLATER and other staff members, "We will need to chat about this. Steve do you want to set something up?"  These emails are attached hereto and marked **Exhibit A.**

5.22    It can inferred Stratman invited the meeting because the communications that would take place could not be discoverable by JOHNSON in response to public records requests.

5.23    On April 20, SLATER and members of the Evaluation Committee including Joshua Frey, Tracy Stratman and Christopher Haberling, met to discuss next steps. It can be reasonably inferred SLATER called the meeting for the purpose of determining the means of enabling BMI to win the bid, and to deny BFW the bid though BFW is a Tier I ESB and though the contract could be properly awarded to BFW without further consideration.

5.24    It is also reasonable to infer that SLATER led the group to decline the award to BFW.

5.25    Following that meeting, on April 29, 2020, Parks officials BENCH and SLATER directed notice be published that it would again reject all bids submitted in response to the March 18, 2020, First Re-Bid.

5.26    BFW's conforming bid was again rejected.

5.27    A second re-bid was ordered.

5.28    BMI would have yet another chance.

5.29    There existed no rational basis to reject BFW's conforming bid.

5.30    City officials including BENCH and SLATER had grown increasingly angered or frustrated by JOHNSON'S taxpayer demand related to the solid waste disposal contract awarded to FCC, especially after learning of his February 2020 public records requests. The taxpayer demand and public records requests continued to serve as motivation to deny BFW's initial bid on the cleaning contract.

5.31    By rejecting BFW's second bid, the CITY, BENCH and SLATER acted in bad faith, with favoritism for BMI and ill will toward BFW, through fraud, collusion, and undue influence, and arbitrarily and capriciously.

5.32    The arbitrary rejection of JOHNSON's bid for a second time again caused him actual injury, including economic damages, as well as personal humiliation, damage to his reputation, mental anguish and suffering.

5.33    On June 10, 2020, Vince Powers, Esq. filed a public record related to the custodial services contract on behalf of JOHNSON.

5.34    On June 20, 2020, Parks Director BENCH resigned from his position with the City of Omaha.

5.35    Tracy Stratman has since also separated from the Parks department.

### VI.    Custodial Services Contract Bidding Process – Third Bid

6.1    On July 21,2020, JOHNSON filed a public records request for information involving the award of the solid waste disposal contract to FCC Environmental Services after violating bidding procedures.

6.2    On August 19, 2020, Parks officials including SLATER directed publishing of an RFB for a second re-bid on the contract (hereinafter "Second Re-Bid").

6.3    On August 20, 2020, JOHNSON filed a taxpayer lawsuit challenging award by the City of the solid waste disposal contract to FCC. The City was served with the lawsuit on August 26, 2020.

6.4    The vendor responses to the Second Re-Bid RFB were publicly opened by the City's Bid Opening Committee on September 2, 2020.

6.5    In response to the Second Re-Bid RFB, only three vendors submitted bids. All were complete and responsive:

6.5.1   BFW bid $266,279.00

6.5.2   BMI bid $291,170.00

6.5.3   RTG bid $336,000.00.

6.6    The Second Re-Bid again included the customary prohibition on communication between potential vendors and City employees. Again, however, City Parks officials including SLATER communicated with BMI's principal Dan Beckman during the August 19, 2020 through November 10, 2020 bid evaluation period in violation of the RFB prohibition and City policy.

6.7    On one occasion, Beckman asked PARKS officials for a bid bond amount and Slater suggested 5% before directing Beckman to the relevant county official. In contrast, if JOHNSON asked a question during the evaluation period he was refused an answer.

6.8    Officials in the City Law Department, in response to public records requests filed by Johnson, have since admitted that emails reflecting improper communications between Parks officials and Beckman were improperly deleted.

6.9    On September 29, 2020, City Parks gave notice of intent to award the services contract to BFW.

6.10   On September 30, 2020, a City Parks Advisory board Member wrote to SLATER, **"How mad is BMI over this!? Crazy… now we have to deal with [BFW]!"**

6.11   On November 10, 2020, the City Council passed Ordinance No. 42362, authorizing entry into a contract with BFW.

6.12   On November 12, 2020, the City's Mayor signed an Agreement with BFW for the custodial services bid. Consistent with the RFB, the contract provided for a start date of January 1, 2021.

6.13   On November 13 and November 23, 2020, JOHNSON sent public records requests related to the bidding process for the custodial cleaning contract.

## VII.   Offer of Settlement in Separate Taxpayer Case Rejected and Followed by Amended Complaint

7.2    On December 22, 2020, an order was entered in the Douglas County District Court sustaining the CITY'S motion to dismiss JOHNSON'S taxpayer lawsuit based on an asserted lack of standing.

7.4    On December 31, 2020, JOHNSON filed the second lawsuit, again challenging the FCC contract and adding additional allegations regarding standing.

## VIII.   Wrongful Termination of Contract

8.1    As law required, the CITY entered into a three-year contract with BFW at $266,279.00 annually equaling $798,837 over the three-year period and $1,597,674.00 over a reasonably anticipated six-year contract term. JOHNSON'S reasonably anticipated profits over a six-year term were $987,090.00.

8.2     The agreement acknowledged that BFW "has been determined to have the sufficient experience and resources in the commercial custodial business to accomplish the City's custodial requirements, specifications and expectations." A copy of the contract is attached hereto and marked **Exhibit B**.

8.3     Now working under the supervision of their new Director, KALCEVICH, SLATER and  VASQUEZ would be primarily responsible for coordinating with BFW to achieve appropriate cleaning of parks and recreational facilities. Facility Supervisors at each parks and recreation facility would also coordinate with BFW and report concerns to both BFW and SLATER and VASQUEZ.

8.4     City officials including KALCEVICH, VASQUEZ, and others had grown even more more angered or frustrated by JOHNSON'S unrelated taxpayer demand and litigation that followed related to the solid waste disposal contract awarded to FCC, as well as his continued public records requests.

8.5     The taxpayer demand and public records requests continued to serve as motivation to deny BFW's an equal opportunity to serve as a cleaning services provider.

8.6     After BFW signed the agreement October 19, 2020, Parks officials including SLATER requested BFW begin performance a month early, on December 1, 2020, because of C.A.R.E.S. Act funding had been received.

8.7     For reasons unknown, Parks officials made the request through the Douglas County Purchasing Division. BFW agreed, provided the required contract Performance Bond, and immediately purchased the required commercial vacuums and industrial floor scrubbers.

### A.  Refusal to Set Cleaning Standards

8.8     The contract set forth the cleaning standards to be met by BFW using a variety of terms, including: "thoroughly and consistently cleaned", "in a satisfactory manner", "according to reasonable and acceptable standards", "according to reasonable and accepted commercial standards", and "in accordance with … all direction provided by the City Representative and in accordance with the provisions of the Agreement."

8.9     JOHSON was aware of the existence of industry standards applicable to this type of cleaning contract. The commonly accepted industry standards of which he was aware made understanding of the contractual standards difficult. He wished to rely upon agreed upon standards to guide BFW's performance of the cleaning contract.

8.10    When BFW requested, even before performance was to begin, clarity as to what cleaning standards applied, Parks officials ignored him.

8.11    Instead of responding in good-faith, SLATER and VASQUEZ took affirmative steps throughout December and January to prevent communication between JOHNSON and Parks officials or Facility Supervisors on this and other issues.

8.12    Parks officials, including SLATER and VASQUEZ, also sabotaged any working relationship between BFW and Facility Supervisors, those who would have first-hand knowledge of and supervise BFW's performance.

8.13    Under the contract, Parks Department Facility Supervisors would inspect the areas required cleaned and report findings to BFW. Under part VIII.C., the contractor is obligated to "direct any questions or complaints directly to the Facility Supervisor."

8.14    Additionally, BFW was required to coordinate with Facility Supervisors on scheduling so that their operations would not interfere with use of the facilities.

8.15    On or about December 10, 2020, JOHNSON sent a supplemental public records request to the city clerk, Elizabeth Butler. The items requested included communications between Parks officials and BMI, including Dan Beckman, during the bidding process in violation of bidding prohibitions.

8.16    This request especially angered PARKS officials including SLATER because it would lead to discovery SLATER had engaged in improper communications and/or that SLATER had improperly destroyed emails reflecting those communications.

8.17    As BFW began performance in December, 2020, BFW implemented or attempted to implement quality assurance efforts to maximize the quality of services provided. BFW's quality assurance program was designed to evaluate the quality of BFW cleaning crew performance through the use of customer surveys, spot inspections, established cleaning metrics, facility supervisor reports and other strategies so that any complaints about work outcomes could be quickly addressed and resolved. Facility Supervisors would be an important part of the quality assurance program.

8.18    As part of its quality assurance efforts, BFW sent City Parks authorities on December 15, 2020: (1) a request for collaboration and feedback form; and (2) A 30-day review surveys for completion by Facility Supervisors. He hoped to receive feedback using the forms at a meeting on or about December 30, 2000.

8.19    In response to JOHNSON'S requests, SLATER instructed his Facilities Supervisors to withhold feedback and refused to facilitate any kind of coordination with

21

BFW in December. Instead of responding to JOHNSON, Coordinator VASQUEZ, by an email dated December 17, 2020, directed all Facility Supervisors to direct any communication to BFW through her and to include SLATER and Manager HABERLING on the email.

8.20    On December 30, 2020, JOHNSON asked by email for a one-month performance review from each of the Facility Supervisor. Rather than allow the Supervisors to respond to JOHNSON directly, VASQUEZ directed the Supervisors by email dated January 6, 2021, to complete the reviews and send them to her and SLATER only.

## B.  Development of Scheme to Terminate

8.21    Emails received through JOHNSON'S public records requests show that at least as early as January 22, 2021, Director KALCEVICH, SLATER, VASQUEZ and others developed a scheme called Janitorial Parts I through IV ("Janitorial Scheme"). The purpose of the plan was to facilitate termination of the contract with BFW, regardless of whether BFW met its contractual obligations.

8.22    Execution of the scheme by KALCEVICH, SLATER AND VASQUEZ generated an **867% increase** in complaints from Facilities Supervisors about cleaning performance.

8.23    One part of the scheme included the adoption of a newly created and subjective grading scale which, despite Johnson's requests, was not shared with BFW.

8.24    Another part of the plan was to pressure Facility Supervisors to find fault in BFW's performance. When Facility Supervisors reported no deficiencies or complimented the work of BFW crews, they were directed to find or create deficiencies and report them.

8.25    Records of electronic communications between Parks officials shows that, on at least one occasion, the pressure caused one Facility Supervisor to submit a complaint about cleaning performance hours prior to when the location had actually been cleaned. This instance happened to occur one day prior to BFW's first thirty-day review.

8.26    On January 19, 2021, JOHNSON sent emails confronting members of the the City Law Department about whether SLATER and others in the Parks Department had deleted email reflecting communication between Parks officials and BMI during the contract bidding process, in violation of bidding rules. On or about that date, JOHNSON was informed by the Law Department that no more the department would answer no

22

more questions about the emails. It can be inferred from JOHNSON'S communications with the law department that emails had been improperly deleted from city servers.

8.27    On January 21, 2021, JOHNSON as a taxpayer sent a public records request related to the bidding process for a contract to clean the Omaha City Library.

8.28    On January 27, 2021, JOHNSON invited Nebraska State Senator Terrell McKinney and Chamber of Commerce official Jason Fisher to walk through one or more facilities SLATER and VASQUEZ had reported complaints about. After JOHNSON invited SLATER and VASQUEZ to join the walk throughs, SLATER forwarded the JOHNSON's email to the Legal Department, prompting an email from the Legal Department stating, "Bringing in a State Senator and/or other community leaders does not foster a sense of conciliation and cooperation, but rather a sense of controversy and hostility which I believe is completely misplaced."

8.29    On January 29, 2011, the CITY made an offer of settlement to JOHNSON to resolve the litigation after JOHNSON expressed an intention to file a new Complaint including better allegations on the issue of standing. JOHNSON declined the offer.

8.30    On January 29, 2021, SLATER informed JOHNSON the performance surveys sent for completion by Facility Supervisors would not be used. Later, in April, SLATER again directed BFW to not contact Facility Supervisors requesting their feedback on BFW's performance.

8.31    On January 29, 2021, SLATER wrote in an email to KALCEVICH and Peters:

 **"While there have been no legal action specifically initiated against our department, I do consider legal action against the City on other matters as adverse action."**

The email is attached hereto and marked **Exhibit C.**

8.32    Also that morning, Director KALCEVICH wrote:

**"Not sure if pointing out the email requests or referencing these other actions, that are highly unorthodox or even suspect to an ulterior motive is necessary. However, no matter what happens I know we will keep our guard up."**

8.33    The legal actions "against the City on other matters" were: (1) JOHNSON's taxpayer action filed in the district court challenging the award of a waste disposal

contract to FCC Environmental Services; and (2) JOHNSON'S public records requests providing information about the bidding process.

8.34    Both of these actions represented JOHNSON's lawful right to petition the government, as a taxpayer and as a contractor.  Neither had anything to do with BFW's performance of their obligations under the contract.

8.35    It is unclear why Director KALCEVICH believed it necessary for his City Parks team to keep their "guard up" less than two months after BFW's performance under the contract began, as JOHNSON strived unsuccessfully to clarify cleaning standards and create productive relationships with the Facility Supervisors who would observe and report BFW's performance.

8.36    The purposes of VASQUEZ's directive and SLATER's subsequent decision to prevent a working relationship between Johnson and Facility Supervisors were to: (1) prevent the constructive communication necessary for success in any employment relationship; (2) prevent BFW from understanding and meeting the City's expectations under the contract thereby preventing BFW from curing any perceived cleaning deficiencies; (3) afford KALCEVICH, SLATER, VASQUEZ and other Parks officials an opportunity to develop information supporting termination of the contract and/or disregard, deter development of, or dispose of information indicating material performance of the contract; and (4) develop a basis for termination of the contract in accordance with the Janitorial Plan.

8.37    All such actions taken toward the ends alleged in the preceding paragraph were arbitrary, capricious, in bad-faith, and with the discriminatory intent of replacing a Black-owned Certified Tier I ESB  with a White-operated Tier II ESB, contrary to State law and Omaha Municipal Code designed to afford BFW equal opportunity, and despite BFW's substantial compliance with its obligations under the contract.

8.38    All such actions toward the ends alleged in paragraph 8.34 were motivated by JOHNSON'S unrelated taxpayer litigation as well as his public records requests.

8.39    On February 5, 2021, the CITY filed a motion seeking dismissal of the taxpayer lawsuit. That motion remained pending through all times relevant to this lawsuit and was eventually overrruled.

8.40    On February 11, 2021, VASQUEZ again sent an email to a Parks Project Manager mentioning an anticipation of litigation. What VASQUEZ and other Parks officials believed they would be sued for is unclear.

### C.  Exclusion of Human Rights and Relations Department

8.1     Under §3.14A of the City Charter, the City's HRR department is charged with the responsibilities of administering the City's SEB Program and "for the investigation, elimination and prevention of **all forms** of prohibited discrimination, **including** that based on race, creed, color, religion, sex, national origin, age, disability, marital status, or any other form of discrimination proscribed by ordinance or resolution."

8.2     As the biased, prejudicial, capricious conduct of the City's parks officials continued even after award of the contract, JOHNSON sought help on February 16, 2021, from Franklin Thompson, Director of Omaha's office of Human Rights and Relations (HRR). JOHNSON sought help working collaboratively with KALCEVICH and Parks officials. THOMPSON referred JOHNSON back to KALCEVICH.

8.3     KALCEVICH learned of JOHNSON'S contact with Thompson and was upset by it.

8.4     On February 22, 2021, KALCEVICH called JOHNSON and immediately attacked BFW. Though the purpose of the call was to talk about issues presented by the cleaning contract, KALCEVICH accused Johnson and BFW of being more concerned with his public records requests and lawsuits than with doing the cleaning work. During the call, KALCEVICH gave JOHNSON AND BFW a verbal 30-day notice of termination.

8.5     At the time he gave the verbal notice, KALCEVICH was unaware written notices were required and believed his verbal notice would allow termination of BFW in thirty days. He was later informed by VASQUEZ written notices were required to terminate BFW.

8.6     KALCEVICH also expressed his anger to City Legal about Thompson's involvement. On February 25, Thompson informed JOHNSON he had been told by the Law Department his office had no jurisdiction over BFW's contract with the City "because it did not involve Housing or Employment discrimination based on one of the 7 protected classes."

8.7     The CITY had somehow prevailed upon Thompson to abdicate his duties when called upon by JOHNSON and to provide JOHNSON a patently false excuse for doing so.

### D. Communications Freeze

8.8     Contrary to the plain terms of the contract, Thompson also informed JOHNSON that only KALCEVICH and Assistant City Attorney Michelle Peters could discuss the contract with him. JOHNSON was now prevented from communicating not only with Facility Supervisors but with SLATER, VASQUEZ and other Parks officials as well.

8.9     In March, Director KALCEVICH directed an email to JOHNSON questioning his motives. Johnson explained he simply was trying to arrive at an acceptable cleaning standard following industry best practices.

### E. Wrongful Termination

8.10    Site Supervisors knew as early as January of KALCEVICH'S and SLATER'S intent to terminate the contract. In a January 14, 2021 email, a Supervisor's email stated to the effect, "We understand the problems with this company and we are working to get rid of them."

8.11    In another, VASQUEZ encouraged Field Supervisors to immediately report deficient cleaning efforts on a shared audit spreadsheet, stating, "I am trying to talk [Director KALCEVICH and Legal] into sending a second [30-day notice] letter sooner than later.

8.12    The decision by City officials, including KALCEVICH and SLATER, to terminate BFW was motivated, at least in part, by JOHNSON'S exercise of his rights as a taxpayer to challenge the award of the solid waste contract to FCC through public records requests and litigation.

8.13    The decision by City officials, including KALCEVICH and SLATER, was also motivated by JOHNSON'S exercise his right as a citizen to request public records informing whether City officials were abiding by laws aimed at preventing discrimination or corruption in the award of city contracts.

8.14    After answering the call to begin providing services a month early, BFW had performed its obligations under the contract for less than four months while attempting to maintain adequate staffing during the COVID19 pandemic and in the absence of productive communication with Facility Supervisors.

8.15    On March 23, 2021, a Parks Department Recreation Coordinator sent an email referring to anticipated litigation, "The Law Department asks that we do not

respond socially like this to Rodney. And that we should only send the initial morning emails because these replies are what he can use against us in court."

8.16    Also on March 23, 2021, KALCEVICH issued a 30-day written notice to remedy deficiencies or face contract termination.

8.17    The March 23 notice was the second notice given by KALCEVICH. The contract required in excess of three notice prior to termination.

8.18    The bases for termination set forth by KALCEVICH were either fabricated or insufficient to warrant issuance of a 30-day notice, to wit:

> 8.18.1  The number of "No-Shows" were inaccurately alleged. For example, overnight cleaning would occur the following day waiting for the building to be open, then accused of missing previous day.

> 8.18.2  The ability to remedy any complaint was impossible because the complaints were reported days after the alleged offense.

> 8.18.3  BFW was informed that moldy conditions left at a location by RTG had been remedied and instructed BFW to proceed with their cleaning. The mold had not been properly addressed, resulting in BFW employees being exposed to unnecessary health risks., despite the fact that it hadn't been addressed. The fabrication of the remedy exposed our employees to health risks.

8.19    On April 1, JOHNSON sent an email again requesting clarification of the cleaning standards so that any deficiencies could be addressed. In response, KALCEVICH directed SLATER and/or VASQUEZ to provide a response based upon the language of the contract and to let the Law Department review it first.

8.20    On five occasions between March 29 and April 26, 2021, BFW requested input on how to remedy any deficiencies, but received no direct response from KALCEVICH or others.

8.21    Winsley Durand, Director of the Omaha Chamber of Commerce's Reach Program send a letter to KALCEVICH suggesting the Parks Department should utilize a clear cleaning standard. KALCEVICH did not respond to the letter.

8.22    On April 2, 2021, SLATER wrote to Johnson, "We ask again that you do not contact our supervisors requesting their opinion of the services provided by BJ's Fleet Wash. Our supervisors are to report any deficiencies … at their specific centers."

8.23    By April 6, 2021, the R.E.A.CH. Executive Director, HRR Director Thompson, and the SEB Program Director all advised Johnson to relinquish the contract in exchange for a release of his performance bond. It is believed this was part of either Part III or Part IV of the previously conceived Janitorial Scheme.

8.24    The contract reserved the City's right, upon termination of the contract to award the contract to the next most qualified Contractor with the lowest bid price," BMI. The CITY terminated the contract May 4, 2021 **and awarded the contract to …  BMI**.

8.25    The actions of Defendants, and each of them, throughout the bidding process and after award of the contract to BFW, were taken while harboring malice or reckless indifference to JOHNSON'S federal constitutional rights, including the right to equal protection, to due process and to petition his government for the redress of grievances.

8.26    The actions of Defendants, and each of them, throughout the bidding process and after award of the contract to BFW, would chill a person of ordinary firmness from exercising their constitutional rights to petition the government for redress of their grievances, to free speech, and to exercise their rights under Nebraska law, including their right to request public records.

8.27    The actions of Defenddants, and each of them, caused JOHNSON actual injury, including economic damages, as well as personal humiliation, damage to his reputation, mental anguish and suffering.

## IX.    Disparate Treatment

9.1    JOHNSON and BFW were subjected to disparate treatment both throughout the bidding process and as a party to the City parks and recreation cleaning contract.

9.2    In contrast to BFW's experience with the CITY, RTG enjoyed during its contractual relationship with the CITY many benefits and allowances not afforded BFW. Parks Officials including SLATER and VASQUEZ:

9.2.1    Allowed RTG direct communication with Facility Supervisors.

9.2.2   Allowed RTG to participate in drafting the initial 2019 RFP scope of work and specifications.

9.2.3   Did not require RTG to make an initial investment in equipment and cleaning supplies upon commencement of their duties under the custodial services contract.

9.2.4   Allowed RTG to use City owned equipment to perform contracted work.

9.2.5   Made prompt payments to RTG despite complaints of poor custodial services cleaning performance.

9.2.6   Used relaxed cleaning standards for RTG.

9.2.7   Permitted RTG to clean facilities as thoroughly as BFW, yet retained the contract even well beyond the term allowed by the contract with all its extensions.

9.2.8    Despite RTG's deficient performance, retained the company as their cleaning contractor and extended the contract seven years and extended the contract even after the City was required to open the contract up for public bidding.

9.3     After terminating the contract with BFW and retaining its preferred contractor BMI, Parks department officials including KALCEVICH, SLATER and VASQUEZ:

9.3.1   Contrary to the contractual requirement to provide a performance bond within ten days after execution of the contract, did not require BMI to provide a performance bond at least until at least March 1, 2022.

9.3.2   Did not require BMI to provide own cleaning supplies.

9.3.3   Relaxed the cleaning requirements and exercised less scrutiny over BMI's performance.

9.3.4   Facilitated communication between BMI and City Parks Facility Supervisors, providing Beckman a spreadsheet and initiating walk-throughs to clarify for BMI cleaning standards and needs.

9.3.5   Directed Facility Supervisors to clean areas left dirty by BMI cleaning crews.

9.3.6   Communicated a remedy plan to avoid termination after a 30-day notice was necessary.

## X.   Damages

10.1    RODNEY JOHNSON, as sole owner of BFW, requests the following relief:

10.2   Economic Damages including but not limited to:

10.2.1  Expenses incurred in the course of his participation in each of the three bidding processes.

10.2.2 $4,762,500 as and for reasonably anticipated lost income; or alternatively lost profits over a six-year period.

10.2.3  $7,988.37, as and for the 3% bid performance deposit made by JOHNSON.

10.2.4   Expenses incurred for performance of the contract, including but not limited to the cost of equipment, supplies, insurance, bonds, employment advertising, payroll onboarding and expense.

10.3   Compensatory Damages

10.4   Punitive damages

10.5   Attorneys Fees

## Rule 38 Demand for Jury

11.1  In accordance with Rule 38 Fed. R. Civ. P., JOHNSON demands a jury and asks that this case be designated on the docket as a jury action

Plaintiff, Rodney Johnson,

By:

Adam J. Sipple, Esq., #20557
Domina Law Group pc llo
2425 S. 144th St.
Omaha, NE 68144
(402) 493-4100
asipple@dominalaw.com

 **Gmail**

Joshua J. Frey (PMtc) <joshua.frey@cityofomaha.org>

## Fwd: Custodial Bid
1 message

**Tracy M. Stratman (Prks-CG)** <Tracy.Stratman@cityofomaha.org>          Thu, Apr 16, 2020 at 1:47 PM
To: "Joshua J. Frey (PMtc)" <joshua.frey@cityofomaha.org>, "Steven R. Slater (Prks)" <Steven.Slater@cityofomaha.org>,
"Christopher K. Haberling (Prks)" <christopher.haberling@cityofomaha.org>

We will need to chat about this. Steve do you want to set something up?

---------- Forwarded message ----------
From: **Brook K. Bench (PMtc)** <Brook.Bench@cityofomaha.org>
Date: Thu, Apr 16, 2020 at 11:11 AM
Subject: Re: Custodial Bid
To: Michelle Peters (Law) <Michelle.Peters@cityofomaha.org>
Cc: Steven R. Slater (Prks) <Steven.Slater@cityofomaha.org>, Tracy Stratman <Tracy.Stratman@cityofomaha.org>

I think we should follow Michelles recommendation.   I'm sure if we rebid it again many red flags would go up.

On Thu, Apr 16, 2020 at 10:46 AM Michelle Peters (Law) <Michelle.Peters@cityofomaha.org> wrote:
> I don't think there is a reasonable basis to rebid. If you can show me emails or something from at least 2 bidders that
> say they were hampered in some way maybe. But this seems to be an effort to accommodate the one bidder that
> screwed up his bid bond and I don't think that is fair. While I feel bad for him, that is his fault for not reading the
> requirements.

*Michelle Peters*
Deputy City Attorney
(402)444-5128
michelle.peters@cityofomaha.org

The information contained in this email contains confidential information from the Omaha City Attorney's Office that is intended solely for the
recipient set forth above. Any redistribution, copying or other dissemination of the contents of this transmission is prohibited. Please be
advised that the contents of this email may be intercepted or diverted through transmission over the internet and therefore the security of this
email cannot be guaranteed by the sender.

On Thu, Apr 16, 2020 at 10:27 AM Steven R. Slater (Prks) <Steven.Slater@cityofomaha.org> wrote:
  Brook & Michelle,

  With the latest Custodial Services bid occurring in the middle of the COVID-19 pandemic, we believe it would best to
  reject the current bids and have the project rebind a second time.

  There was confusion over the change in bid bond requirements from the proposal (RFP) to the bid (RFB), along with
  concerns raised by potential bidders of the accessibility of our closed facilities to help prepare their bids. With all the
  issues the pandemic has caused everyone, we believe it would be in the best interest to have the project rebid a
  second time.

  If everyone is okay, I will notify Purchasing and prepare a bid rejection letter for Michelle to review and have Brook
  sign.

  Thanks,


  **Steve Slater**

  Contractual Services Coordinator
  City of Omaha Parks, Rec & Public Property Dept.

*Ex. A*

# AGREEMENT

## CUSTODIAL SERVICES – CITY OF OMAHA PARK FACILITIES

This Custodial Services Agreement, (hereinafter referred to as "Agreement") is hereby made and entered into by and between the City of Omaha, a municipal corporation organized and existing under the laws of the State of Nebraska located in Douglas County, (hereinafter referred to as "City"), and BJ's Fleet Wash, LLC, (hereinafter referred to as "Contractor").

### I.    PURPOSE

The purpose of the Agreement is to set forth the specifications, requirements and expectations of the City for the custodial services performed at its Park Facilities, including Community Centers and Recreational Facilities.  The City's Community Centers and Recreational Facilities are open to the public and are extensively utilized on a day-to-day basis throughout the year. It is required that these facilities be thoroughly and consistently cleaned according to the specifications set forth in this Agreement.

### II.   TERM

The term of the Agreement shall be for a period of three (3) years from the date of the Omaha City Council's approval. This Agreement may be extended, at the sole option of City and exercised by the Director of Parks, Recreation and Public Property or their designated representative, for either an additional three (3) year term, or for up to three (3) additional one-year terms at the discretion of the City.

### III.  GENERAL REQUIREMENTS & SPECIFICATIONS

The Contractor has been determined to have the sufficient experience and resources in the commercial custodial business to accomplish the City's custodial requirements, specifications and expectations. The Contractor shall provide all management, supervision, equipment, supplies and labor to ensure that the custodial services contained in this Agreement are performed in a manner that will maintain clean and healthy conditions in the Community Centers and Recreational Facilities at all times. The Contractor shall be held to the highest standards by the City in the performance of this Agreement.

With the COVID-19 pandemic continuing to evolve throughout the county, this Agreement Contractor to be educated on and able to provide and utilize the products and services for both routine cleaning and deep cleaning of facilitates in accordance with industry standards related to the COVID-19 virus cleaning and disinfecting requirements.

It is understood between the parties that the purpose of these specifications are to ensure that all facilities shall be kept clean according to reasonable and accepted commercial standards, and in accordance with these requirements, specifications and expectations contained in this Agreement, regardless of the number of times an operation is required to accomplish this result.

A.   **Supplies:**  During this Agreement, the City shall furnish the following supplies: 1) Paper Towels; 2) Toilet Tissues; 3) Soft-Hand Soap; and 4) Hand Sanitizer for Contractor personnel to restock all related dispensers within the facilities on a daily basis.

All other cleaning materials and supplies shall be supplied by Contractor, including, but not limited to: 1) Heavy-duty plastic bags; and 2) Trash Can Insert Liners.

1)   Contractor's cleaning equipment, supplies and materials must meet the approval of City. The City reserves the right to require changes in cleaning equipment, supplies and materials shown to be sub-par in quality, consistency, or other factors affecting the appearance or performance of the product.



1

2) All disinfectants used by Contractor in the performance of this Agreement must be a detergent thickened and non-acid bowl and bathroom cleaner that effectively eradicates the COVID-19 and the HIV virus (chlorine bleach is not acceptable as a disinfectant).

3) Commercial/Industrial cleaning products and supplies must be from a reputable supplier; products or materials that are environmentally safe and that meet the sustainability criteria outlined in Indoor Environmental Quality (IEQ) Credit 3.3 Green Cleaning.

4) All mops, buffs, cleaning cloths, buckets, and/or or other tools or machines shall be supplied by the Contractor and remain the property of the Contractor. Material and equipment belonging to the Contractor must be marked with Contractor's identification.

B. **Sub-Contracting of Services:** Contractor shall not sub-contract any services in this Agreement, without the prior written permission of City. Contractor must have the experience, resources and capacity to perform all the custodial services required, without the need or use of sub-contractors.

C. **Contractor Storage at City Facilities:** For this Agreement, City will provide a small storage room at each location, which Contractor can utilize to store their equipment and supplies for use at that facility.

D. **Commercial Grade Equipment:** All Commercial Grade equipment, including, but not limited to mops, buffs, cleaning cloths, buckets, vacuum cleaners, floor scrubbers, ladders, carpet cleaners, or any other tools, machines or cleaning items, shall be supplied by Contractor and remain the property of Contractor.

E. **Purchase of Equipment:** At the beginning of the Agreement, Contractor shall be required to purchase new high efficiency industrial vacuum cleaners and industrial floor scrubbers for each Community Center. This equipment will be stored and used at each facility during the term of the Agreement. The vacuums and floor scrubbers shall be used by Contractor and remain property of Contractor. If any of this equipment fails during the term of the Agreement and is unable to be sufficiently repaired, it shall be replaced by Contractor with new equipment of the same or similar type.

F. **Material Safety Data Sheets (MSDS):** Only Commercial/Industrial cleaning supplies from reputable suppliers are to be used by Contractor. Contractor shall supply and keep current Material Safety Data Sheets (MSDS) of all products used by them at all locations in an appropriate printed booklet and digital format at all times. The MSDS booklet is to be kept in the custodial closet at each City facility and a digital copy of MSDS, preferably in PDF format, provided to City. MSDS booklets and digital copies must be submitted prior to start of agreement and kept current throughout the term of agreement

G. **Facility Checklist:** Contractor will provide City a checklist of all duties to be performed by Contractor at each facility. Cleaning personnel will check off and date each duty as it is completed. These checklists will remain in the facility at all times and will be available for inspection by City personnel.

H. **Facility Keys:** City will issue Contractor access keys to facilities for which services are to be provided. It is the responsibility of Contractor to see that issued keys are not misplaced, lost, stolen or copied and to immediately notify City if such an event should occur. The following may be reasons for the City to terminate the Agreement with Contractor: (1) Failure of Contractor to immediately notify City of any occasion where issued keys are lost, misplaced, stolen or copied; or, (2) Any unauthorized use of issued keys to access facilities for any unauthorized reasons. In the event that issued keys are lost, misplaced, stolen or copied, Contractor shall be responsible for all costs associated with the replacement of such keys, along with any costs incurred for changing associated locks, as determined necessary by City.

I. **Contractor Compliance:** Contractor shall comply with and all work shall be accomplished in accordance with all federal, state and local laws, regulations and requirements, as well as, all direction provided by the City Representative and in accordance with the provisions of the Agreement.

J. **Contractor Site Verification:** Contractor is responsible for verifying the location of all facilities, utilities, all communication, fuel and electrical lines, lighting, controls, pipes, and any other item in which Contractor will in any way come in contact with or which in any way will affect the accomplishment of their services.

K. **Contractor Coordination:** Contractor shall ensure that all work being performed will not interfere with the operations and use of the facility, the public or City staff.  Contractor shall coordinate their operations, including but not limited to: work hours, vehicle parking, loading/unloading and equipment storage and location, with the Facility Supervisor or designated representative.

## IV.  DESIGNATED REPRESENTATIVES

In further consideration of the mutual covenants herein contained, the parties hereto expressly agree that for purposes of notice, including legal service of process, during the term of this Agreement and for the period of any applicable statute of limitations thereafter, the following named individuals shall be the authorized representatives of the parties:

**BJ's Fleet Wash, LLC:**

Rodney Johnson, President
6716 Northridge Dr., Omaha, NE 68112
Phone: (402) 319-3390
Email:  BJswash@yahoo.com

**City of Omaha:**

Recreation Manager (or designee)
Parks, Recreation and Public Property
1819 Farnam Street, Suite 701, Omaha, NE 68183
Phone: (402) 444-5900

## V.  FACILITIES & SCHEDULES

Contractor shall arrange with each Facility Supervisor regarding the time frame when the facility will be cleaned. Facilities may be added or removed from this list at any time, for any reason, by City.  All facilities are to be cleaned fifty-two (52) weeks per year, seven (7) days per week, unless specified differently.  Those facilities not currently requiring daily cleaning are:  Koch Trap & Skeet Range, Hummel Nature Center and Dewey Building. These facilities will be cleaned on a schedule of once or twice per week. Scheduled cleaning days for these and all facilities may be increased or decreased during the term of this agreement. See separate Seasonal Outdoor Restroom Cleaning Schedule in Exhibit B.

No cleaning will be required on the following holidays:  New Year's Day, Martin Luther King, Jr. Day, President's Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, and Christmas Day. The hours and days of cleaning may be changed or modified by the Facility Supervisor or a designated representative.  Below is a current list of City Community Centers and Recreational Facilities:

**COMMUNITY CENTERS:**

- **Adams Community Center:** 3230 John A. Creighton Blvd.
- **A.V. Sorensen Community Center:** 4808 Cass St.
- **Benson Community Center:** 6008 Maple St.
- **Camelot Community Center:** 9270 Cady Ave
- **Christie Heights Community Center:** 5105 South 37th St.
- **Common Ground Community Center:** 1701 Veterans Dr. (Elkhorn)
- **Columbus Community Center:** 1515 South 24 St.
- **Florence Community Center:** 2920 Bondesson St.
- **Mockingbird Hills Community Center:** 10242 Mockingbird Dr.
- **Montclair Community Center:** 2304 South 135 Ave
- **Pipal Community Center:** 7770 Hascall St.
- **Sherman Community Center:** 5701 North 16 St.

**NATURE CENTER:**

- **Hummel Nature Center:** 3033 Hummel Park Rd.

**ICE ARENA:**

- **Motto Mclean Ice Arena:** 5025 South 45 St.

**TENNIS CENTERS:**

- **Hanscom Tennis Center:** 3220 Ed Creighton Ave
- **Koch Family Tennis Center:** 12440 W Maple Rd.

**TRAP & SKEET RANGE:**

- **Harry A. Koch Trap & Skeet Range:** 6802 Harrison St.

**OUTDOOR RESTROOMS:**

- **Zorinsky Lake Restrooms (4):**  3808 S. 156th St.
- **Flanagan Lake Restrooms (2):** 168th & Ida Sts.
- **Pipal Park Restrooms (1):** 7770 Hascall Street
- **Dewey Park Restrooms (1):** 550 Turner Blvd.

3

## VI.  CONTRACTOR'S PERSONNEL & SUPERVISION

A.  **Supervisory Personnel:** Contractor supervisory personnel must be on call and available twenty-four (24) hours per day, year round.  Contractor will provide City personnel with contact names and telephone numbers for reporting problems or requesting emergency services.

B.  **Bonded Personnel:** Only bonded Contractor personnel must be present at City Facilities anytime custodial services are being performed.

C.  **Identification of Personnel:** All Contractor personnel must be identifiable at all times while on City property by means of no less than a name plate or badge with Contractor's identification on the badge.  Contractor will not allow any non-custodial individuals at City facilities during the performance of custodial services.

D.  **Background Checks of Personnel:** All Contractor personnel are required to obtain a background checks with approved company prior to working in City facility. If requested, background checks will be submitted to City Representative. Background checks must be completed on an on-going basis for any changes in employees. Background checks must be completed by a service provider authorized by City and paid for by Contractor.

E.  **Training of Personnel:** Contractor is responsible for providing training of its personnel.  All Contractor personnel utilized in the performance of this service must be trained to perform the services set forth in these specifications.

F.  **Discipline of Personnel:** Contractor's personnel will not be disciplined by City personnel.  Contractor's Management will be alerted and informed of any violations or problems concerning Contractor's personnel.

G.  **Removal of Personnel:** City shall have the authority to require the immediate removal of any Contractor personnel from a City site who is deemed incompetent or detrimental to the best interest of the work performed for City.

H.  **Listing of Personnel:** If requested, Contractor must advise City of the name(s) of Contractor's employees providing services at all or specific City facilities.

I.  **Service Disputes:** Any disputes over whether services were performed or whether they were performed in a satisfactory manner will be settled by Contractors designated representative and City representative.

## VII.  SECURITY ALARM SYSTEMS

Most facilities are equipped with Security Alarm Systems.  Proper security protocol shall be observed by all Contractor personnel working in the facilities at all times.  Security of the facilities and all property contained therein must be of an on-going concern to all Contractor personnel. Failure of Contractor personnel to follow security requirements will be reported to the Contractor and may result in the denial of access to the facility.

A.  **Security Alarm Codes:** Contractor will be provided with alarm codes and instructions for arming and disarming alarm systems and contacting the designated security authority each time an alarm system is armed or disarmed, if applicable.  Contractor will ensure that all personnel knows and follows the protocol for arming and disarming alarm systems at their assigned facility and contacting the designated security authority each time an alarm is armed or disarmed. Failure to follow protocol may result in the designated security authority requesting a law enforcement response to the location.  If such a response is made by law enforcement, and there is no unauthorized intrusion or attempted intrusion, that event will be considered a false alarm.

B.  **Security Alarm Activation:** If an alarm signal is activated, Contractor or responsible Contractor personnel must immediately contact the designated security authority to provide identification and cause for the alarm.  A false alarm will mean an alarm signal or an event eliciting an urgent response by law enforcement, emergency or fire personnel when a situation requiring an urgent response did not exist.

C.  **Unauthorized Individuals:** Unauthorized individuals are not allowed to enter or remain in facility when that facility is closed to the public.  Only Contractor personnel are allowed to be in City facilities when those facilities are closed and only there for the purpose of fulfilling custodial requirements.  No children or non-

Contractor individuals will be allowed to accompany Contractor personnel inside any City facility for the purposes of this Agreement.

D. **Securing Facilities:** All doors designated as secured doors must be checked by Contractor to insure they are secured before Contractor leaves a facility; this includes exterior doors and interior doors leading into secured areas.

## VIII. INSPECTIONS AND REPORTS

City Facility Supervisors and personnel with inspect work performed Contractor personnel and report any findings to Contractor, if there are any issues. Periodic reviews and inspections will be made together with City and Contractor Supervisors to determine if services are being performed as required by the established cleaning specifications contained in this Agreement.

A. **Monthly Inspections:** Contractor's Supervisor personnel shall make monthly inspections of facilities and meet with each City Facility Supervisor to review work performance and correct any deficiencies.

B. **Facility Reports:** Contractor will immediately report to Facility Supervisor of any conditions observed by Contractor personnel that needs repairs or attention of City.

C. **Communications:** Contractor should direct any questions or complaints directly to the respective Facility Supervisor.

## IX. PHYSICAL DAMAGE

Any physical damage caused by Contractor personnel at any facility, whether caused by accident, intent, or negligence, will be the responsibility of Contractor to remedy at no cost to City. Repair or replacement of damage property will be completed within a time frame arrived at by consultation with City representative. All materials used for the replacement or repair will be pre-approved by a City representative.

Failure to make acceptable repairs and/or provide satisfactory equipment replacement will result in City accomplishing the required repairs and/or obtaining equipment replacement. All costs, including City employee's time and all administrative costs to make repairs or complete equipment replacement will be either deducted from Contractor's next billing or be charged to Contractor for the full amount of the cost incurred.

## X. LIQUIDATED DAMAGES

The City may impose Liquidated Damages to the Contractor should any of the following occur:

A. **Failure to Perform Duties:** Failure to perform requirements, specifications and expectations contained within this Agreement or failure to perform duties in a satisfactory manner shall be promptly reported to Contractor by City. If more than four (4) such unacceptable performances or failures in any one (1) month occur, this may result in a 15% deduction on the amount of the billing for that month at any one or combination of facilities. More than eight (8) such unacceptable performances or failures in a month may result in a 30% deduction on the amount of the billing for that month. More than ten (10) such unacceptable performances or failures in a month will relieve City of any obligation to pay for service for that month. Any disagreement over whether services were performed or whether they were performed in a satisfactory manner will be settled by the Contractor's designated representative and City Representative.

B. **False Security Alarms:** In the event that Contractor is responsible a false alarm of a facilities' security alarm system by not following the proper security procedures and protocols, the following penalties will apply: (1) The false first alarm per location during each 12-month term of the Agreement, there will be no charge to Contractor; (2) The second false alarm per location during each 12-month term of the Agreement may result in a $25.00 charge to Contractor; (3) The third false alarm per location during each 12-month term of the Agreement may result in a $50.00 charge to Contractor; (4) The fourth and each subsequent false alarm per location during each 12-month term of the Agreement may result in a $100.00 charge to Contractor.

5

## XI.  SERVICE BILLINGS

Contractor is to submit a monthly bill/invoice for services completed.  The first month's bill will be prorated by the actual number of days worked, if applicable. Optional work, per-authorized by City, will be itemized and be included in the following month's billing.

## XII.  INSURANCE & BOND REQUIREMENTS

Throughout the term of the Agreement and any renewal thereof, Contractor must procure and maintain in effect during the term of this Agreement, with companies licensed to do business in the State of Nebraska and naming the City of Omaha as an additional insured, except for Workers' Compensation policies/certificates, for the term of the agreement.

A.  **Workers' Compensation:** (Statutory Limits).

B.  **Liability Insurance:**   Throughout the term of the Agreement Contractor agrees to procure and maintain in effect during the term of this Agreement, with companies licensed to do business in the State of Nebraska, public liability insurance with minimum policy limits of $1,000,000/$5,000,000 per event for bodily injury or death and property damage. Said policy shall expressly include the "City of Omaha" as an additional named insured. A certified copy of the policy or certificate evidencing existence shall be delivered to the City Parks, Recreation and Public Property Director, or their designee.  If possible and financially feasible, Organization shall endeavor to have the foregoing insurance policy provide coverage for the issues related to COVID-19, Novel Coronavirus, or similar issues.

C.  **Property Damage Insurance:**  Property damage insurance in an amount not less than $500,000.

D.  **Fidelity Bond:**  Contractor shall maintain a Fidelity Bond in the amount of $25,000.

E.  **Performance Bond:**  Contractor shall obtain a performance bond in the amount of one hundred percent (100%) of the annual contract price, executed by a corporation authorized to contract as surety in Nebraska, payable to the City of Omaha.

A current copy of each policy or certificate evidencing the existence thereof and bonds shall be delivered to the City Parks, Recreation and Public Property Director or their designee prior to the start of any work by the Contractor and Contractor shall maintain current evidence of coverage with City throughout the term of the Agreement.

## XIII.  INDEMNIFICATION

Contractor covenants and agrees to indemnify and hold harmless City of Omaha, its officers, agents and employees, their successors and assigns, individually or collectively from and against all liability for any fines, claims, suits, demands, actions or causes of action of any kind and nature asserted by Contractor or by anyone else, for personal injury or death, or property damage in any way arising out of or resulting from any activity or operation of  Contractor in fulfilling its duties, responsibilities and obligations pursuant to the Agreement and Contractor further agrees to pay all expenses in defending against any claims made against City; provided, however, that Contractor shall not be liable for any injury, damage or loss occasioned to the extent of or willful misconduct of City, its agents or employees. Contractor and City shall give prompt and timely notice of any claim made or suit instituted which, in any way, directly or indirectly, contingently or otherwise, affects or might affect either party.  Without limiting the foregoing, the parties acknowledge and agree that the foregoing indemnification specifically includes any claims, damages, or causes of action and all liability, cost or expense specifically including court costs and all reasonable attorney fees for any COVID-19, Novel Coronavirus, or related issues.

## XIV.  TERMINATION OF SERVICES

Following formal written notice of non-compliance with specifications from the City in excess of three (3) times in any one year period or less, the City may terminate its Agreement with the Contractor. If the Agreement with Contractor is terminated, the City reserves the right to award the Custodial Services Agreement to the next most qualified Contractor with the lowest bid price.

6

In the event a facility is to be closed or no longer managed by the Recreation Division or for some other reason custodial services are no longer required, the City may terminate that particular facility from the contract by giving the Contractor written notice of termination no less than thirty (30) days prior to the final day on which services are to be performed.

In addition to all other legal remedies available to City, the City may cancel Custodial Services Agreement should any one or more of the following events occur:

A.  If Contractor files petition of bankruptcy; or if proceedings in bankruptcy will be instituted against it and it is thereafter adjudicated bankrupt pursuant to proceedings; or if a court takes jurisdiction of Security Contractor its assets pursuant to proceedings brought under the provisions of any federal reorganization act; or if a receiver for Security Contractor's assets is appointed; or if Security Contractor will be divested of its rights, powers and privileges to provide services identified herein by other operation of law.

B.  If Contractor fails to perform, keep or observe any of the terms, provisions, performances, covenants and conditions contained herein these specifications to be performed, kept and observed by it.

C.  If Contractor fails to abide by any and all applicable laws, ordinances, rules and regulations of the United States of America, State of Nebraska, Douglas County, or City of Omaha.

D.  If following formal written notice of non-compliance with specifications from City in excess of three times in any one year period or less, City may terminate its Agreement with Contractor.  If Contractor is terminated, City reserves the right to award custodial services agreement(s) to the next most qualified Contractor submitting a proposal.

E.  If Contractor fails to provide an adequate number of required personnel necessary to complete the required custodial services on three (3) or more occasions during any one-year period or less.

F.  If Contractor fails to provide scheduled custodial services at any one or combination of facilities on three or more occasions during any one-year period or less.

G.  If Contractor fails to immediately remove Contractor personnel from any City facility, if requested by City.

H.  If Contractor's Carpet Cleaning Services, Window Cleaning Services, or Outdoor Restroom Services (opening, closing and cleaning) functions prove to be unsatisfactory to the City, under the Custodial Services Agreement, City shall have the right to independently terminate any one or all these services with the Contractor and obtain such services from another Contractor(s), without terminating the entire Agreement.

Failure of City to terminate Agreement for any of the reasons stated above, or to insist upon strict performance of any of the terms of the Agreement, will not constitute a waiver of any part of the Agreement.  The Agreement will be and remain in full force and effect until City calls a formal default and demands remedy.

## XV.  GENERAL CONDITIONS

A.  **Applicable Law:**  Parties to this Agreement shall conform to all existing and applicable city ordinances, resolutions, state laws, federal laws, and all existing and applicable rules and regulations.  Nebraska law will govern the terms and the performance under this Agreement.

B.  **Assignment:**  Contractor may not assign its rights under this Agreement without the prior written consent of City. This includes if Contractor is acquired by, merged into, or similar actions by another Entity. In such cases, permission must be obtained in advance from City by Contractor for new organization to be allowed to be assigned the Agreement and related terms and conditions. If Contractor fails to obtain City permission for assignment, this Agreement shall terminate at that time of acquisition, merger or other related actions.

C.  **Captions:**  Captions used are for convenience and are not used in the construction of this Agreement.

D.  **Equal Opportunity Clause:**  Annexed hereto as Exhibit "A" and made a part hereof by reference are the equal opportunity provisions and this Agreement.  Refusal by the Contractor or any subcontractor to comply with any portion of this program as therein stated and described will subject the offending party to any or all

7

of the following penalties: 1) Withholding of all future payments under the involved Agreement to Contractor in violation until it is determined that Contractor or subcontractor is in compliance with the provisions of the Agreement; and 2) Refusal of all future bids for any contracts with the City or any of its departments or divisions until such time as the Contractor or subcontractor demonstrates that it has established and shall carry out the policies of the program as herein outlined.

E.  **E-Verify:**  The parties are required and hereby agree to use a federal immigration verification system to determine the work eligibility status of new employees physically performing services within the State of Nebraska. A federal immigration verification system means the electronic verification of the work authorization program authorized by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 8 U.S.C. 1324a, known as the E-Verify Program, or an equivalent federal program designated by the United States Department of Homeland Security or other federal agency authorized to verify the work eligibility status of a newly hired employee.

F.  **Extraordinary Event Clause:**  An Extraordinary Event is an event beyond the reasonable control of City which makes performance of an agreement impossible or so impractical as to be considered impossible by City to perform the agreement or any portion thereof. An Extraordinary Event may be a natural or man-made event which creates circumstances beyond City's reasonable control. City shall not be responsible or liable for any failure nor delay in performance to the extent said failures or delays are caused by an Extraordinary Event. The City, at its sole discretion, may indefinitely suspend any portion of this Agreement if an Extraordinary Event exists. In the event of an Extraordinary Event which results in one, some or all of the listed facilities in this Agreement being closed for two weeks or more, the City may discontinue services upon immediate notice.

G.  **Independent Contractor:**  It is understood by the Contractor that any and all acts that Contractor or its personnel, employees, agents, contractors, or servants, perform pursuant to the terms of this Agreement shall be undertaken as independent contractor and not as employees of the City.

H.  **Interest of the City:**  Pursuant to Section 8.05 of the Home Rule Charter, no elected official or any officer or employee of the City shall have financial interest, direct or indirect, in any City contract. Any violation of this section with the knowledge of the person or corporation contracting with the City shall render the contract voidable by the Mayor or Council.

I.  **Interest of Contractor:**  Contractor covenants that it presently has no interest and shall not acquire any interest, direct or indirect, which would conflict with the performance of services required to be performed under this Agreement; it further covenants that in the performance of this Agreement, no person having any such interest shall be employed.

J.  **Merger:**  This Agreement shall not be merged into any other oral or written Agreement, lease or deed of any type.  This is the complete and full agreement of the parties.

K.  **Modification:**  This Agreement contains the entire agreement of the parties.  No representations were made or relied upon by either party other than those that are expressly set forth herein.  No agent, employee or other representative of either party is empowered to alter any of the terms hereof unless done in writing and signed by an authorized officer of the respective parties.

L.  **Non-Discrimination:**  Contractor shall not, in the performance of this Agreement, discriminate or permit discrimination in violation of federal or state laws or local ordinances because of race, color, sex, age, disability, political or religious opinions, affiliations or national origin.

M.  **Records:**  Contractor shall maintain and make available records and accounts of all transactions of Contractor's activities and operations pursuant to this Agreement to the Finance Director of City or any other authorized City representative for audit purposes and to retain such records and accounts for a period of three (3) years.

N.  **Strict Compliance:**  All provisions of this Agreement and each and every document that shall be attached shall be strictly complied with as written, and no substitution or change shall be made except upon written direction from authorized representatives.

8

IN WITNESS WHEREOF, we the contracting parties, by our representative duly authorized agents, hereto affix our signatures and seals at Omaha, Nebraska;

**BJ'S FLEET WASH, LLC**                                    **CITY OF OMAHA**

Executed this 19 day of Oct , 20 20          Executed this 12th day of November, 20 70

By: _____                    _____
         Authorized Signature                                        Jean Stothert, Mayor

_Rodney Johnson President_
         (Printed Name & Title)                                 **ATTEST:**

_____                            _____
         Witness Signature                                          City Clerk

                                                                           **APPROVED AS TO FORM:**

                                                                           _____ 10/20/20
                                                                           Deputy City Attorney

# EXHIBIT A

## EQUAL EMPLOYMENT OPPORTUNITY CLAUSE

During the performance of this contract, the contractor agrees as follows:

1) The contractor shall not discriminate against any employee applicant for employment because of race, religion, color, sex, age, sexual orientation, gender identity, disability or national origin.  The contractor shall ensure that applicants are employed and that employees are treated during employment without regard to their race, religion, color, sex, age, sexual orientation, gender identity, disability or national origin.  As used herein, the word "treated" shall mean and include, without limitation, the following:  recruited, whether by advertising or by other means; compensated; selected for training, including apprenticeship; promoted; upgraded; demoted; downgraded; transferred; laid off; and terminated.  The contractor agrees to and shall post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officers setting forth the provisions of this nondiscrimination clause.

2) The contractor shall, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, religion, color, sex, sexual orientation, gender identity or national origin, age, disability.

3) The contractor shall send to each representative of workers with which he has a collective bargaining agreement or other contract or understanding a notice advising the labor union or worker's representative of the contractor's commitments under the equal employment opportunity clause of the city and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

4) The contractor shall furnish to the human rights and relations director all federal forms containing the information and reports required by the federal government for federal contracts under federal rules and regulations, including the information required by section 10-192 to 10-194, inclusive, and shall permit reasonable access to his records.  Records accessible to the human rights and relations director shall be those which are related to paragraphs (1) through (7) of this subsection and only after reasonable notice is given the contractor.  The purpose of this provision is to provide for investigation to ascertain compliance with the program provided for herein.

5) The contractor shall take such actions with respect to any subcontractor as the city may direct as a means of enforcing the provisions of paragraphs (1) through (7) herein, including penalties and sanctions for noncompliance; however, in the event the contractor becomes involved in or is threatened with litigation as the result of such directions by the city, the city will enter into such litigation as is necessary to protect the interests of the city and to effectuate these provisions of this division; and in the case of contracts receiving federal assistance, the contractor or the city may request the United States to enter into such litigation to protect the interests of the United States.

6) The contractor shall file and shall cause his subcontractors, if any to file compliance reports with the contractor in the same form and to the same extent as required by the federal government for federal contracts under federal rules and regulations.  Such compliance reports shall be filed with the human rights and relations director.  Compliance reports filed at such times as directed shall contain information as to the employment practices, policies, programs and statistics of the contractor and his subcontractors.

7) The contractor shall include the provisions of paragraphs (1) through (7) of this section, "Equal employment opportunity clause," and section 10-193 in every subcontract or purchase order so that such provisions will be binding upon each subcontractor or vendor.

# EXHIBIT B

## SCHEDULE OF CUSTODIAL SERVICES REQUIRED BY CITY OF THE CONTACTOR

**DEFINITION OF NON-CARPETD FLOORING**
Non-Carpeted flooring shall include, but not be limited to tile, VCT, linoleum, ceramic, quarry, terrazzo, brick, cement, etc.  If flooring is not carpeted, it shall fall under the Non-Carpeted category, except for rubber flooring.

**A.   DAILY SERVICE REQUIREMENTS – ALL FACILITIES:**

1.   Clean and disinfect all touchable surfaces, including, but not limited to, door handles, knobs, push bars, counters, etc.

2.   Clean all restrooms thoroughly, to include:

   (a)   Wet mop floors with a disinfectant cleaning solution. With dedicated mop for restrooms only and locker rooms.

   (b)   Clean mirrors and metal to include fixture hardware.

   (c)   Thoroughly clean toilets, urinals, and lavatories, sinks, walls and bathroom doors with a disinfectant cleaning solution.

   (d)   Wash toilet partitions in all restrooms with a disinfectant cleaning solution.

   (e)   Deodorizing blocks supplied by Contractor shall be maintained daily in all urinals.

   (f)   Refill soap, deodorizer, towel, tissue and sanitary product dispensers.

3.   Thoroughly clean and disinfect all showers, stalls, sinks, walls and bathroom doors (including locker rooms).

   (a)   Wet mop floor with a disinfectant.  With dedicated mop for restrooms only and locker rooms.

   (b)   Remove soap scum, mold, mildew and scale from walls and partitions.

4.   Empty sanitary boxes in women's restrooms.  Plastic liner must be in place in each box at all times.

5.   Empty and clean all wastebaskets and garbage containers, as well as disposing of packing materials.  Overflow trash will be placed in boxes beside wastepaper baskets and will clearly be labeled as trash by City staff to avoid confusion over what is to be discarded.  Refuse shall be bagged and removed to a designated area on the premises.  All trash can and wastepaper receptacles shall be lined with plastic bags supplied by Contractor and shall be heavy duty with a minimum of 0.63 mil thickness. Plastic bag liners are to be securely tied at the top to prevent spillage. Dirty, soiled and/or torn trash can liners and wastepaper basket liners shall be replaced.

6.   Clean drinking fountains with a disinfecting cleaning solution.

7.   Clean all sinks with disinfecting cleaning solution.

8.   Vacuum all carpet, throw rugs and mats in the designated areas throughout the building including public areas, work rooms, corridors, meeting rooms, study rooms, lounges, offices, elevators, etc.

9.   All tiled floor areas and stairways, including quarry tile and brick, shall be kept clean by sweeping as required including under all throw rugs and floor mats.  If floors are wet because of moisture brought in due to weather conditions or any other reason, floor surfaces shall be wet mopped.

10.   Scuffs and black heel marks are to be removed if present on a daily basis.  Special attention shall be paid to corners, base cove or tile turns to ensure cleanliness.

11.   After cleaning of all floors and vacuuming of throw rugs and floor mats, replace all throw rugs and floor mats in proper and original locations.

11

12. Mop buckets must be emptied daily, and mops must be rinsed clean.  Wet mops must be hung over slop sink.

13. All floors shall be kept clean, according to reasonable and acceptable standards, regardless of the number of times that floors have to be mopped and/or waxed to accomplish this purpose.  Wax build-up in corners and along edges and dirt streaks are not acceptable.

14. Clean table tops and countertops in all work areas.

15. Clean table tops, chairs, furniture and countertops in meeting rooms and lunch rooms.

16. Dust all window sills.

17. Dust all furniture and counters in public areas, including desks, tables, catalogs, filing cabinets, television, etc.

18. Remove spots from carpeting, throw rugs and furniture with approved spot remover.

19. Maintain furniture arrangement.

20. Inspect all table tops, walls, etc. for writing, marks and vandalism.  Clean those needed and report those that cannot be corrected by cleaning in writing to Facility Supervisor.

21. Clean Window and Glass:

    (a)   Entrance and exit doors (interior and exterior).
    (b)   Vestibule doors, office doors, and all glass panels adjacent to doors.
    (c)   Glass-fronted display cases.
    (d)   Television sets and monitors (not computer monitors).
    (e)   Clean interior glass and windows in high traffic areas.

22. Thoroughly scrub and polish desk tops and public service counters, where applicable and accessible.  (Contractor is not required to remove paperwork, etc.)

23. Gymnasium Wood Floor daily cleaning to include:

    (a)   Dust mop floor daily with clean treated mop head. With dedicated mop for gymnasium
    (b)   Damp mop (with damp, clean mop only).  There must be a designated mop for the gym floor only.  Must Not Leave Water Streaks and Spots.
    (c)   Remove gum/candy and black marks from floor.

24. Gymnasium Synthetic Floors cleaning to include:

    (a)   Sweep floor daily.
    (b)   Damp mop floor twice a week with dedicated mop for gymnasium. Must use a clean mop head and water.  Must Not Leave Water Streaks and Spots.

25. General Gymnasium Cleaning:

    (a)   Remove all debris, spots, and spills from bleachers.
    (b)   Move portable bleachers and clean up spots, spills, and debris.
    (c)   Clean behind stationary bleachers.

26. Weight Room cleaning is to include:

    (a)   The vinyl and rubber covers on each piece of the weight room equipment are to be washed with mild soap and water daily.

**AGREEMENT**
Custodial Services – City of Omaha Park Facilities
Updated:  October 14, 2020

**B. DAILY SERVICE REQUIREMENTS – MOTO MCLEAN ICE ARENA:**

1. All requirements list in All Facilities above, plus;
2. Remove debris from under bleachers.
3. Showers and bathroom tile are to be thoroughly cleaned. Contractor will use chemicals, as needed, to remove scale and lime buildup.
4. Wash walls in restroom and treat with a disinfectant.
5. Mop all spills and spots under bleachers as well as wipe down bleacher seats.
6. Mop players' benches and back side of rink boards in the players' area.
7. Mop black matting floor in locker rooms.
8. Twice a month – clean and mop all rubber floors.

**C. WEEKLY SERVICE REQUIREMENTS – COMMON GROUND:**

1. Power wash all shower floors using electric power washers.

**D. WEEKLY SERVICE REQUIREMENTS – ALL FACILITIES:**

1. Clean Custodial closet/storage areas. Custodian closet/storage area must be kept clean and organized at all times.
2. Vacuum all upholstered furniture (including public areas, workrooms, and offices.
3. Wipe with damp cloth all vinyl and other hard surface covered furniture (including public areas, work rooms, and offices).
4. Clean and polish all metal (including kick plates, switch plates, door hardware, etc.).
5. Wash exterior of water fountains and vending machines.
6. Spot clean walls in high traffic areas, especially around switch plates, etc.
7. Dust partitions, ledges, low moldings, window sills and all book shelves, including those in work rooms, offices, etc. (Contractor is not required to move or remove any equipment, books, paperwork, etc.).
8. Dust all blinds.
9. Clean stove tops, cabinet doors and exteriors of all appliances (refrigerators, microwaves, etc.) in all staff rooms, kitchens and kitchenettes.

**E. MONTHLY SERVICE REQUIREMENTS – ALL FACILITIES:**

1. Polish all furniture and wooden doors.
2. High dust door frames and other moldings and casings.
3. Dust and vacuum all HVAC grills, vents and louvers in all walls and suspended ceiling areas.
4. Wash all banisters and rails including the removal of all grease and oil residue when required.
5. Shower rooms and bathroom walls and floors are to be thoroughly cleaned by using appropriate chemicals and cleaning agents required to ensure removal of scale and lime buildup and the disinfecting of all surfaces.
6. Wet or dry mop (depending on weather and floor materials) all entry vestibules.  Spray buff twice weekly with dedicated mop.

**F. MONTHLY SERVICE REQUIREMENTS – SPECIAL CLEANING INSTRUCTIONS:**

1. Motto McLean Ice Rink - Extract Clean Black Floor Matting throughout Arena.
2. Common Ground Community Center - Extract Clean Black Floor Matting in Weight Room.

AGREEMENT
Custodial Services – City of Omaha Park Facilities
Updated:  October 14, 2020

**G.   BI-MONTHLY SERVICE REQUIREMENTS – SPECIAL INSTRUCTIONS:**

1.   Common Ground Community Center - Replace all shower curtains.

**H.   QUARTERLY SERVICE REQUIREMENTS – ALL FACILITIES:**

Generally, Quarterly Services are to be performed in the months of March, June, September & December, unless specifically instructed by City for different months. Any other floor finishing will be done at the option of City.

1.   Strip and rewax all non-carpeted floors - All non-carpeted floors are to be machine scrubbed, rinsed and sealed with at least one (1) coat of an acrylic or polymer sealer, appropriate for floor type, with a minimum of 16% solids.  All non-carpeted floors mentioned above are then to have applied three (3) coats of polymer floor finish having a minimum of 24% solids.

2.   All rubber floors are to be machine scrubbed and rinsed.

3.   Clean all non-upholstered furniture and chairs in all rooms and common areas.

4.   Clean all cobwebs from upper windows, light fixtures, walls, HVAC vents, etc.

**I.   SEMI-ANNUAL SERVICE REQUIREMENTS – ALL FACILITIES:**

1.   Dust and clean interior and exterior of all light fixtures and diffusers.

2.   Clean all plastic chairs with soap and water (this includes all plastic chairs in public areas, meeting rooms, offices, staff areas, break rooms, etc.).

3.   Steam clean all upholstered furniture.

**J.   ANNUAL SERVICE REQUIREMENTS – ALL FACILITIES:**

1.   Clean all exterior windows and glass at each facility.

**K.   SEASONAL SERVICE REQUIREMENTS – ZORINSKY LAKE, FLANAGAN LAKE, PIPAL PARK RESTROOMS:**

During the Lake and Park Restroom open season of approximately April 15th through October 15th, the following maintenance will be performed on Restroom buildings:

1.   Open and close designated restrooms daily.  Zorinsky Lake has four (4) Restroom Buildings; Flanagan Lake has two (2) Restroom Buildings.  Restrooms are to unlocked on or around 5:00 am and locked around 11:00 pm daily during the season.

2.   This service may be cancelled by City at any time during the term of an agreement.

3.   City may add additional restroom facilities at each lake, other lakes, or other facilities at a later date.

4.   Restrooms are to be cleaned and supplied daily.

5.   Restroom supplies will be provided by Contractor and will be stocked and maintained daily.

**L.   GENERAL SERVICE REQUIREMENTS:**

It is understood between all parties that the quarterly, semi-annual, and annual services are to be included in Contractor's monthly service bid.  Contractor will need to provide a per-facility cost as well as a monthly cost.

**M.   SPECIAL SERVICE REQUESTS:**

From time-to-time the City may request Contractor perform custodial related services in addition or above the specifications listed in these specifications.  Contractor shall provide an hourly or per job quote for such services.

AGREEMENT
Custodial Services – City of Omaha Park Facilities
Updated:  October 14, 2020

# EXHIBIT C
## CARPET CLEANING SPECIFICATIONS

**A.   CARPET CLEANING REQUIREMENTS:**

**Requires Use of Dupont Resistech Carpet Maintenance System or Equivalent**

1) Low moisture carpet cleaning chemistry designed to clean a carpet's fibers by encapsulating soils.
2) System is to provide soil resistance and vacuuming efficiencies.
3) Supply, equipment, chemicals, labor, supervision, storage, and transportation.
4) Obtain approval of Fleet and Facilities Supervisor before performing operations.
5) Perform maintenance operations outside of normal work hours unless directed by facilities supervisor.
6) Contractor Supervisory personnel must be present while carpet cleaning services are being performed.
7) Proof of Certification and Training for Employees will be provided to City.
8) Must comply with environmental regulations of City of Omaha.

**B.   CARPET CLEANING FREQUENCY:**

1) Carpet Cleanings will be quarterly at all facilities, unless otherwise specified.

**C.   CARPET CLEANING EQUIPMENT TO BE USED:**

1) Low moisture carpet maintenance system machine.
2) Dual Brush Pile Lifter - Used during both Low moisture carpet maintenance chemistry and Extraction cleaning
3) Walk behind, self-contained Extractor.
4) Equipment used is to be in optimum condition to provide optimum cleaning.

**D.   CARPET CLEANING MATERIALS TO BE USED:**

1) Maximum pH 10.0 [Synthetic/Nylon fibers] Maximum pH of 8 or approval of the New Zealand Wool Bureau (wool/natural fibers).
2) Phosphate free.
3) No optical brighteners.
4) No chlorinated solvents.

**E.   CARPET CLEANING METHOD TO BE USED:**

1) Low moisture chemistry to be used on carpet.
2) Restoration cleaning for heavy soil conditions prior to low moisture carpet maintenance chemistry application.

**F.   CARPET CLEANING PROCESS TO BE USED:**

1) Vacuum carpet before proceeding with cleaning processes.
2) Ensure that carpet pile is lifted to the maximum extent possible.
3) Edge and detail vacuuming as necessary.
4) Spot and spill removal before low moisture cleaning.
5) Restoration cleaning for heavy soil conditions prior to low moisture carpet maintenance chemistry application.
6) Clean with low moisture carpet maintenance system.
7) Force air-dry carpet as required based on local humidity conditions.
8) Damp mop hard surface floors adjacent to work areas to minimize slippery surfaces.
9) Carpets will be dry prior to resumption of foot traffic.

**G.   FOLLOW UP TO CARPET CLEANINGS:**

1) Contractor will be required to make follow up visits after each cleaning for items which have not been cleaned to the satisfaction of the Facilities Supervisor, at no additional cost.

Subject: Re: Site visits
From: "Steven R. Slater (Prks)" <Steven.Slater@cityofomaha.org>
Date: 1/29/2021, 8:46 AM
To: "Matthew K. Kalcevich (Prks)" <matthew.kalcevich@cityofomaha.org>
CC: Michelle Peters <Michelle.Peters@cityofomaha.org>, "Kari H. Vasquez"
<Kari.Vasquez@cityofomaha.org>

Thanks Matt and everyone for their support on this matter. I believe Kari and I had a good and
productive meeting last week with Rodney's staff.  I didn't realize that the recap he said was sent
needed us to validate it, but I will revisit the email. I do need to inform them that we will not be
returning the surveys BJ's has sent out, as we prefer to use our own evaluations with their
performance.  While there have been no legal actions specifically initiated against our department,
I do consider legal action against the city on other matters as adverse action and feel our actions in
working through the custodial issues are being influenced by that fact.  I drafted a questionnaire in
the last bid specifications that went out.  See the attached "Contractor Certification". Rodney
initiated and answered "Yes" to each question; however, I would like to see what jobs BJ's has
completed in the past of similar size and complexity.


Steve Slater
Contractual Services Coordinator
City of Omaha Parks, Recreation & Public Property Dept.
1819 Farnam St., Suite 701, Omaha, NE 68183
Direct: (402) 444-4987  |  Office: (402) 444-5900
Email: steven.slater@cityofomaha.org
Web: parks.cityofomaha.org/parks


On Fri, Jan 29, 2021 at 8:14 AM Matthew K. Kalcevich (Prks)
<matthew.kalcevich@cityofomaha.org> wrote:

    Interesting email.  Seems like a lot of backtracking to me.  If can follow up and reiterate that our
entire goal is to simply have his people perform the duties to which he committed and things
would be fine.  Not sure if pointing out the email requests or referencing these other actions, that
are highly unorthodox or even suspect to an ulterior motive is necessary.  However, no matter
what happens I know we will keep our guard up.  I am certainly highly frustrated and disappointed
by what a strain this has been on all of you.  I appreciate your persistence and professionalism to
try and put this in the best spot possible.  Let me know what else we need to discuss or of any
other concerns.  Good luck.
    Matt

*Ex. C*