IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RODNEY JOHNSON and BJ's FLEET WASH, LLC, | **8:22CV131** |
| Plaintiffs, | |
| v. | **MEMORANDUM AND ORDER** |
| CITY OF OMAHA; MATT KALCEVICH and BROOK BENCH, in their individual and official capacities; and KARI VASQUEZ and STEVEN SLATER, in their individual capacities, | |
| Defendants. | |

This matter is before the court on the Motion to Dismiss Amended Complaint (Filing No. 30)[1] filed by defendants City of Omaha (the "City"), Matt Kalcevich ("Kalcevich"), Brook Bench ("Bench"), Kari Vasquez ("Vasquez"), and Steven Slater ("Slater") (collectively, the "defendants"), and the Motion to Strike filed by plaintiffs Rodney Johnson ("Johnson") and BJ's Fleet Wash, LLC ("BJ's") (collectively "plaintiffs") (Filing No. 33).

The defendants move to dismiss "the claims asserted by [Johnson] in their entirety and the official capacity claims asserted by [plaintiffs] against [Bench] and [Kalcevich]"

---

[1]The plaintiffs first filed an original complaint on this case (Filing No. 1), which the defendants moved to dismiss (Filing No. 18). While the original motion to dismiss was pending, plaintiffs filed an amended complaint (Filing No. 21), followed by a brief opposing the original motion to dismiss (Filing No. 22). The defendants then filed the present motion to dismiss the amended complaint (Filing No. 30), and the plaintiffs filed a second opposition brief (Filing No. 34). Because "[i]t is well-established that an amended complaint supercedes an original complaint and renders the original complaint without legal effect," *In re Atlas Van Lines, Inc*., 209 F.3d 1064, 1067 (8th Cir.2000), the Court treats the defendants' motion to dismiss the original complaint as moot and disregards the briefing on that original motion.

under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  For the following reasons, the plaintiffs' Motion to Strike is denied, and the defendants' Motion to Dismiss Amended Complaint is granted.

## I.    BACKGROUND[2]

### A.    The City's Emerging Small Business ("ESB") Program

Johnson, who is African American, is the sole member-owner of BJ's, a limited-liability corporation located in North Omaha.  BJ's has "provid[ed] cleaning services in Eastern Nebraska for twenty-eight years," and "has been bidding jobs with the City . . . since 2013."  BJ's typically has twenty to thirty employees.

Since September 5, 2013, BJ's has been certified by the City as a Tier I ESB contractor through the City's Small and Emerging Business ("SEB") Program.  The SEB program categorizes ESBs as Tier I or Tier II based on the location of their headquarters and employees' residence.  To qualify as Tier I, an ESB must "maintain its principal place of business in areas of the city with higher levels of poverty which," according to the plaintiffs, "correspond to higher population concentrations of Black Omahans and other people of color."  Additionally, the City publishes a "Certification Directory listing all SEB Certified businesses, their status as a Tier I or Tier II vendor, their Ethnic Origin and Gender, and other information" (the "SEB directory").

---

[2]This case involves detailed background allegations, which are drawn primarily from the Amended Complaint.  The Court "accept[s] as true all factual allegations in the light most favorable to the nonmoving party" at this stage. *Schulte v. Conopco, Inc.*, 997 F.3d 823, 825 (8th Cir. 2021).  The plaintiffs attached three exhibits to their Complaint: two sets of emails (Exhibits A and C) and excerpts from BJ's Agreement with the City (Exhibit B).  Because all three are "documents whose contents are alleged" in the Amended Complaint "and whose authenticity no party questions," the Court finds they are necessarily embraced by the pleadings, *Ashanti v. City of Golden Valley,* 666 F.3d 1148, 1151 (8th Cir. 2012) (quoting *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir.2003)), and thus part of the Complaint.

A City ordinance gives Tier 1 ESBs priority consideration in requests for proposals ("RFP").  The ordinance, OMC 10-200.3(d), reads:

> Provided that an adequate number of certified entities are available, the solicitation or request for proposal will give priority to certified Tier I and/or Tier II small businesses and/or emerging small businesses. 'Priorities' are set forth as follows: if there is an adequate number of Qualified and Certified ESBs, first priority shall be given to Tier I ESBs; if not, then the next priority will be given Tier II ESBs; if there are not an adequate number of ESBs, then priority shall go to Tier I small businesses and then to Tier II small businesses.

In other words, "the priority created by Ordinance . . . provide[s] preference for ESB's [sic] . . . and for Tier I ESB's [sic] over Tier II ESB's [sic]."

### B.      RFP for Parks-and-Recreation Custodial Services

In July 2019, the City Parks, Recreation, and Public Property Department ("Parks Department") issued a RFP "from qualified vendors to provide custodial services for the City's parks and recreational facilities" (the "parks-and-recreation contract").  BJ's was one of six vendors to submit a proposal.  Three of the six proposals were quickly rejected: one was "much higher than other[s]," and two were "not responsive" to the RFP because the vendors "were not certified participants" in the SEB program.

Of the remaining three bids, one was from "the incumbent contractor for the previous seven years," RTG Building Services ("RTG").  It was a conforming proposal and the highest of the three frontrunners at $496,620.00.  The second proposal was from BMI Janitorial Group ("BMI").  It was the lowest bid at $223,920.00 but was non-conforming.  According to the plaintiffs, BMI's bid was "so low it immediately caused concerns among city officials."  The RFP also stated that "[p]roposals that [did] not conform to the mandatory items . . .in the proposal instructions [would] not be considered."

On August 21, 2019, BJ's submitted its proposal, and it was the lowest conforming bid at $297,499.98. The proposal was allegedly "misreported" as $318,000 by Slater, the Parks Department's Contractual Services Coordinator.

BJ's was listed in the City's SEB directory as a Tier I ESB with a "Black/African American" ethnic origin when it submitted its proposal. RTG was listed as a Tier II ESB with a "Hispanic" national origin, and BMI was listed as a Tier II ESB with a "White" national origin. Thus, "[o]f the three bidders qualified under the SEB program, only BJ's was listed as a Certified Tier I ESB 'Black/African American' owned business." And "since [BJ's] bid proposal conformed with the requirements of the RFP," the City ordinances "provided [BJ's] priority over all others except other Tier I ESB bidders."

The plaintiffs contend that when the RFP was issued, Parks Department employees, including Slater, Bench—then-Director of the Parks Department—and Vasquez, the Park Department's Community Center Facility Coordinator, "determined that Tier II bidders would be given preference over Tier 1 bidders during the bid evaluation process." In fact, "[t]he RFP expressly stated a preference for a Certified Tier II ESB contractor" and "disqualified all Certified Tier I contractors from" consideration.

Johnson was told that his bid on behalf of BJ's "was removed from consideration" because "it did not meet the RFP requirements" since "[BJ's] was not a Tier II contractor." Slater, with Bench's approval, forwarded only the proposals from BMI and RTG to a proposal-evaluation committee. BJ's then "petition[ed] Parks [Department] officials for the opportunity to have its bid proposal evaluated."

BJ's proposal was evaluated and "received the highest-ranking evaluation score" while "quot[ing] a price 4.6% lower than what the City was paying its previous contractor." Despite this, City officials, including Bench and Slater, "continued to consider BMI's non-conforming bid proposal."

4

On November 4, 2019, the City issued a notification of its intent to award the parks-and-recreation contract to BMI.  The City then submitted an ordinance to the Omaha City Council to approve the agreement between the City and BMI.  Both BJ's and RTG filed formal bid protests in response.

During a public Omaha City Council hearing, opponents to the ordinance "point[ed] out the [sic] BMI's bid proposal was non-compliant and, under the RFP's rules, could not be considered a qualifying bid."  The Omaha City Council ultimately "denied the [City's] recommendation to award the contract to BMI."

### C.    BJ's Subsequent Bids

After the Omaha City Council rejected the City's award of the parks-and-recreation contract to BMI, City officials determined "all bids would be rejected and the project would be re-bid."  The City informed the bidders that the Omaha City Council had rejected all proposals because of "conflicting criteria."  According to the plaintiffs, however, this was not true; the Omaha City Council "had not rejected [BJ's bid] at all," and it remained the "lowest conforming bid from a Tier I ESB contractor."

On March 18, 2020, the Parks Department published a second opportunity to bid for the parks-and-recreation contract, this time through a Request for Bid ("RFB" or the "first re-bid").  The RFB included a clause prohibiting communication between potential vendors and City employees, except through a particular email address.  Despite this, Slater directly communicated with the owner of BMI, "solicited . . . his preferences for the specifications" in the RFB, informed him the RFB "was coming out," "provided [him] legal advice[,] and named lawyers who may help."[3]

---

[3]The plaintiffs also allege, "Officials in the City Law Department, in response to public records requests filed by Johnson, have since admitted that emails reflecting improper communications between Parks officials and [BMI's owner] were improperly deleted."

The first re-bid required bidders to provide a "bid bond or certified check" as bid security.  It also required vendors to supply commercial vacuums and industrial-floor scrubbers for each facility.  BJ's met both requirements and was, again, one of six potential vendors to submit a bid.  Two of the six bidders—including BMI—failed to provide sufficient bid security.  BJ's bid was the lowest conforming bid from a Tier I ESB vendor.

Rather than award the parks-and-recreation contract at that point, however, the City decided to "reject the current bids and have the project rebid a second time," blaming the COVID-19 pandemic.  The City published notice of the bid rejections on April 29, 2020 and ordered another re-bid (the "second re-bid").

The Parks Department published a RFB for the second re-bid on August 19, 2020. BJ's was one of three vendors to submit a bid, along with BMI and RTG again.  All three bids were conforming, and BJ's was the lowest.  The City gave notice on September 29, 2020, of their intent to award the parks-and-recreation contract to BJ's. The Omaha City Council passed Ordinance No. 42362 authorizing the City to enter the parks-and-recreation contract agreement (the "Agreement") with BJ's, and the Agreement was entered on November 12, 2020.

### D.      Johnson's Public-Records Requests and Unrelated Litigation

During the bid-solicitation period between July 2019 and November 2020, Johnson submitted several record-request letters and a demand letter to the City.  He also filed an unrelated lawsuit.

On August 28, 2019, one week after BJ's submitted its initial proposal, Johnson delivered an unrelated "resident taxpayer demand letter" to the President of the Omaha City Council.  In the letter, Johnson "demanded repeal" of a City ordinance "which awarded a contract for solid waste collection" (the "solid-waste contract") in "violation of bidding procedures."  The demand letter was unconnected to BJ's and the parks-and-recreation contract; in fact, "[n]either BJ's, nor any business in which Johnson had an

interest," submitted a bid for the solid-waste contract.  Johnson wrote the demand "[a]s a taxpayer and as an individual."  Johnson's demand—the contents of which are not entirely clear from the pleadings—"was pending . . . before being denied on September 26, 2019."

Johnson also sent the City several public-records requests related to both the solid-waste contract and parks-and-recreation contract.  In February 2020, he sent records requests seeking information about the initial parks-and-recreation contract RFP.  The requests concerned communications with Bench, Slater, and other Parks Department officials, and those officials were aware of the requests.  Johnson filed additional requests related to the bidding process for the parks-and-recreation contract: one on June 10, 2020, after the first re-bid was rejected; two more on November 13, 2020, and November 23, 2020; and a supplemental request on December 10, 2020, which sought communications between Parks Department officials and BMI.  He filed a records request for information about the solid-waste contract on July 21, 2020, and he filed another request on January 21, 2021, "related to the bidding process for a contract to clean the Omaha City Library."

Johnson also filed a "taxpayer lawsuit" in state court on August 20, 2020, challenging the award of the solid-waste contract.  The court dismissed the suit on December 22, 2020, finding Johnson lacked standing.  Johnson then filed a second lawsuit challenging the solid-waste contract on December 31, 2020.

The plaintiffs allege the defendants' actions in this case were in retaliation for "Johnson's lawful right to petition the government."  They allege and attach as an exhibit an email from Slater to Kalcevich stating he "consider[s] legal action against the City on other matters as adverse action"—presumably meaning Johnson's demand letter and solid-waste contract lawsuit were considered adverse action against the City.

### E.    Performance and Termination of the Parks-and-Recreation Contract

The City and BJ's entered into a three-year contract at $266,279.00 annually.  BJ's estimated its profits over a six-year period would be $987,090.00.  Johnson expected to personally draw down approximately $5,000 per month as income.

BJ's began performance of the contract on December 1, 2020.  Both before and after starting performance, Johnson requested "standards to guide BJ's performance of the cleaning contract."    After the City did not provide standards, Johnson and BJ's "implemented or attempted to implement quality assurance efforts . . . to evaluate the quality of [BJ's] cleaning crew performance," including using surveys, spot inspections, cleaning metrics, and facility supervisor reports.

In response, Slater "refused to facilitate any kind of coordination" between BJ's and facility supervisors, instead instructing the facility supervisors to "withhold feedback."  On December 30, 2020, when BJ's sought a one-month performance review from each of the facility supervisors, Vasquez "directed the [s]upervisors by email . . . to complete the reviews and send them to her and Slater only."

The plaintiffs further allege that the defendants developed a "scheme to terminate" BJ's Agreement with the City, referred to by the plaintiffs as the "Janitorial Scheme." Under the Janitorial Scheme, the City adopted a "newly created and subjective grading scale" but did not share it with BJ's, "despite Johnson's requests."  Facility supervisors were allegedly pressured "to find fault in BJ's performance," resulting in 867% increase in performance complaints.  For instance, "one day prior to [BJ's] first thirty-day review" with the City, "the pressure caused one [f]acility [s]upervisor to submit a complaint about cleaning performance hours prior to when the location had actually been cleaned."

Facility supervisors "knew as early as January [2021]" of certain City officials' intent to terminate the Agreement with BJ's.  On February 22, 2021, Kalcevich "called Johnson and immediately attacked [BJ's,] . . . accus[ing] Johnson and [BJ's] of being more

8

concerned with his public records requests and lawsuits than with doing the cleaning work." Kalcevich then gave BJ's "a verbal 30-day notice of termination." However, the City requires written notice to terminate contracts, so the verbal notice was invalid.

On March 23, 2021, Kalcevich sent BJ's a 30-day written notice "requiring it to remedy deficiencies or face contract termination." Johnson sought "input on how to remedy any deficiencies" from the City on five separate occasions through April 26, 2021 but received no response. The City terminated the Agreement with BJ's on May 4, 2021. The contract was then awarded to BMI instead.

### F.      Present Lawsuit

The plaintiffs filed this lawsuit on April 11, 2022, bringing claims for (1) First Amendment retaliation (the "retaliation claim,"); (2) race discrimination in the making and enforcing of public contracts under §§ 1981 and 1983,[4] and (3) "denial of equal protection and due process" under § 1983 (together the "race-discrimination claims").

The plaintiffs first argue that by "ignor[ing] laws requiring priority be given to Tier I ESB bidders" and instead favoring Tier II bidders, the City "knowingly and intentionally acted to deny Johnson and [BJ's] equal protection of the laws because Johnson is Black and the racial identity of [BJ's] is Black." They point to specific examples of the "disparate treatment" BJ's and RTG—the former parks-and-recreation contractor—allegedly received from the City, as well as differences between the treatment of BJ's and BMI.

They also argue that the City's decision "to terminate [BJ's] was motivated, at least in part, by Johnson's exercise of his rights as a taxpayer" to challenge the solid-waste contract award "through public records requests and litigation," as well as Johnson's "right as a citizen to request public records informing [sic] whether City officials were abiding

---

[4]"A federal action to enforce rights under § 1981 against a state actor may only be brought pursuant to § 1983." *Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1181 (8th Cir. 1998).

by laws aimed at preventing discrimination or corruption in the award of city contracts."
According to the plaintiffs, the City's repeated "arbitrary" rejections of BJ's bids and early
termination of the Agreement caused "actual injury" to both BJ's and Johnson separately.

The defendants now move to dismiss under Rules 12(b)(1) and 12(b)(6), arguing
Johnson lacks standing and "is not the real party in interest." The plaintiffs filed a motion
to strike the index of evidence that the defendants submitted in support of their brief.

### B.    Legal Standard

Standing is a "question[] of subject matter jurisdiction." *Doe v. Nixon*, 716 F.3d
1041, 1047 (8th Cir. 2013). In evaluating subject matter jurisdiction, a court "must
distinguish between a 'facial attack' and a 'factual attack.'" *Carlsen v. GameStop, Inc.*,
833 F.3d 903, 908 (8th Cir. 2016) (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6
(8th Cir. 1990)).

When reviewing a facial attack, "the court restricts itself to the face of the pleadings,
and the non-moving party receives the same protections as it would defending against a
motion brought under Rule 12(b)(6)." *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir.
2018) (quoting *Osborn*, 918 F.2d at 729 n.6). For a factual attack, "the court considers
matters outside the pleadings, and the non-moving party does not have the benefit of
12(b)(6) safeguards." *Carlsen*, 833 F.3d at 908. This motion presents a facial attack on
standing and subject matter jurisdiction.

To survive a motion to dismiss under Rule 12(b)(6), "[a] complaint must contain
facts that, if 'accepted as true, . . . state a claim to relief that is plausible on its face.'"
*Liscomb v. Boyce*, 954 F.3d 1151, 1153-54 (8th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009)). A plausible claim is one that "plead[s] 'factual content that allows
the court to draw the reasonable inference that the defendant is liable for the misconduct
alleged.'" *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1063 (8th Cir.
2017) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Labels and

conclusions" or "a formulaic recitation of the elements" are insufficient to state a claim showing the plaintiff is entitled to relief. *Ash v. Anderson Merchandisers, LLC*, 799 F.3d 957, 960 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678); Fed. R. Civ. P. 8(a)(2).

     **C.**     **Plaintiffs' Motion to Strike**

The plaintiffs move to strike (Filing No. 33) the index filed in support of the defendants' motion to dismiss (Filing No. 32) "and all references thereto in its [sic] brief." The defendants' index contains a single exhibit: a copy of City of Omaha Ordinance No. 42362 and its attachments (the "ordinance document"). The plaintiffs argue, without submitting a supporting brief, that the ordinance document is not properly authenticated under NECivR7.1 because it is "unsupported by an affidavit identifying and authenticating" it.

In response, the defendants point to Federal Rule of Evidence 902, which contains a list of self-authenticating evidence that "require[s] no extrinsic evidence of authenticity in order to be admitted." The list includes certified copies of public records, meaning a "copy of an official record" that is certified by "the custodian or another person authorized to make the certification." Fed. R. Evid. 902(4). The defendants submitted a certified copy of the ordinance document and its attachments, which are "maintained in the office of the City Clerk of the City of Omaha." The ordinance document is self-authenticating.

Still, if "matters outside the pleadings are presented to and not excluded by the Court on a Rule 12(b)(6) motion," the motion may be converted to one for summary judgment. Fed. R. Civ. P. 12(d). A document is not outside the pleadings if it is "necessarily embraced by the complaint." *Ashanti v. City of Golden Valley,* 666 F.3d 1148, 1151 (8th Cir. 2012) (quoting *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir.2004)).

The ordinance document is clearly embraced by the plaintiffs' complaint. Not only does the Amended Complaint specifically reference Ordinance No. 42362 and its

provisions—but the plaintiffs themselves already submitted part of the ordinance document as Exhibit B to their Amended Complaint. As the defendants note, the plaintiffs' Exhibit B "is not a complete copy of the ordinance and contract documents" referenced in the Complaint. As such, the defendants simply submitted a "complete and certified copy" of the ordinance document since it is "central to the [plaintiffs'] claims and a portion" of the document is already attached to the Amended Complaint as Exhibit B. The plaintiffs' motion to strike is denied.

### D.      Defendants' Motion to Dismiss

The defendants challenge the First Amended Complaint in two respects. First, they assert that Johnson "lacks standing and is not the real party in interest" because "he did not bid, nor did he contract, with the City." They contend all claims asserted by Johnson should be dismissed under Rules 12(b)(1) and 12(b)(6). Second, they argue all claims against Bench and Kalcevich "in their official capacities are redundant to the claims against the City" and thus fail to state a claim under Rule 12(b)(6).

#### 1.      Johnson's Standing

Johnson must have "standing for each claim [he] bring[s] and for each form of relief [he] seek[s]." *Webb ex rel. K.S. v. Smith*, 936 F.3d 808, 814 (8th Cir. 2019) (citing *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. ___, ___, 137 S. Ct. 1645, 1650 (2017)). "[T]he irreducible constitutional minimum of standing" requires: (1) an injury in fact; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood that a favorable decision will redress the injury." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

An injury in fact must be "concrete and particularized" and "actual or imminent." *Huyer v. Van de Voorde*, 847 F.3d 983, 986 (8th Cir. 2017) (quoting *Lujan*, 504 U.S at 560). But at the pleading stage, a plaintiff "can move forward with 'general factual allegations of injury.'" *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013).

*See also Hutterville Hutterian Brethren, Inc. v. Sveen*, 776 F.3d 547, 553 (8th Cir. 2015) ("Where . . . the case has progressed only to the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (internal quotations omitted).

In addition to Article III standing, the Court "must consider judicially imposed prudential limits on standing." *Oti Kaga, Inc. v. S. Dakota Hous. Dev. Auth.*, 342 F.3d 871, 880 (8th Cir. 2003) (citing *Bennett v. Spear*, 520 U.S. 154, 162 (1997)). "Under the prudential limits of the standing doctrine, 'even when the plaintiff has alleged injury sufficient to meet the case or controversy requirement . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Potthoff v. Morin*, 245 F.3d 710, 715 (8th Cir. 2001) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

For instance, "[b]ecause a corporation is an entity separate and distinct from its shareholders, a shareholder does not have standing to assert a claim for harm suffered by the corporation." *In re AFY, Inc.*, 902 F.3d 884, 890 (8th Cir. 2018). Instead, "[a] shareholder must allege that he has personally 'suffered a direct, nonderivative injury' to proceed independent of the corporation." *Id.* (quoting *Potthoff*, 245 F.3d at 717).

The defendants' briefing on the standing issue focuses only on the plaintiffs' race-discrimination claims. They cite to *Potthoff v. Morin*, where the Eighth Circuit affirmed dismissal for lack of standing when the individual plaintiff "had not pled any damages other than a derivative claim for compensatory damages based upon economic harm suffered by [his company]." 245 F.3d at 714.

The plaintiffs in that case were a company and its sole shareholder. *Id.* at 712. The company had entered a lease with a property manager working for the city port authority. *Id.* Later, the shareholder was quoted in a newspaper criticizing the city mayor, at which

point the manager of the city port authority told the shareholder the company's lease would be terminated if he "did not recant and desist" from his criticism. *Id*. at 713. The company's contract with the property manager was terminated one week later at the request of the city port authority. *Id*.

The shareholder and company both filed suit, bringing claims for, among other things, "violating the free speech and due process rights of [the shareholder]" under § 1983. *Id*. at 714. The district court dismissed the shareholder's claims for lack of standing. *Id*. On appeal, the Eighth Circuit affirmed, holding "that the shareholder standing rule applies to civil rights actions brought pursuant to 42 U.S.C. § 1983 by shareholders." *Id*. at 717 (explaining that when the shareholder incorporated his company, "he relinquished the right to seek direct legal redress under § 1983 for injuries suffered by him as [the company's] sole shareholder and principal employee"). The court explained that although the shareholder "highlight[ed] the allegations in the complaint setting forth his personal financial losses and injuries"—including the fact that the city port authority "directed the ultimatum at him personally, not [his company]"—those injuries were indirect and derivative of the company's injuries. *Id*.

Here, the plaintiffs allege the defendants "caused Johnson actual injury independent from those suffered by [BJ's], including economic damages, as well as personal humiliation, damage to his reputation, mental anguish and suffering." They further allege "[t]he emotional injuries suffered by Johnson impacted his family and necessitated reaching out to others for counseling and support." He alleges he "invested over $100,000 of his own personal funds into [BJ's] to finance increased staffing and new equipment and supplies" to complete the contract, and also "invested his own time and labor on a daily basis." He further alleges he "nearly went bankrupt as a result of [the defendants'] actions" and "was forced to take several high interest loans" after he was unable to draw anticipated income. Finally, he alleges damage to his reputation and loss of another contract.

14

These allegations, taken as true, are insufficient to show Johnson suffered injuries independent from BJ's alleged race-discrimination-claims injuries.  BJ's was the only party to submit bids to the City, enter the Agreement with the City, and have its Agreement terminated.  Any financial loss Johnson suffered, including loss of salary, personal debt, and loss of contract, was incidental to BJ's financial and contractual injuries.  *See Jewell v. United States*, 548 F.3d 1168, 1173 (8th Cir. 2008) (quoting *Potthoff*, 245 F.3d at 716) ("[A]ctions to enforce corporate rights . . . cannot be maintained by a stockholder in his own name . . . even though the injury to the corporation may incidentally result in [the stockholder's financial loss].").  Similarly, Johnson's emotional, mental, and reputational injuries derive from BJ's relationship with the City.

As the plaintiffs point out, the defendants do not address Johnson's standing to bring the retaliation claim in their brief.  Johnson personally—as a "taxpayer" and citizen—submitted the public-records requests and filed the solid-waste contract lawsuit against the City.  Assuming without deciding that those actions are protected speech, it is Johnson's speech that is protected, not BJ's.  Johnson alleges he personally suffered concrete financial, reputational, and emotional harm, caused directly by the City's alleged retaliatory behaviors.

Although the constitutional interest at issue—the protected speech—is Johnson's interest as an individual, the injuries he suffered are nevertheless derivative of BJ's and of Johnson's status as BJ's sole owner.  Like in *Potthoff*, where the speech-related ultimatum from the city was directed at the shareholder, the City's alleged retaliation against Johnson for his protected speech is not sufficient to show Johnson has a nonderivative injury.  *See Potthoff*, 245 F.3d at 718 (*Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986)) ("[A] claim based merely upon the deprivation of an abstract constitutional right is not justiciable unless a legally protectible interest is at stake.").

The Court finds Johnson has not alleged sufficient facts showing he suffered a direct, nonderivative injury to proceed independent of BJ's.  Since he has not "clearly

alleg[ed] facts demonstrating the elements of standing," *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)), the claims brought by Johnson are dismissed.

### 2. Official-Capacity Claims

The defendants argue, and the plaintiffs do not dispute,[5] that the claims against Bench and Kalcevich in their official capacities "are redundant and must be dismissed." Because the official-capacity claims against Bench and Kalcevich are "functionally equivalent" to a suit against the City, *McKay v. City of St. Louis*, 960 F.3d 1094, 1102 (8th Cir. 2020), the official-capacity claims against Bench and Kalcevich are dismissed.

The claim against the City of Omaha by BJ's and the individual-capacity claims by BJ's against Vasquez, Slater, Bench, and Kalcevich, remain. Accordingly,

IT IS ORDERED:

1.  The Motion to Strike (Filing No. 33) filed by plaintiffs Rodney Johnson and BJ's Fleet Wash, LLC is denied.

2.  The Motion to Dismiss Amended Complaint (Filing No. 30) filed by defendants City of Omaha, Matt Kalcevich, Brook Bench, Kari Vasquez, and Steven Slater relating to claims brought by Rodney Johnson is granted.

3.  All claims brought by Rodney Johnson, and those claims brought against Matt Kalcevich and Brook Bench in their official capacities, are dismissed without prejudice.

Dated this 27th day of December 2022.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge

---

[5]The plaintiffs state they "[b]eliev[e] Kalcevich and Bench properly rely upon *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010)," and "submit this argument to the Court without argument."