IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

BJ'S FLEET WASH, LLC,

Plaintiff,

v.

CITY OF OMAHA, and MATT
KALCEVICH, BROOK BENCH, KARI
VASQUEZ, and STEVEN SLATER, in their
individual capacities,

Defendants.

**8:22CV131**

**MEMORANDUM
AND ORDER**

This matter is before the Court on defendants City of Omaha (the "city"), Matt Kalcevich ("Kalcevich"), Brook Bench ("Bench"), Kari Vasquez ("Vasquez"), and Steven Slater's ("Slater" and together, the "defendants") Motion for Summary Judgment Based Upon Qualified Immunity and Upon the Merits (Filing No. 169). As described below, the defendants' motion is granted in part and denied in part.

## I.    BACKGROUND

Through the Small and Emerging Small Business program (the "SEB program"), the city aims "to promote and encourage the creation of business opportunities for emerging and small businesses," including in the competition for city contracts. Omaha, Neb., Code § 10-200. In doing so, the SEB program defines what entities qualify as a small business ("SB") or emerging small business ("ESB") and further categorizes those entities as Tier I and Tier II SBs or ESBs. *See id.* § 10-200.1(j)-(m). To qualify for Tier I, a business must be located in and employ individuals that reside within areas with higher levels of poverty. *See id.* § 10-200.1(l). All other SBs and ESBs fall under Tier II. *See id.* § 10-200.1(m).

Businesses authorized as participants in the SEB program are listed in a city directory that compiles the type and tier of the entity. The directory also lists each entity's contact person, address, "Ethnic Origin," and "Gender."[1]

The SEB program sets forth certain procedures to ensure the city is making an effort "to utilize [SBs] and [ESBs] in all city contracts." *Id.* § 10-200.3(a). Under those provisions, the department soliciting a bid must work with the city's Human Rights and Relations Department (the "HRR Department") to first determine—"[p]rior to soliciting bids or proposals"—if "any portion of the bid may be completed by" an SB or ESB. *Id.* § 10-200.3(d). When a project fulfills that condition and "an adequate number of authorized entities are available," the SEB program requires that a "solicitation or request for proposals [] give . . . first priority" to Tier I ESBs, then to Tier II ESBs, Tier I SBs, and Tier II SBs, in that order. *Id.*

BJ's Fleet Wash, LLC ("BJ's") is a Nebraska limited liability corporation that has been authorized as a Tier I ESB through the SEB program since 2013. BJ's has performed public and private cleaning contracts in and around Omaha for decades. Its sole member is Rodney Johnson ("Johnson"), a Black man who has resided in North Omaha since birth. Johnson manages BJ's day-to-day operations on top of raising two special-needs children.

In time, Johnson became interested in and began to closely follow the city's contract bidding activities. Throughout the years, he has expressed disagreements with the way in which the city has awarded particular contracts, alleging the city has at times demonstrated "bias or favoritism" (Filing No. 1 in Case No. 8:17CV23). In 2017, that complaint led BJ's to file a lawsuit against the Omaha Transit Authority concerning a contract for the cleaning of city busses which BJ's had bid on but not been awarded. *See*

---

[1]The defendants do not clarify how the city determined each business's "Ethnic Origin" and "Gender." They emphasize that the directory makes no explicit mention of the entities' owners.

*BJ's Fleet Wash LLC v. Transit Auth. of City of Omaha*, 423 F. Supp. 3d 726, 730-32 (D. Neb. 2019).

In 2020, Johnson further voiced his concerns with a multimillion-dollar public contract for solid-waste collection unrelated to his business (the "waste-collection contract"). In a demand letter and subsequent lawsuit filed in the District Court of Douglas County, Nebraska, Johnson alleged the city's Public Works Department violated standard bidding procedures and engaged in prohibited contact with the awardee to give them an unfair advantage. Both the 2017 federal suit, s*ee id.* at 740, and 2020 state suit were dismissed on summary judgment.

## A.      The July 2019 Request for Proposal

On July 31, 2019, the Douglas County Purchasing Agent (the "Purchasing Agent") issued a Request for Proposal on behalf of the city's Parks, Recreation, and Public Property Department (the "Parks Department") to solicit proposals to provide custodial services for its facilities (the "RFP"). Proposals were to be submitted by August 21, 2019. The RFP specified the contractor must be an authorized Tier II ESB under the SEB program.[2]

The RFP directed vendors to submit "one [] original, two [] copies, and two [] electronic copies" of their proposal by the opening date. It also set out a number of requirements for "proposals . . . to be considered valid," and provided that any proposals that failed to comply with those requirements would be rejected. Among other things, the

---

[2]According to Steven Slater ("Slater"), then a contractual services coordinator for the Parks Department, the Parks Department did not consult with the HRR Department "to determine if the bid or any portion of the bid may be completed by a authorized small business or emerging small business." Omaha, Neb., Code § 10-200.3(d). The defendants inaptly quarrel with BJ's complaint over that omission by claiming that § 10-200.3(d) merely requires the Parks Department to work with the Purchasing Agent to come to such a determination. Their position is belied by a plain reading of that subsection.

RFP required vendors to provide a $1,500 bid bond or certified check and ensure their proposal met all of the RFP's "specifications, terms, and conditions."

In total, six vendors submitted proposals in response to the RFP. Four of those vendors were ESBs, including BJ's. The other vendors participating in the SEB program were Tier II ESBs: BMI Janitorial Group ("BMI"), Nifty Clean, LLC ("Nifty Clean"), and RTG Building Services ("RTG"). RTG, which is listed as "Hispanic" in the SEB directory, was the incumbent contractor. BMI is listed as "White" in the SEB directory and is headquartered in West Omaha. Dan Beckman ("Beckman"), a white man, is BMI's president.

BJ's proposal met the RFP's submittal and bid-bond requirements. It estimated the annual cost of its services under the proposed contract would total $297,499.98. RTG also properly submitted its proposal, which BJ's contends was much higher in price. BMI, on the other hand, obtained the required bid bond but did not submit the copies requested by the RFP. Its proposed annual contract amounted to $223,920.00. That number was so low that Slater was initially concerned it didn't align with the level of services the city expected.

The parties disagree whether BJ's and BMI's proposals conformed with all of the RFP's required conditions. The defendants now contend BJ's proposal was nonconforming, despite seeming to meet all other requirements, because the RFP limited proposals to Tier II ESBs. BJ's vigorously disputes the propriety of the RFP's stated preference for Tier II ESB vendors in light of the priorities established by the SEB program. *See* Omaha, Neb., Code § 10-200.3(d). The defendants explain Slater set forth that preference based on his misunderstanding that the SEB program's tiers were organized based on the size of the organization and his belief the city needed a larger business to handle the complex job. They also dubiously assert their interpretation that § 10-200.3 only requires the city to prioritize Tier I ESBs "prior to the publication of the solicitation, not after publication or during the selection/evaluation process."

4

Turning to BMI, BJ's has long argued BMI's proposal was nonconforming based on its failure to supply the requisite copies on submission. BJ's emphasizes the RFP's language that "[p]roposals must meet all specifications, terms and conditions" of the RFP to be valid and would otherwise be rejected. In response, the city maintains BMI's shortcomings were "not disqualifying" because the submission provision merely set out "a discretionary rule."

The city established an Evaluation Committee (the "committee") to assess the submitted proposals. The committee consisted of Slater, maintenance manager Joshua Frey ("Frey"), recreation manager Tracy Stratman ("Stratman"), and recreation coordinator Chris Haberling ("Haberling"). Initially, Slater forwarded only BMI's and RTG's proposals to the committee for evaluation. Johnson challenged BJ's exclusion upon being notified its proposal did not meet the RFP's tier specification. Slater ultimately relented and submitted BJ's proposal to the committee as well.

The committee interviewed representatives from BJ's, BMI, and RTG in October 2019. Each committee member then separately evaluated the vendors, assigning numerical scores to various elements of their proposals. BMI received the highest average score of 95 out of 100 points, with BJ's in second place with an average score of 85.5. RTG trailed with 75.25 average points. A few weeks after the committee's interviews, Slater learned about Johnson's previous lawsuit against the city.

The committee recommended the Parks Department award the custodial contract to BMI. Slater reports he believed BMI fit the bill because it was "the lowest bidder with the overall highest score." In line with that recommendation, Bench—then the Director of the Parks Department—submitted the janitorial contract with BMI for consideration by the City Council on January 7, 2020. *See* Omaha, Neb., Code § 10-141 (requiring the

City Council's approval of "all contracts in excess of $20,000.00"). The proposed three-year contract amounted to a total cost of $680,760.[3]

The city received written protests to the proposed award, including one from BJ's, arguing that BMI fell short of the RFP's required conditions in failing to provide written and electronic copies of its proposal. A representative of RTG likewise expressed that opinion at City Council hearings in January 2020 during consideration of Ordinance 42122—the ordinance to approve the agreement with BMI. Omaha resident Spencer McGruder also appeared in opposition to Ordinance 42122. Like the other opponents, he believed "BMI's bid submittal should have been rejected on its face as noncompliant."

After hearing the public's comments, the City Council rejected Ordinance 42122 by a vote of four to three at the January 28, 2020, hearing. On January 29, 2020, Bench sent letters to BJ's and other vendors who submitted proposals in response to the August 2019 RFP but lost out to BMI. Slater drafted the letter shortly after the City Council's vote on Ordinance 42122 to inform the vendors that "all proposals submitted . . . ha[d] been rejected by the Omaha City Council due to conflicting criteria" in the RFP. After Deputy City Attorney Michelle Peters ("Peters") approved the letter, Bench signed it.

The parties dispute the letter's accuracy and who exactly ordered that all of the proposals be rejected. Bench admits that the City Council only formally rejected the agreement with BMI. But the defendants dither and obfuscate in their statement of facts by asserting "[a]ll proposals were rejected by the Omaha City Council[, the] Parks [Department], and [] Bench." In support of the wholesale rejection of all proposals, the

---

[3]Based on the Parks Department's calculations, Bench relayed to the City Council that the savings in their "budget by choosing BMI" "over the three-year period [would be] $275,000." BJ's accuses Parks Department officials of misreporting the relative costs of its and BMI's proposals, implying the City Council was led to believe BMI's proposal was an even better deal than it was. To be sure, some of the calculations discussed by officials appear to vary from those made in the vendors' proposals. The reasons for those discrepancies are not fully illuminated by the parties or the record.

defendants also point to councilmembers' concerns over the RFP's potentially confusing language and their hope it would be revised in the future.

Omaha Code § 10-110 gives a contracting department's director the power to "review [] bids and determine if any or all bids should be rejected."  That section also states, "If the department director decides to reject all bids because the bids received are over budget or because circumstances have changed, the department director shall send written notice to all bidders that the city is not proceeding with an award." *Id.*  BJ's cites to this language as evidencing the limited reasons that could justify the rejection of the proposals in this case—circumstances which arguably were not present.  Unsurprisingly, the defendants see things differently, and contend the "plain language of the ordinance [makes clear] that the [c]ity can reject any or all bids . . . for any reason."

Slater contacted Beckman the same day the rejection letters were sent.  In his email to Beckman, Slater attached a "spreadsheet comparing the proposal prices of each" vendor and calculations regarding the city's potential savings if it chose "BMI over the other companies."  When deposed, Slater stated he sent the information to Beckman because he "believe[d Beckman] requested it."  BJ's assumes Slater had other motives and acted "[i]n an effort to provide BMI a competitive advantage over the other bidders."

On February 6, 2020, Slater emailed Beckman again, this time with instructions on how to appeal the rejection of BMI's agreement with the city.  Neither Slater nor any other Parks Department official attempted to contact BJ's following the proposals' rejection or provide any guidance regarding the appeals process.

Still, BJ's submitted a written appeal on February 7, 2020.  *See id.* (providing a "rejected bidder may appeal" within ten days after a bid is rejected by submitting their objections to the city clerk).  A few weeks later, Slater emailed Beckman about BJ's appeal and notified him the City Council would consider the matter on February 25, 2020, in case he wanted to attend.  That month, Johnson also began requesting public

records regarding the RFP and ensuing events.  Slater stated he was aware of those requests because "[i]t would have been [his] job to collect the documents."

### B.      The March 2020 Re-Bid

By early March 2020, the COVID-19 pandemic had begun transforming public life in the city.  Events were cancelled and city libraries and community centers were closed.  Amid those developments, a Request for Bid (the "first RFB") was published for the Parks Department's custodial needs on March 18, 2020.  The bid opening date was set for April 1, 2020.

Like the RFP, the first RFB required bidders to provide a bid bond or certified check, this time amounting to 5% of the total cost of the bid.  Three bidders submitted conforming bids: BJ's, RTG, and Nifty Clean.  This time, BJ's bid was the highest at $377,785.01, followed by Nifty Clean at $365,900.00, and RTG at $308,000.00.  BMI submitted a bid too but failed to secure sufficient bid security.  On that basis, BMI's bid was deemed noncompliant with the RFB and ineligible for consideration.

On April 16, 2020, Slater opined in an email to Bench and Peters that the Parks Department should reject the bids to the first RFB and have the project rebid.  He cited the COVID-19 pandemic, "confusion over the change in bid bond requirements," and bidders' purported difficulty in accessing the facilities as necessary to prepare their bids.  Slater later admitted in his deposition that he had not heard from any of the bidders that they had such concerns.

Peters pushed back, stating she did not "think there [was] a reasonable basis to rebid."  Peters expressed her concern that the proposed rejection "seem[ed] to be an effort to accommodate" BMI, which she did not feel was fair.  At first, Bench agreed with Peters, adding that a rebid would cause "many red flags [to] go up."

On Stratman's recommendation, Slater scheduled a meeting with the committee's members to discuss what to do with the first RFB.  It is not clear what was discussed at

that April 20, 2020, meeting, but Bench believes Slater and Stratman likely concluded the Parks Department should reject all of the bids. Bench then followed through with that decision and rejected all of the bids in response to the first RFB. On April 29, 2020, Bench notified the bidders via letter of that decision.

As Bench reported in those letters, the defendants maintain the wholesale rejection of bids was caused by changing circumstances from the COVID-19 pandemic. BJ's contends the rejection was yet another decision made by Bench and Slater with the intent "to provide BMI more opportunities to win the bid." The defendants deny any such partiality but also continuously assert Bench had "the right to reject any and all bids for any reason."

Following these events, an attorney for BJ's submitted a public-records request to the city seeking documents related to the first RFB on June 10, 2020. Ten days later, Bench resigned from his position. Later that summer, Johnson filed another public-records request, this time for information related to the waste-collection contract.

### C.    The August 2020 Re-Bid and Award to BJ's

On August 19, 2020, another request for bid (the "second RFB") was published for the parks facilities' custodial services, with bids to open on September 2, 2020. The defendants aver that at least some requirements were added since the first RFB due to the COVID-19 pandemic. The second RFB also included a customary clause prohibiting communication between potential bidders and city employees, directing all communication to a specific email set up for bid questions. It further provided that violation of the second RFB's conditions was sufficient cause to reject a bid.

On August 20, 2020, Slater contacted Beckman personally by email to inform him the second RFB would be published that day on the Purchasing Agent's website. He directed Beckman to the website for "[s]pecifications and bid bond instructions."

9

That same day, Johnson filed the lawsuit challenging the waste-collection contract. Johnson served the city with that lawsuit six days later. The litigation progressed throughout the Fall of 2020.

On September 2, 2020, the city publicly opened the bids responding to the second RFB, which included conforming bids from BJ's, BMI, and RTG. BJ's was the lowest bid at $266,279, BMI's was $291,170, and RTG's was $336,000. After being informed of the bids, Jake Lindner ("Lindner"), then the Interim Director of the Parks Department, asked the members of the committee, "Is that the same guy as last time?"

On September 29, 2020, the Purchasing Agent gave notice of the city's intent to award the custodial contract to BJ's. Slater informed public events administrator Kayla Clemens ("Clemens") of the award on September 30, to which she replied: "How mad is BMI over this!? Crazy . . . now we have to deal with BJs." Slater responded that BMI was understanding given its increased costs due to the pandemic.

The City Council accepted the custodial contract with BJ's through its vote on Ordinance No. 42362 on November 12, 2020, and the mayor signed the agreement that day. BJ's was required by the Purchasing Agent to provide proof of fidelity and performance bonds within ten days or risk forfeiting the award. BJ's secured the requisite insurance and bonds and delivered proof on November 24, 2020. A few days later, the Purchasing Agent asked BJ's to begin performance a month early at Slater's request. Slater believes Vasquez, then the acting recreation manager, made the decision to move up the start date.

Around that time, Johnson served public-records requests on the city pertaining to the custodial contract. Clemens discussed the requests with Parks Department officials—including Slater, Haberling, and Kalcevich—and their need to collect some of the requested information. In emails with Peters in January 2021, Johnson expressed his concern he did not receive all relevant communications, including communications

between city employees and BMI.  Peters assured Johnson the city provided him "everything [it had]," but that individual employees were generally "not required to keep their emails."

### D.      BJ's Performance of and Termination from the Contract

Upon being awarded the contract, BJ's immediately began to prepare for its performance of the custodial services.  Johnson contacted the Parks Department's facility supervisors during the first week of October and requested to meet and discuss the needs of each facility.  He also proposed hiring special-needs high school students to address overlooked issues at the facilities and conduct extra disinfecting at no charge to the city.  Vasquez and Kalcevich, who became the Parks Department Director in December 2020, rejected his proposal.

BJ's suspects that some at the Parks Department doubted whether the company would do a good job from the outset.  Slater and Vasquez believed it could take thirty to sixty days for BJ's to adjust and get into the groove of things.  Still, Vasquez prompted Parks Department staff to provide immediate feedback to her about BJ's performance of its first week on the job.

Kalcevich became the Director of the Parks Department on December 14, 2020, and started receiving reports about BJ's "very early on."  At some point, he was made aware of the earlier proposed award to BMI as well as Johnson's waste-collection-contract lawsuit.  Slater and Vasquez also informed Kalcevich of BJ's bid-rejection appeal and records requests.  Based on discussions with Vasquez, Kalcevich became more personally involved in overseeing BJ's performance of the custodial contract.

For his part, Johnson began attempting to elicit, review, and address feedback from Parks Department staff.  Section VIII of the custodial contract provided for direct cooperation between BJ's and facility supervisors to report any issues, field questions, and address items needing attention.  Accordingly, Johnson states that he sent a letter on

11

December 15, 2020, asking how BJ's could work directly with facility supervisors to address concerns in a timely manner. Johnson also created and sent site evaluation forms to Parks Department supervisors and coordinators to receive feedback.[4]

After Slater sent Johnson's letter to the city's Law Department, Vasquez directed that all complaints regarding cleaning deficiencies were to go through her rather than to BJ's. Kalcevich further opposed the use of BJ's evaluation forms. On January 6, 2021, Vasquez instructed supervisors not to respond to BJ's request for cleaning reviews and to send them to her or Slater. This approach sharply contrasted with RTG's performance under the previous contract, during which RTG was allowed to directly communicate with facility coordinators to address issues without the involvement of other Parks Department officials. Johnson was also unsatisfied by Vasquez and Slater's general responses to his requests to clarify the cleaning standards.

Early on, some Parks Department staff seemed happy with BJ's performance. While noting some "growing pains," various city employees communicated their satisfaction that the facilities were being cleaned and that BJ's responsibilities were being fulfilled. On January 5, 2021, Peoples told Kolala that he did not have "any problems so far" with BJ's and felt its services were much better than those of earlier vendors at his facility.

Beckman reached out to Slater on January 14, 2021, to "check[] in to see how cleaning [was] going." In that email, he also attached "samples of office buildings that [BMI had] clean[ed]." Just a day later, facility coordinator Orenthian Everett ("Everett") sent an email response to a recreation supervisor, who seemed dissatisfied with BJ's services at her facility. Everett replied, "We are aware of the challenges with this company and are working on severing ties." Recreation supervisor Kelly Maher

---

[4]All told, recreation supervisor Shawn Peoples ("Peoples") was the only coordinator to complete BJ's site evaluation form, which he sent to Vasquez and recreation supervisor Sara Kolala ("Kolala") in January 2021. His evaluation was largely positive, but BJ's was never notified of it.

("Maher") also was aware that the custodial contract was a "very hot topic of conversation in early 2021" and that the Parks Department was already looking to terminate its agreement with BJ's.

On January 22, 2021, Vasquez directed Parks Department supervisors and coordinators to begin "Part I" of a janitorial plan tracking BJ's performance. The defendants assert the janitorial plan was only put in place after early concerns about BJ's performance, and that each of the six "parts" of the plan simply amounted to thirty-day reviews of its services. Upon the initiation of the plan, supervisors and coordinators were instructed to review video surveillance of the facilities and note cleaning deficiencies they believed their review revealed. At Kalcevich's instruction, Vasquez also created a performance scoring spreadsheet and directed supervisors to input their daily evaluations of BJ's performance. Under that scoring system, staff were asked to assign a percentage score to the best of their ability based on the custodial contract's requirements but were not given an objective scoring model.

Vasquez regularly reviewed surveillance footage to investigate the accuracy of the supervisors' evaluations. BJ's believes she pressured staff to find fault in its services. For example, when Peoples reported his facility was cleaned to standards, Vasquez expressed doubts to Kolala over email, asking "Do we think this is real?" On multiple occasions in March 2021, Vasquez also contacted staff directly about their performance evaluations, opining their scoring of certain tasks were too complimentary in comparison to their description of the cleaning results.

On January 27, 2021, Johnson scheduled a walk-through of some facilities with State Senator Terrell McKinney ("McKinney") and Jason Fischer ("Fischer"), Chairman for the Minority Economic Development Committee. Both McKinney and Fischer are Black. In an email to Slater, Vasquez, Everett, and other city employees, Johnson detailed his plans "to take a few pictures and discuss the cleanliness and [BJ's] methods for cleaning" and invited city officials to join. BJ's bases its decision to hold this walk-

through in Section VIII of the custodial contract, which requires BJ's supervisors to "make monthly inspections of facilities and meet with each City Facility Supervisor to review work performance and correct any deficiencies."

Slater sent Johnson's email to Peters, who emailed Johnson to object to his planned walk-through. Peters informed Johnson that "unauthorized individuals [were] not allowed in [city] facilities after hours" and that she did not believe McKinney and Fischer had any "legitimate reason for being" in the facilities. She further accused Johnson of fostering a "sense of controversy and hostility" as well as acting in bad faith under the custodial contract.

That week, Slater reacted to the situation in an email to Kalcevich, Peters, and Vasquez. Among other things, Slater explained, "While there has been no legal actions specifically initiated against [the Parks D]epartment, I do consider legal action against the city on other matters as adverse action and feel our actions in working through the custodial issues are being influenced by that fact." Around that time, Kalcevich also grew "highly suspicious" over whether BJ's genuinely wanted "to be a good partner." In a February 22, 2021, phone call with Johnson, Kalcevich expressed those concerns "very intensely." That day, Kalcevich gave Johnson a thirty-day verbal warning and threatened to terminate the custodial contract.

On February 16, 2021, Johnson contacted Dr. Franklin Thompson ("Thompson") for help in improving his relationship with the city during the performance of the custodial contract. At that time, Thompson was the Director of the city's HRR Department, which was created "to eliminate and prevent all forms of unlawful discrimination." On February 26, 2021, Thompson informed Johnson his department was not able to help. Thompson explained the city's Law Department "specifically told [him] . . . [his] office had no jurisdiction" over Johnson's matter.

14

In their 220-page Statement of Material Facts (Filing No. 170), the defendants detail the purported failures of BJ's custodial services, beginning in January 2021 and continuing throughout the spring. As evidentiary support, they generally cite to (1) a large trove of emails from various Parks Department employees reporting alleged complaints with BJ's performance, (2) surveillance footage from various facilities, and (3) Vasquez's spreadsheet compiling scoring and comments regarding BJ's cleaning. BJ's disputes the accuracy of the defendants' assertions, challenges the bulk of those fact statements on hearsay and foundation grounds, and offers at least some evidence to show it received compliments on its performance as late as the end of February.

At the time, however, BJ's was explicitly made aware of perceived issues with its performance. Under the custodial contract, the city could terminate its agreement with BJ's "[f]ollowing formal written notice of non-compliance with specifications from the City in excess of three [] times in any one year period or less." Kalcevich sent BJ's three formal written notices of non-compliance on March 23, April 9, and April 26, 2021. In those notices, Kalcevich specifically complained of purported no-shows, failure to perform required tasks, and the presence of unauthorized children at worksites with BJ's employees. With Kalcevich's approval, Slater instructed BJ's in early April 2021 not to ask facility supervisors about their opinions of its performance.

On April 6, 2021, BJ's informed various city officials that he would like to be provided a remedy plan. Winsley Durand of the Greater Omaha Chamber responded that he did not believe the city would put together a remedy plan, feeling that—at that point— BJ's had decided to walk away from the custodial contract. When BJ's did not walk away, the city sent Johnson notice that it was terminating the custodial contract on May 4, 2021. BJ's disputes whether that termination complied with the custodial contract's terms. Despite BJ's requests, the city has not released its performance bond.

Sometime in May 2021, BMI assumed the custodial contract. The city approached its relationship with BMI differently than it did BJ's, during good times and bad. For

one, BMI was allowed to perform custodial services for several months without securing a performance bond. BMI was also provided the contact information of site supervisors and permitted to communicate with them directly during their performance.

When complaints arose early in BMI's performance, the city seemingly avoided resorting to the strategies it used with BJ's. The parties disagree on whether a similar spreadsheet was used to log BMI's performance; at a minimum, Slater did not recall having such a log. Nor does it seem that the Parks Department officials utilized surveillance footage in the same way it did to track BJ's cleaning. Further, Kalcevich wrote to BMI in October 2021 to implement a five-point remedy plan to get the company back on track before potentially being fired. Eventually, though, BMI was also terminated from the custodial contract for poor performance.

### E.   The Lawsuit

On April 11, 2022, Johnson sued (Filing No. 1) the city; Bench and Kalcevich in their individual and official capacities; and Slater and Vasquez in their individual capacities. He alleged the defendants' actions "were taken [with] malice or reckless indifference to" his rights to "equal protection, to due process, and to petition his government for the redress of grievances." *See* Const. amend. I, XIV; 42 U.S.C. § 1983. After the defendants moved to dismiss his lawsuit for failure to state a claim (Filing No. 18), *see* Fed. R. Civ. P. 12(b)(6), Johnson filed an amended complaint (Filing No. 21) adding BJ's as a plaintiff, *see* Fed. R. Civ. P. 15(a)(1)(B).[5]

On December 27, 2022, the Court agreed with the defendants' renewed arguments for dismissal under Rule 12(b)(1) and (6) (Filing No. 30). The Court first dismissed all claims asserted by Johnson for lack of standing (Filing No. 43), concluding he failed to allege "sufficient facts showing he suffered a direct, nonderivative injury to proceed

---

[5]In opposing summary judgment, BJ's clarifies that it brings claims "pursuant to 42 U.S.C. §§ 1981 and 1983" for First Amendment retaliation and "discriminat[ion] against BJ's based upon race in violation of Due Process and Equal Protection."

independent" from BJ's. *See*, *e.g.*, *In re AFY, Inc.*, 902 F.3d 884, 890 (8th Cir. 2018) (explaining and applying the shareholder standing rule). It also dismissed BJ's official-capacity claims against Bench and Kalcevich as redundant of its claims against the city. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). In the meantime, the Court addressed issues with Beckman's refusal to respond to a Rule 45 subpoena (Filing Nos. 29, 47, 74, and 100).

Near the close of discovery, the magistrate judge[6] in this case ruled on privilege-related disputes (Filing No. 159) and denied the defendants' motion to exclude BJ's expert witnesses (Filing No. 163). The defendants' moved for summary judgment (Filing No. 169) on all of the remaining claims on August 7, 2024. BJ's has opposed that motion (Filing No. 186). A jury trial is scheduled to begin on April 14, 2025.

## II. DISCUSSION

### A. Standard of Review

The Federal Rules of Civil Procedure have long authorized motions for summary judgment to dispose of claims and defenses that "lack [] genuine, triable issues of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 327 (1986); *see also Eggers v. Wells Fargo Bank, N.A.*, 899 F.3d 629, 632 (8th Cir. 2018) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact." (quoting *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir. 1987))). Summary judgment is required under Federal Rule of Civil Procedure 56(a) when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the" record "which it believes

---

[6]The Honorable Michael D. Nelson, United States Magistrate Judge for the District of Nebraska.

demonstrate the absence of a genuine [dispute] of material fact." *Celotex*, 477 U.S. at 323 (internal quotation omitted). It can satisfy that burden by either producing "evidence negating an essential element of the nonmoving party's case" or showing "that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (describing the relative ease with which parties can fulfill this initial burden). When the movant carries that burden, it becomes the nonmovant's responsibility to preclude summary judgment by submitting evidence "of specific facts showing the presence of a genuine issue for trial." *Id.* at 997. To do so, the nonmovant must "present enough evidence that a jury could reasonably find in his favor." *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In reviewing the record on summary judgment, the Court generally "consider[s] only admissible evidence." *Davis v. City of Little Rock*, 122 F.4th 326, 331-32 (8th Cir. 2024) (explaining that it is not an error for a district court to consider hearsay evidence that a party fails to challenge); *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (stating evidence is admissible for summary-judgment purposes if it "*could* be presented at trial in an admissible form"). The Court views that evidence in the light most favorable to the nonmovant and draws all reasonable inferences in their favor. *See Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc.*, 34 F.4th 649, 652 (8th Cir. 2022). The Court must also "not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Great Plains Real Est. Dev., LLC v. Union Cent. Life Ins.*, 536 F.3d 939, 943-44 (8th Cir. 2008)). As such, summary judgment is improper where the weight of opposing evidence is material to the outcome of the case or where "specific facts 'even partially' undermine the witness's credibility in a material way." *Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1048 (8th Cir. 2022).

### B.   Analysis

The defendants assert they are entitled to summary judgment on all of BJ's claims. Their arguments are wide-ranging, including that (1) BJ's lacks standing to bring race discrimination claims, (2) the individual defendants are entitled to qualified immunity on those claims, (3) the city is not liable for discrimination under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), and (4) BJ's has failed to show it engaged in protected activity to support its retaliation claim.  Some of those arguments miss the mark entirely, and others are defeated by BJ's assertion of triable fact issues.

### 1.   Due Process

First, the defendants find some success with BJ's due-process claim.  In prohibiting the states from depriving "any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, cl. 3, the drafters of the Fourteenth Amendment concerned themselves with protecting individuals from arbitrary government action, *see County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).  For the better part of the past century, courts have recognized that the protections under the Due Process Clause are two-fold, containing both "procedural due process and [] substantive due process components."  *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999).  The existence of a "protected life, liberty, or property interest" is a necessary element for any claim based on either procedural or substantive due process.  *McDonald v. City of St. Paul*, 679 F.3d 698, 704 (8th Cir. 2012) (quoting *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997)).

BJ's fails to sufficiently support a triable due-process claim in either form.  From the outset of this case, BJ's has alleged the defendants' actions "were arbitrary, capricious," and discriminatory.  To the extent it raised any due process claim under § 1983, BJ's appeared to base that claim on procedural due process.[7]  And logically so.

---

[7]At the motion-to-dismiss stage, the plaintiffs cited procedural-due-process cases in support of their claims (Filing No. 34).  *See, e.g.*, *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1130 (8th Cir. 2016).  In their subsequent answer to the

BJ's factual allegations, in large part, detail the alleged procedural abnormalities of its relationship with the city in proposing, bidding, performing, and resolving issues with respect to the custodial contract.

The defendants now move for summary judgment having made that same assumption. Their brief describes the factors to be weighed in procedural-due-process challenges, *see Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), and questions whether BJ's can successfully assert a "property interest in an unawarded contract." In response, BJ's curtly and peculiarly states it "does not assert a" procedural-due-process claim.

BJ's does not attempt to articulate any substantive-due-process claim either. Despite the defendants' arguments, BJ's does not describe any "interest allegedly violated" by the city officials. *Singleton*, 176 F.3d at 424 (quoting *Dover Elevator Co. v. Ark. State Univ.*, 64 422, 445-46 (8th Cir. 1995)). Nor does it put forth any effort to establish that the defendants' "conduct [] is so outrageous that it shocks the conscience or otherwise offends judicial notions of fairness, or is offensive to human dignity." *Williams v. Mannis*, 889 F.3d 926, 932 (8th Cir. 2018) (quoting *Moran v. Clarke*, 296 F.3d 638, 643 (8th Cir. 2002) (en banc), *abrogated on other grounds by Manuel v. City of Joliet*, 580 U.S. 357, 367-68 (2017)); *see also Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104 (8th Cir. 1992) (stating a "plaintiff must allege something more than that the government decision was arbitrary, capricious, or in violation of state law" to support a substantive-due-process claim). Those omissions are fatal to any substantive-due process-claim. The defendants are therefore entitled to summary judgment on any due process claim still asserted by BJ's.

---

plaintiffs' amended complaint (Filing No. 52), the defendants denied having "failed to provide [BJ's] with adequate due process." *Cf. Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007) (explaining substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them" (internal quotations omitted)).

### 2.   Race Discrimination

#### a.   Standing

At the motion-to-dismiss stage, the defendants argued and the Court agreed that Johnson was not a proper party to this suit because their allegedly injurious actions were taken against BJ's itself, and any claims Johnson asserted individually were derivative of BJ's. *See Potthoff v. Morin*, 245 F.3d 710, 716 (8th Cir. 2001) ("Generally, if a harm has been directed toward the corporation, then only the corporation has standing to assert a claim."). Having successfully represented that BJ's held all the cards, the defendants now seek to change trump, arguing it lacks standing to bring the very race-discrimination claims that sent Johnson out of the game. Neither the case law they cite nor principles of consistency and fairness support that conclusion.

The defendants frame their standing argument in terms of "whether the corporate entity [BJ's] may be found to have a racial identity such that it can be [unlawfully] discriminated against."[8] They largely seek support from *Oti Kaga, Inc. v. South Dakota Housing Development Authority*, 342 F.3d 871, 880 (8th Cir. 2003), but also admit that case "side-stepp[ed]" the actual issue they raise. There, the Eighth Circuit ignored the question of "whether a corporation can have a racial identity" and focused instead the prudential standing issue of the entity's ability to pursue Fair Housing Act, 42 U.S.C. § 3631 *et seq.*, "claims premised upon discrimination directed towards unnamed third-parties." *Id.* at 880; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014) (explaining the prohibition on raising another's legal rights falls under the prudential branch of standing, not Article III).

The defendants' reliance on *Oti Kaga* is flawed for a number of other reasons. Importantly, that case's holding was limited to circumstances that are not present here.

---

[8]This question is not—as BJ's puts it—one of Article III standing. The defendants do not appear to doubt that BJ's fulfills Article IIIs jurisdictional requirements, and there are no obvious reasons for the Court to do so either. *See* U.S. Const. Art. III, § 2; *Food & Drug Admin. V. All. for Hippocratic Med.*, 602 U.S. 367, 380-81 (2024) (stating the essential elements of Article III standing).

First, the Circuit's reasoning only addressed circumstances where a corporate plaintiff "assert[s] the rights of third-parties who have not been named as plaintiffs." *Oti Kaga*, 342 F.3d at 881. Those cases were distinguished from ones where "a corporate plaintiff, whose rights were 'intimately close' to the rights of named individual plaintiffs, [] assert[s] the rights of the individual plaintiffs who had standing to sue in their own right." *Id.* (discussing *Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208, 1214 (8th Cir. 1972)). In the latter scenario, a corporate plaintiff was already able to "establish prudential standing" to bring discrimination claims under the Fair Housing Act.

Putting the statutory differences aside, this case is much more similar to those cases than the scenario presented in *Oti Kaga*. Johnson initially filed this lawsuit as the sole plaintiff, and remained a named plaintiff when BJ's was added as a party in the amended complaint. Those circumstances do not present the same prudential standing concerns that were discussed in *Oti Kaga*.

Second, the defendants disregard the fact that matters of prudential standing necessarily turn on "the constitutional or statutory provision on which the claim rests." *Lucas v. Jerusalem Cafe, LLC*, 721 F.3d 927, 939 (8th Cir. 2013) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). *Oti Kaga*'s elaboration on a corporate plaintiff's ability to bring claims under the Fair Housing Act, therefore, has limited applicability to BJ's § 1983 claims. The case's reasoning is likely even less applicable to its § 1981 claim given the contractual relationship between BJ's and the city. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476-77 (2006) (explaining a § 1981 claim must identify an impaired contractual relationship under which the plaintiff itself has rights); *FCS Advisors, LLC v. Missouri*, 929 F.3d 618, 621 (8th Cir. 2019) (explaining only the corporate entity that was a party to the contract at issue would be able to assert a § 1981 claim, and that the plaintiff could not sue on its behalf); *see also Inner City Contracting, LLC v. Charter Twp. of Northville, Mich.*, 87 F.4th 743, 753 (6th Cir. 2023) (applying prudential-standing principles in concluding that "[w]here a corporation alleges that it

22

was not awarded a contract on the basis of race, it clearly falls within the zone of interests protected by" § 1981).

Finally, the prior events of this case further demonstrate the folly of the defendants' latest standing argument. In their arguments for dismissal, the defendants asserted Johnson did not claim an injury distinct from BJ's. That statement is directly at odds with the argument they now make to knockout the entirety of BJ's race discrimination claims. Such a two-tiered approach to attacking the plaintiffs' claims is inconsistent at best and manipulative at worst. It may also have effectively forfeited the arguments the defendants now make. *See June Med. Servs. LLC v. Russo*, 591 U.S. 299, 316-17 (2020) (discussing the possibility that prudential standing can be forfeited or waived), *overruled on other grounds by Dobbs v. Jackson Whole Women's Health Org.*, 597 U.S. 215, 292 (2022). *But cf. Lucas v. Jerusalem Cafe, LLC*, 721 F.3d 927, 938 (8th Cir. 2013) (discussing the diverging case law addressing whether prudential standing is jurisdictional or waivable). The defendants' fail to demonstrate their entitlement to summary judgment on this ground.

### b.    Individual Officers

Moving to the substance of BJ's discrimination claims, the defendants assert Bench, Kalcevich, Slater, and Vasquez (collectively, the "city officials") are entitled to qualified immunity. According to the defendants, the city officials cannot be held liable for violating BJ's rights under the Equal Protection Clause or § 1981 because it was not "clearly established in the Eighth Circuit that a corporation or limited liability company is capable of having membership in a protected class." They also claim there is a "complete lack of evidence in this case of discriminatory intent" and emphasize the purported nondiscriminatory reasons for the city officials' actions.

BJ's disagrees. It first counters that the defendants have incorrectly framed the clearly established question by focusing on an issue that has solely been treated as a matter of prudential standing. Regardless of that question, BJ's asserts the defendants

"knew or should have known the law forbids discrimination against BJ's" on the basis of race. BJ's also invokes the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-805 (1973), in arguing that fact issues preclude summary judgment on its discrimination claims against the city officials.

BJ's § 1981 and equal-protection claims are both brought pursuant to § 1983. *See Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 731 (1989) (concluding § 1983 is the exclusive means to bring actions against state actors alleged to have violated the rights protected by § 1981). When sued in their individual capacity, "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). On summary judgment, district courts "have discretion to decide the order in which to engage these two prongs" but "may not resolve genuine disputes of fact in favor of the party seeking summary judgment" in doing so. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### i.    Clearly Established Law

Like the parties, the Court begins its analysis with the clearly established prong. "A right is 'clearly established' when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Dimock, Tr. for Heirs of Dimock-Heisler v. City of Brooklyn Ctr.*, 124 F.4th 544, 550 (8th Cir. 2024) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)). To be clearly established, "existing law must put the constitutional question beyond debate." *Harmon v. Preferred Family Healthcare, Inc.*, 125 F.4th 874, 885 (8th Cir. 2025). Such a showing can be made through either "'controlling authority' or a 'robust consensus of cases of persuasive authority.'" *Dimock*, 124 F.4th at 550 (quoting *Wesby*, 583 U.S. at 63).

24

The question must not be defined "at a high level of generality." *Id.* at 884 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). But absolute specificity is also not required: a plaintiff need not identify "a case directly on point" to establish that a "'reasonable official would understand that what he is doing is unlawful.'" *Id.* (quoting *Wesby*, 583 U.S. at 63); *see also Ellis v. Houston*, 742 F.3d 307, 325 (8th Cir. 2014) ("The unlawfulness of the action 'must merely be apparent in light of preexisting law.'" (quoting *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 531 (8th Cir. 2009) (en banc))).

The Court harbors some doubt about the parties' framing of the question presented by BJ's discrimination claims. The Court's qualified-immunity analysis focuses on whether the plaintiff's claimed "right" was clearly established. Here, that right is the right of BJ's to be free from race discrimination in seeking and performing public contracts. The question of whether BJ's substantive right to equal treatment is clearly established is arguably separate from the statutory and prudential standing concerns surrounding whether a corporate plaintiff can seek relief for such discrimination. Still, as described below, the law appears to be relatively clear that BJ's can pursue such claims.

The Court concludes the law was sufficiently clear that every reasonable official would understand it to be unlawful to discriminate against a public contractor or hopeful public contractor on the basis of race. The "general principle of the right to equal protection has been clearly established," but "a more specific inquiry" must be made for qualified-immunity purposes. *Bills v. Dahm*, 32 F.3d 333, 335 (8th Cir. 1994); *see, e.g.*, *Ellis v. Houston*, 742 F.3d 307, 325 (8th Cir. 2014) (concluding "the law was clearly established that race based harassment and retaliation would violate black officers' constitutional rights"). There can be little to no doubt here that, if their actions were motivated by race,[9] the city officials' differential treatment of BJ's would be

---

[9]The city officials deny acting with any racist or discriminatory intent. But at this point in its inquiry, the Court must not "import[] genuinely disputed factual propositions," *Tolan v. Cotton*, 572 U.S. 650, 657 (2014), or delve into questions of

unconstitutional. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1995) (subjecting race-based classifications in public contracting to strict scrutiny). Section 1981, on its face, establishes an even clearer prohibition against such discrimination. *See Domino's Pizza*, 546 U.S. at 474 (stating § 1981 "protects the equal right of 'all persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race" (quoting § 1981)).

### ii. Violation of Rights

The Court must therefore assess whether BJ's has provided sufficient proof that each of the city officials violated its rights under § 1981 and the Equal Protection Clause. *See Beard v. Falkenrath*, 97 F.4th 1109, 1114 (8th Cir. 2024) (stating the court must conduct its qualified-immunity analysis "defendant-by-defendant and claim-by-claim"). "[T]he Fourteenth Amendment 'proscri[bes] . . . all invidious racial discriminations.'" *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 205 (2023) (second alteration in original) (quoting *Loving v. Virginia*, 388 U.S. 1, 8 (1967)). Section 1981 more specifically "prohibits racial discrimination in all phases and incidents of a contractual relationship." *Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 962 (8th Cir. 2023) (quoting *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 468 (8th Cir. 2009) (en banc)); *see also Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) ("[P]urposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981.").

To establish a prima facie case of discrimination under § 1981, "a plaintiff must show '(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected [contractual] activity, and (4) interference with

---

subjective intent, *see Mathers*, 636 F.3d at 401. Instead, those issues go to whether BJ's has produced sufficient proof of discrimination. *See Mathers* at 401.

that activity by the defendant.'"[10]  *Johnson v. Schulte Hosp. Grp., Inc.*, 66 F.4th 1110, 1118 (8th Cir. 2023) (quoting *Gregory*, 565 F.3d at 469).  Ultimately, a § 1981 "plaintiff bears the burden of showing that race was a but-for cause of its injury."  *Comcast Corp. v. Nat'l Assoc. of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020).  "To show discriminatory purpose" violative of the Equal Protection Clause, a plaintiff must show the official action or decision "was at least partially based on race."  *United States v. Bell*, 86 F.3d 820, 823 (8th Cir. 1996).

Generally, a plaintiff may preclude summary judgment on a discrimination claim either by "present[ing] admissible evidence directly indicating unlawful discrimination" or establishing "an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas*."  *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012) (quoting *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009).  As BJ's recognizes, the burden-shifting analysis set forth in *McDonnell Douglas* governs both its § 1981 and equal protection claims on summary judgment given the lack of direct evidence of discrimination.[11]  *See*, *e.g.*, *Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 899 (8th Cir. 2020) (equal protection); *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 (8th Cir. 2010) (Section 1981).

Under that framework, BJ's "has the [initial] burden to establish a prima facie case of discrimination."  *Lake*, 596 F.3d at 873 (8th Cir. 2010).  "The burden then shifts to the defendant[s] to provide a legitimate, nondiscriminatory reason for its decision."  *Lake*,

---

[10]The defendants do not effectively challenge BJ's evidence of the third and fourth elements of its § 1981 claim.  Their questionable, fleeting statement that Slater and Vasquez took no "adverse action" against BJ's is unsupported by the record or any reference to authority.  *Cf. Ritchie Cap. Mgmt., LLC v. Jeffries*, 653 F.3d 755, 763 n.4 (8th Cir. 2011) (refusing to "address the merits of . . . [an] argument mentioned in [a party's] brief only by way of a footnote").

[11]The defendants fail to acknowledge the import of *McDonnell Douglas* analysis in either their initial or reply briefs in support of their motion for summary judgment.

596 F.3d at 873.  If they're able to do so, the burden "shifts back to [BJ's] to show that the proffered reason was pretext for discrimination."  *Id.* at 874.

The defendants first claim that BJ's cannot establish it is a member of a protected class.  The Court disagrees.  "Almost every federal court of appeals has allowed corporations to allege racial discrimination, and none have established a contrary rule." *Inner City Contracting,* 87 F.4th at 752 (collecting cases); *see also Domino's Pizza*, 546 U.S. at 473 n.1 (acknowledging "the Courts of Appeals to have considered the issue have concluded that corporations may raise § 1981 claims).

Although the Eighth Circuit has yet to establish a line of analysis for discrimination claims brought by corporate plaintiffs, the present record indicates that BJ's would fulfill any such standard.  *See*, *e.g.*, *Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 715 (4th Cir. 2014) (stating a plaintiff's corporate status did not prevent its assertion of a race-discrimination claim where the plaintiff was certified by the state as a minority-owned business and represented itself as such when it contracted to work with a public agency); *White Glove Staffing, Inc. v. Methodist Hosps. of Dallas*, 947 F.3d 301, 305-07 (5th Cir. 2020) (deciding that a corporate § 1981 plaintiff "does not need a racial identity" to assert a discrimination claim); *Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1072 (10th Cir. 2002) (permitting a corporation "to assert discrimination claims under § 1981 and § 1982 where such discrimination is based on the race of one of its employees").  It is undisputed that BJ's is Black-owned and operated and was identified by the city as "Black/African American" in the SEB directory.  The Court is not compelled by the defendants' attempts to muddy the water.

"An inference of racial discrimination may be established by showing that a similarly-situated person of another race was treated more favorably."  *Mitchell*, 959 F.3d at 899.  Evidence satisfying the pretext stage of *McDonnell Douglas* "can also satisfy the inference-of-discrimination element of the prima-facie case."  *Young v. Builders Steel*

*Co.*, 754 F.3d 573, 578 (8th Cir. 2014).  That includes evidence that a defendant "failed to follow its own policies" or "shifted its explanation of [its] decision."  At this stage, though, the plaintiff does not bear the "onerous" burden to "disprove [the] defendant's alleged" legitimate reason for its treatment.  *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994).

Setting aside the defendants' proffered reasons as the Court must, BJ's presents various circumstances underlying its bidding for and performance under the custodial contract that create an inference of discrimination.  *Lake*, 596 F.3d at 874.  Of particular import are the numerous instances of the city officials' arguable violations of or inability to follow the city's own laws and procedures governing its contracting.  That includes— among other things—the omission of the HRR Department from the process, failure to properly prioritize SEB program participants, and improper communications with BMI.  Additionally, BJ's aptly points out contradictions in the city officials' explanations of their decisions, especially in the bidding process.

Moreover, the record could lead to a reasonable inference that the city officials wanted to avoid contracting with BJ's and took multiple measures to do so.  In fact, when Peters warned the city officials that the proposed rebid of the project "seem[ed] to be an effort to accommodate" BMI and had no "reasonable basis," Slater and Bench eventually disregarded that advice and set up another opportunity for BMI to get things right.  A reasonable jury could further construe the evidence of Vasquez's efforts to increase surveillance and criticism of BJ's as purposefully setting the company up for termination.

There is also colorable evidence that BMI—a white-owned company that similarly struggled with performance issues—did not face that same scrutiny when it took on the custodial contract.  The defendants' argument that BMI was also eventually fired by the city fails to reasonably rebut that evidence.  Nor do they challenge whether BJ's and BMI were "similarly situated in all relevant respects."  *Young*, 754 F.3d at 578 (quoting *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 (8th Cir. 2012)).

Viewing that evidence in the light most favorable to BJ's, BJ's has established an inference of discrimination as to each of the city officials individually. *See Tolan*, 572 U.S. at 655-56; *Barbibeau v. City of Minneapolis*, 596 F.3d 465, 482 (8th Cir. 2010) (explaining a public "employee may be held personally liable for a constitutional violation only if his own conduct violated a clearly established constitutional right"). There is significant evidence that Slater engaged in inappropriate communication with BMI and took other actions indicating a preference for BMI over BJ's, even in the face of contradictory regulations and advice. For her part, Vasquez was heavily involved in scrutinizing BJ's performance through methods that do not appear to have been used with other, non-Black contractors.

With the exclusive powers of his position, Bench rejected bids to the RFP and first RFB—giving BMI more chances to win the Parks Department's business—and arguably misconstrued those decisions to vendors. When Kalcevich took over the Director position, he too seems to have treated BJ's disparately. Kalcevich admittedly became personally involved in the scrutiny applied to BJ's and gave BMI more leeway when it also struggled to succeed on the job. In all, there is evidence from which a reasonable jury could conclude each of the city officials individually treated BJ's worse than BMI.

The defendants proffer alternative explanations for some of these actions. At the outset, they defend their approach to the bidding process by offering their own interpretations of municipal laws and RFP language, admitting officials' misunderstandings, and pointing to the COVID-19 pandemic. They also heavily rely on the asserted issues with BJ's performance to support their management and termination of the custodial contract.

That reasoning may get them part of the way there, but triable issues remain. To start, the defendants fail to offer any reasons for BMI's differential treatment during its performance of the custodial contract. Given the defendants' admission that issues with performance remained once BMI took over, there is no obvious reason why Parks

30

Department officials would throw out methods they found useful in evaluating and addressing BJ's performance.

Even assuming the defendants can rebut the presumption of discrimination, BJ's establishes triable issues remain to preclude summary judgment. For the same reasons described above, the Court concludes BJ's has met its burden "to produce evidence sufficient to create a genuine issue of material fact regarding whether [the defendants'] proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *Torgerson*, 643 F.3d 1031. In sum, the defendants have failed to demonstrate the city officials' entitlement to summary judgment on qualified-immunity grounds or the merits of BJ's race-discrimination claims.

### c. City of Omaha

To prevail on its race-discrimination claims against the city, BJ's must do more than establish the city officials violated its rights under § 1981 and the Equal Protection Clause. *See Monell*, 436 U.S. at 691 (explaining "a municipality cannot be held liable" under § 1983 "*solely* because it employs a tortfeasor"); *Jett*, 491 U.S. at 735-36 (applying those principles to causes of action based on § 1981). It must also show that the violation of its rights "was caused by a [municipal] custom or policy within the meaning of *Monell* and subsequent cases." *Jett* at 736. In opposing summary judgment, BJ's contends it can make such a showing based on the actions of "municipal officials who have 'final policymaking authority.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

"Municipal liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017) (quoting *Pembaur*, 475 U.S. at 483). Which officials "decisions represent the official policy of the local government unit is [] a legal question." *Jett*, 491 U.S. at 737; *see also Atkinson v.*

31

*City of Mountain View*, 709 F.3d 1201, 1215 (8th Cir. 2013) (describing that question as one for the judge, "not the jury"). The Court makes that determination by looking to "(1) state and local positive law and (2) state and local custom or usage having the force of law." *Soltesz*, 847 F.3d at 946 (quoting *Atkinson*, 709 F.3d at 1215).

BJ's argues that both Bench and Kalcevich's "policy-level," "personal participat[ion] in the discriminatory conduct toward BJ's" warrants holding the city liable for the city officials' alleged misconduct. Its argument is rather brief and does not totally knock the ball out of the park. But the defendants utterly fail to address BJ's assertions, which have at least some factual support. Under these circumstances, the defendants have not established the city's entitlement to summary judgment.

### 3.     First Amendment Retaliation

Finally, the parties express some disagreement over BJ's maintenance of a First Amendment retaliation claim. The defendants state they assume, based on the plaintiffs' amended complaint and the Court's earlier Memorandum and Order, "that the only claims asserted by [BJ's] were race discrimination claims." In their view, any retaliation claim was "personal to" Johnson and dismissed "when he was dismissed as a party to these proceedings."

Nothing in the amended complaint so limits a First Amendment retaliation claim under the facts of this case. And the only matter addressed by the Court on the defendants' motion to dismiss was whether BJ's or Johnson was the real party in interest to such a claim. Deciding that the injuries from any alleged retaliation were borne by BJ's, the Court merely extended its earlier reasoning that Johnson's claims were derivative and warranted dismissal. *See generally Potthoff*, 245 F.3d at 716. It did not intend to speak to the validity of any claim brought by BJ's.

That aside, the defendants' only substantive argument for summary judgment is that the plaintiffs' previous lawsuits were baseless. As support, they mention that BJ's

32

admits one of the lawsuits was eventually dismissed and argue that BJ's fails to establish the legitimacy of another suit it filed against the city. That argument falls short of establishing their entitlement to summary judgment. *Hodge ex rel. Farrow v. Walgreen Co.*, 37 F.4th 461, 465 (8th Cir. 2022) (describing the summary-judgment movant's burden to show "that there is an absence of evidence to support the nonmoving party's case").

Among other things, a retaliation claimant must show that they engaged in constitutionally protected activity. *See Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014). The "filing of a lawsuit is generally a protected activity under the First Amendment," *Eggenberger v. W. Albany Twp.*, 820 F.3d 938, but engaging in "baseless litigation" is not, *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983).

The mere fact that Johnson and BJ's past lawsuits were dismissed on summary judgment fails to demonstrate that they were without any factual basis, let alone that they were somehow "made for purposes of harassment, vexatiousness [or] otherwise in bad faith." *Eggenberger*, 820 F.3d at 938. The defendants also turn a blind eye to the circumstances surrounding the multiple public-records requests made to the city. *See Rudd v. City of Norton Shores, Mich.*, 977 F.3d 503, 514 (6th Cir. 2020) (concluding the plaintiff adequately alleged he engaged in protected "petitioning and speech activities" by filing public-records requests); *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019) (stating "a citizen's public records requests and lawsuits against the government can clearly constitute protected First Amendment activity"). Their brief assumption that BJ's may not be able to prove causation—which is usually a jury question—also does not warrant the entry of summary judgment. *See De Rossitte v. Correct Care Solutions, LLC*, 22 F.4th 796, 804 (8th Cir. 2022) (explaining the question of whether the defendant's retaliatory motive was a but-for cause of adverse action must be "so free from doubt as to justify taking it from the jury" at the summary-judgment stage).

33

## III.    CONCLUSION

BJ's has presented evidence that could be reasonably inferred to demonstrate the defendants preferred to work with another vendor and took steps to avoid contracting with BJ's that resulted in differential treatment.  It is not for the Court to decide whether that treatment was based on BJ's race, criticism and oversight of the city's practices, or some other, benign reason.   On the record and arguments before the Court, those questions are for a jury.  Thus, for the foregoing reasons,

IT IS ORDERED:

1.    Defendants City of Omaha, Matt Kalcevich, Brook Bench, Kari Vasquez, and Steven Slater's Motion for Summary Judgment Based Upon Qualified Immunity and Upon the Merits (Filing No. 169) is granted in part and denied in part as described in this Memorandum and Order.

2.    Plaintiff BJ's Fleet Wash, LLC's due-process claim (Filing No. 21) is dismissed.  The defendants' motion for summary judgment is denied in all other respects.

Dated this 4th day of March 2025.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge