**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| BJ'S FLEET WASH, LLC, | |
| **Plaintiff,** | **8:22CV131** |
| vs. | |
| CITY OF OMAHA, et al., | **FINDINGS AND RECOMMENDATION** |
| **Defendants.** | |

This matter comes before the Court on the Motion to Enforce Settlement Agreement (Filing No. 219) filed by the defendants, the City of Omaha ("the City"), and Brook Bench, Matt Kalcevich, Steven Slater, and Kari Vasquez in their individual capacities (collectively, "Defendants"). Defendants move the Court for an order enforcing the terms of a settlement agreement—the Mediation Settlement Memorandum ("MSM")—reached and signed by the parties in this case during a mediation facilitated by an independent third-party mediator on April 10, 2025. Defendants assert they have performed their obligations under the MSM, including obtaining the City Council's approval of a resolution authorizing payment of the agreed settlement amount of $575,000 to the plaintiff, BJ's Fleet Wash, LLC ("BJ's"), and the Mayor has signed the City Council's resolution. Defendants now request that the Court enter an order (1) permitting the City to deposit $575,000 with the Clerk of Court; (2) releasing and discharging "all claims [BJ's] claims to have, or in the future may have against the City Defendants and their/its agents, employees, heirs, successors, assigns and insurers arising out of the dispute;" (3) dismissing the above-captioned lawsuit against the defendants; (4) and, upon the Clerk of Court's receipt of $575,000, entering a satisfaction of judgment. (Filing No. 219).

BJ's contends the MSM is unenforceable under various equitable principles of Nebraska contract law. (Filing No. 223). BJ's asserts there was no "meeting of the minds" as to the scope of the release, which was a material term of the agreement. Second, BJ's contends there was a "mistake" as to the scope of the suit itself and the potential damages available at trial, and that BJ's former attorney and the mediator misrepresented the facts regarding the scope of release and scope of the suit. (Filing No. 223 at pp. 6-7, 18). BJ's further argues the MSM is an unenforceable "agreement to agree" and lacked certainty. (Filing No. 223 at pp. 19-20). BJ's also asserts the

MSM "is voidable based on duress because its terms are unjust and unconscionable," as BJ's attorney at the time threatened to withdraw from his representation if his client failed to participate in the mediation.  (Filing No. 223 at pp. 20-22).  Finally, BJ's asserts the MSM's waiver is so broad that it would allow Defendants to "discriminate and retaliate against [BJ's] with impunity, so long as those actions were somehow related to [this] suit."  (Filing No. 223 at pp. 22-23).

The matter was referred to the undersigned magistrate judge to issue a Findings and Recommendation pursuant to 28 U.S.C. § 636 by the Honorable Robert F. Rossiter, Jr., Chief United States District Court Judge.  The undersigned magistrate judge held an evidentiary hearing on the motion on November 7, 2025, and the matter is now fully submitted.  For the following reasons, the undersigned magistrate judge will recommend that Defendants' motion to enforce the mediated settlement be granted.

## FACTUAL BACKGROUND

The Court set forth the facts in detail in its Memorandum and Order (Filing No. 200) on Defendants' motion for summary judgment, but for context they are summarized below.

BJ's is a Nebraska limited liability corporation that has performed public and private cleaning contracts in and around Omaha for decades.  Its owner and sole member, Rodney Johnson ("Rodney"), is a Black male that manages BJ's day-to-day operations.  BJ's is a certified Tier I emerging small business ("ESB") under the City's Small and Emerging Business program (the "SEB program"), which was established to promote opportunities for small businesses.  Over the years, Rodney has expressed disagreements with the City's award of certain contracts, alleging the City has demonstrated bias or favoritism.  BJ's has previously filed lawsuits against the City for the way it handled certain bids for contracts for services, including a lawsuit in federal court against the Omaha Transit Authority concerning a cleaning contract for city busses, (Case No. 8:17CV23), and a lawsuit in state court against the Public Works Department for violating standard bidding procedures regarding a 2020 public contract for solid-waste collection.

The instant case arises out of the City's requests for proposals for vendors to provide custodial services for the City's Parks, Recreation, and Public Property Department (the "Parks Department") facilities.  On July 31, 2019, the Douglas County Purchasing Agent (the "Purchasing Agent") issued a Request for Proposal (the "RFP") to solicit proposals.  Proposals were to be submitted by August 21, 2019.  The RFP provided certain specifications for contractors, and set

forth requirements and directions for vendors submitting proposals in order for their proposals to be considered valid, including submitting a bid bond. Proposals that failed to comply with those requirements would be rejected.

Six vendors submitted proposals to the RFP. BJ's was one of four ESB vendors that submitted a proposal. BJ's proposal met the RFP's submittal and bid-bond requirements. Among the other vendors that submitted proposals were BMI Janitorial Group ("BMI"), whose president, Dan Beckman ("Beckman"), is a white man. Another vendor, RTG Building Services ("RTG") listed as "Hispanic" in the SEB directory also properly submitted its proposal.

The parties disagree whether BJ's and BMI's proposals conformed with all of the RFP's required conditions. The City established an Evaluation Committee (the "Committee") consisting of Slater, maintenance manager Joshua Frey ("Frey"), recreation manager Tracy Stratman ("Stratman"), and recreation coordinator Chris Haberling ("Haberling") to assess the submitted proposals. Initially, Slater forwarded only BMI's and RTG's proposals to the Committee. Rodney challenged BJ's exclusion, and Slater ultimately also submitted BJ's proposal to the Committee. In October 2019, the Committee interviewed representatives from BJ's, BMI, and RTG, and each Committee member separately evaluated and assigned numerical scores of up to 100 to the vendors. BMI received the highest average score of 95, with BJ's in second with 85.5. The Committee thereafter recommended the Parks Department award the custodial contract to BMI. Brook Bench ("Bench"), the Director of the Parks Department at the time, submitted the janitorial contract with BMI for consideration by the City Council on January 7, 2020.

The City received written protests to the proposed award, including one from BJ's, arguing that BMI did not comply with the RFP's required conditions. During the City Council hearings in January 2020 for consideration of the ordinance to approve the agreement with BMI ("Ordinance 42122"), a representative of RTG expressed a similar opinion. Another Omaha resident also appeared in opposition to Ordinance 42122, voicing his belief that BMI's bid submittal should have been rejected as noncompliant. Following these public comments, the City Council rejected Ordinance 42122 by a vote of four to three at a January 28, 2020, hearing.

Slater then drafted a letter to inform all vendors who had submitted proposals to the RFP that "all proposals submitted . . . ha[d] been rejected by the Omaha City Council due to conflicting criteria" in the RFP. Deputy City Attorney Michelle Peters ("Peters") approved the letter, and

3

Bench signed it and sent it to BJ's and the other vendors on January 29, 2020. The parties dispute the rejection letter's accuracy and whether Defendants properly rejected all proposals.

On the same day the rejection letters were sent, Slater emailed Beckman with a spreadsheet comparing the proposal prices of each vendor and calculations regarding the City's potential savings if it chose BMI. At his deposition, Slater testified he sent the information to Beckman because he "believe[d Beckman] requested it," whereas BJ's surmises Slater was attempting to provide BMI a competitive advantage over the other bidders. On February 6, 2020, Slater again emailed Beckman with instructions on how to appeal the rejection of BMI's proposal. BJ's was not contacted with similar information.

BJ's submitted a written appeal on February 7, 2020. Rodney also began requesting public records regarding the RFP and ensuing events. Slater emailed Beckman about BJ's appeal, and notified him the City Council would consider the matter on February 25, 2020, in case he wanted to attend.

In March 2020, the Parks Department published a Request for Bid (the "first RFB") for its custodial needs due to the effects of the COVID-19 pandemic. The bid opening date was set for April 1, 2020. The first RFB required bidders to provide a bid bond or certified check amounting to 5% of the total cost of the bid. Three bidders submitted conforming bids: BJ's, RTG, and Nifty Clean. BJ's bid was the highest. BMI also submitted a bid but failed to secure sufficient bid security, and was deemed ineligible for consideration on that basis.

On April 16, 2020, Slater sent an email to Bench and Peters with his opinion that the Parks Department should reject the bids to the RFB and have the project rebid due to the COVID-19 pandemic, "confusion over the change in bid bond requirements," and bidders' purported difficulty in accessing the facilities as necessary to prepare their bids. In his deposition, Slater testified he had not heard from any of the bidders that they had such concerns. Peters responded that she did not "think there [was] a reasonable basis to rebid" and expressed concern that the proposed rejection was an unfair effort to accommodate BMI. Bench initially agreed with Peters, adding that a rebid would cause "many red flags [to] go up." Following an April 20, 2020, Committee meeting, however, Bench rejected all of the bids in response to the RFB, and notified the bidders by letter on April 29, 2020.

Defendants maintain that, as Bench stated in his letters, the rejection of bids was due to the changing circumstances from the COVID-19 pandemic. BJ's contends the rejection was another

4

decision with the intent to provide BMI with more opportunities to win the bid. An attorney for BJ's submitted a public-records request to the city seeking documents related to the first RFB on June 10, 2020. Ten days later, Bench resigned from his position. Later in the summer, Rodney also later filed a public records request for information related to the waste-collection contract.

On August 19, 2020, another request for bid (the "rebid") was published for the parks facilities' custodial services, with bids to open on September 2, 2020. Defendants maintain they added additional requirements due to the COVID-19 pandemic. The rebid also included a clause prohibiting communication between potential bidders and City employees, directing all communication to a specific email set up for bid questions. It further provided that violation of the rebid's conditions was sufficient cause to reject a bid.

On August 20, 2020, Slater contacted Beckman personally by email to inform him the rebid would be published that day on the Purchasing Agent's website, and directed Beckman to the website for "[s]pecifications and bid bond instructions." On the same day, Rodney filed a lawsuit challenging the waste-collection contract. Rodney served the City with that lawsuit six days later. That litigation progressed throughout the Fall of 2020.

On September 2, 2020, the City publicly opened the bids responding to the rebid, and received conforming bids from BJ's, BMI, and RTG. BJ's was the lowest bid at $266,279, BMI's was $291,170, and RTG's was $336,000. After being informed of the bids, Jake Lindner ("Lindner"), then the Interim Director of the Parks Department, asked the members of the committee, "Is that the same guy as last time?" On September 29, the Purchasing Agent gave notice of the City's intent to award the custodial contract to BJ's. Slater informed public events administrator Kayla Clemens ("Clemens") of the award on September 30, to which she replied: "How mad is BMI over this!? Crazy . . . now we have to deal with BJs."

The City Council accepted the custodial contract with BJ's through its vote on Ordinance No. 42362 on November 12, 2020, and the Mayor signed the agreement that day. BJ's was required by the Purchasing Agent to provide proof of fidelity and performance bonds within ten days or risk forfeiting the award. BJ's secured the requisite insurance and bonds and delivered proof on November 24, 2020. A few days later, the Purchasing Agent asked BJ's to begin performance a month early at Slater's request. Slater believes Vasquez, then the acting recreation manager, made the decision to move up the start date.

5

Rodney suspects that some at the Parks Department doubted whether his company would perform well from the outset. As outlined by the Court in more detail in its Memorandum and Order, the relationship between BJ's and the City from BJ's assumption of performance under the custodial contract and the City's termination of the contract on May 4, 2021, was fraught with difficulties. From BJ's perspective, although Rodney was proactive in attempting to elicit, review, and address feedback from Parks Department staff, Vasquez instructed supervisors not to respond to BJ's request for cleaning reviews and to send them to her or Slater, an approach that contrasted with how another vendor was treated under a previous contract. Early on, BJ's received some positive feedback and some Parks Department staff seemed happy with BJ's performance.

By January 15, 2021, however, facility coordinator Orenthian Everett ("Everett") sent an email indicating the City was "working on severing ties" with BJ's due to performance problems. In response to what Defendants assert were early concerns about BJ's performance, on January 22, 2021, Vasquez directed Parks Department supervisors and coordinators to begin "Part I" of a janitorial plan tracking BJ's performance. Vasquez regularly reviewed surveillance footage to investigate the accuracy of the supervisors' evaluations, and BJ's believes she pressured staff to find fault in its services.

Near the end of January 2021, Kalcevich was "highly suspicious" over whether BJ's genuinely wanted "to be a good partner," and expressed those views in a February 22, 2021, phone call with Rodney. Kalcevich also gave Rodney a thirty-day verbal warning and threatened to terminate the custodial contract. As required under the custodial contract, Kalcevich sent BJ's three formal written notices of non-compliance with contractual specifications on March 23, April 9, and April 26, 2021. Kalcevich specifically complained of purported no-shows, failure to perform required tasks, and the presence of unauthorized children at worksites with BJ's employees. On May 4, 2021, the City sent Rodney notice that it was terminating the custodial contract. BJ's disputes whether that termination complied with the custodial contract's terms. The City has also not released BJ's performance bond.

In May 2021, BMI assumed the custodial contract. The City approached its relationship with BMI differently than it did BJ's, permitting BMI to perform custodial services for several months without securing a performance bond and to contact site supervisors directly. And, when BMI received complaints about its performance, the City did not utilize the same aggressive

8:22-cv-00131-RFR-MDN    Doc # 242    Filed: 02/20/26    Page 7 of 30 - Page ID # 5327

strategies it used with BJ's to monitor BMI's performance.  Eventually, however, BMI was also terminated from the custodial contract for poor performance.

## PROCEDURAL BACKGROUND

On April 11, 2022, Rodney, individually, commenced the instant lawsuit against the City, Bench and Kalcevich in their individual and official capacities, and Slater and Vasquez in their individual capacities.  (Filing No. 1).  After Defendants moved to dismiss his lawsuit for failure to state a claim (Filing No. 18), Rodney filed an Amended Complaint (Filing No. 21) adding BJ's as a plaintiff and asserting claims for (1) First Amendment retaliation; (2) race discrimination in the making and enforcing of public contracts under 28 U.S.C. §§ 1981 and 1983, and (3) "denial of equal protection and due process" under § 1983.  In the Amended Complaint, BJ's requested economic damages including $4,762,500 for "reasonably anticipated lost income" or alternatively lost profits over a six-year period; expenses "incurred in the course of his participation in each of the three bidding processes"; punitive damages, and attorneys' fees.  (Filing No. 21 at p. 31). Rodney, individually, requested damages in the amount of $7,988.37 for the 3% bid performance deposit; economic damages including recovery of his investment of his personal funds, lost income, expenses incurred in the course of his participation in each of the three bidding processes, expenses incurred for performance of the contract, compensatory damages; punitive damages; and attorneys' fees.  (Filing No. 21 at pp. 31-32).

Defendants also moved to dismiss the Amended Complaint. The Court granted Defendants' motion and dismissed all claims asserted by Rodney individually for lack of standing because he failed to allege sufficient facts showing he suffered a direct, nonderivative injury independent from BJ's.  The Court also dismissed BJ's official-capacity claims against Bench and Kalcevich as redundant of its claims against the City.  (Filing No. 43).

The remainder of BJ's claims proceeded, and over the ensuing years, the parties engaged in discovery, including third-party discovery directed to Beckman, and encountered many discovery hurdles requiring the Court's intervention.  Eventually, the matter was set for trial to commence on April 14, 2025, (Filing No. 168), and at the close of discovery Defendants moved for summary judgment on all of BJ's remaining claims, (Filing No. 169).

On March 4, 2025, the Court granted Defendants' motion for summary judgment as to BJ's due process claim, but otherwise determined that BJ's presented evidence that could be reasonably

7

inferred to demonstrate Defendants preferred to work with another vendor and took steps to avoid contracting with BJ's, resulting in differential treatment. The Court concluded a jury must determine whether that differential treatment was based on race or some other reason. (Filing No. 200).

Upon the parties' joint request (Filing No. 198), the Court continued the final pretrial conference to April 14, 2025, and continued trial to May 12, 2025. (Filing No. 202). Prior to their final trial preparation, the parties scheduled mediation with Mark Christensen on April 10, 2025. The details of that mediation will be discussed further below, but on April 11, 2025, the undersigned magistrate judge was advised by counsel for BJ's, Adam Sipple, that the parties had settled the case at mediation. Because the City needed to obtain approval of the settlement from the City Council, the Court entered an Order requiring the parties to file a stipulation for dismissal on or before June 27, 2025. The Order warned the parties that "Absent compliance with this order, this case (including all counterclaims and the like) may be dismissed without further notice." (Filing No. 203).

Less than a week later, on April 15, 2025, Sipple filed a sealed motion to withdraw from his representation of BJ's, citing several grounds for his withdrawal, including that Rodney had instructed Sipple to inform defense counsel "he will not settle as agreed" during the mediation. (Filing No. 205). On April 29, 2025, the undersigned magistrate judge held a partially sealed hearing on Sipple's motion to withdraw. During the unsealed portion of the hearing, Rodney indicated he had retained new counsel that would be entering an appearance on BJ's behalf. Defendants also stated their intent to seek the Court's enforcement of the settlement agreement reached during mediation. (Filing No. 208). Following the hearing, the Court permitted Sipple to withdraw as BJ's counsel, and attorneys Lynae A. Tucket-Chellew and Keith W. Dornan entered their appearance for BJ's. (Filing Nos. 209-211).

On May 9, 2025, the undersigned magistrate judge held a telephone conference with the current attorneys of record, during which they requested a court-supervised settlement conference to see if the mediated settlement could be salvaged. (Filing No. 214). The undersigned magistrate judge presided over a settlement conference with counsel and representatives for the parties for nearly 6.5 hours on May 22, 2025, but the parties did not reach a final agreement; however, the parties requested additional time to consider the matter. (Filing No. 216). The undersigned magistrate judge held status conferences with counsel on May 27, 2025, and June 24, 2025, but

Rodney, on behalf of BJ's, remained unwilling to execute the settlement and release drafted by Defendants and to dismiss this case. (Filing Nos. 217-218). The undersigned magistrate judge therefore granted Defendants leave to file a motion to enforce the mediated settlement agreement.

Defendants filed the present Motion to Enforce the Settlement Agreement on July 1, 2025. (Filing No. 219). The motion was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636. Because the undersigned magistrate judge previously presided as the neutral in the settlement conference, on July 28, 2025, the parties were required to file a Declaration stating whether or not they waived his recusal for the pending matter. (Filing No. 226). In the same order, the undersigned magistrate judge granted BJ's request for an evidentiary hearing (Filing No. 223). Both parties filed Declarations waiving the undersigned magistrate judge's recusal. (Filing No. 228; Filing No. 229).

The undersigned magistrate judge held a status conference on August 13, 2025, with current counsel for the parties and with Sipple, whose communications with his client, Rodney, would be elicited with respect to the motion to enforce. BJ's was directed to file a stipulation of waiver of attorney-client privilege regarding Rodney's communications with Sipple. On August 29, 2025, BJ's filed the stipulation stating it "waives its attorney-client privilege concerning communications between Rodney Johnson and Adam Sipple concerning the mediation and settlement of this case." (Filing No. 231).

An evidentiary hearing on the motion to enforce took place on November 7, 2025. (Filing Nos. 234, 241). The Court received testimony from Sipple and from Rodney. The Court received Defendants' Exhibits 101-128, without objection, and received Defendants' Exhibit 129 over Plaintiff's foundation objection. The Court requested a transcript[1] be prepared of the evidentiary hearing, which was filed on December 11, 2025. (Filing No. 241).

### TESTIMONY AND EVIDENCE ADDUCED AT THE EVIDENTIARY HEARING

Rodney testified he approached a few different law firms for advice regarding the facts outlined above. He eventually was referred to Domina Law, where Sipple was then working, and hired the firm in December 2021 or January 2022. Shortly thereafter, Sipple advised Rodney he was leaving Domina Law, and gave him the option to stay with the firm or have Sipple continue

---

[1] The Court will cite to testimony from the hearing using the page number of the Transcript ("TR.) located at Filing No. 241.

his representation. Rodney opted to have Sipple continue to represent him, and paid his retainer and entered a structed fee agreement. (TR. 59-60). Sipple was BJ's only attorney from the inception of the lawsuit and "did everything." (TR. 13-14).

Rodney testified that from the beginning, he expressed his position to Sipple that he wanted to go to trial rather than settle. (TR. 63). Rodney testified that after the case survived summary judgment, Sipple told him you "got to do this," meaning mediate, because "[t]he courts want to see that you're participating[.]" Rodney testified he "went into mediation to follow the rules." (TR. 82). Rodney testified that Sipple indicated he "might withdraw and not take this to trial" in the week before mediation. (TR. 63-64). Sipple testified he never told Rodney he would no longer represent him if he did not mediate. (TR. 15).

In the week leading up to mediation, email exchanges between Rodney and Sipple from April 2 to April 9, 2025, reflect some conflict regarding realistic expectations of damages recoverable by BJ's in this case. (Ex. 101-105). In the early morning hours on April 2, 2025, Rodney emailed Sipple, seemingly angry over a disagreement as to whether each separate bid—the July 31, 2019, RFP, the March 2020, RFB, and the August 19, 2020, rebid—constituted "three separate harms," stating "I love you but I won't be cheated by you . . ." (Ex. 101 at pp. 8-9). Sipple responded, "I specifically acknowledged three harms. My point is you don't get to double up on damages" and stated, "Let me follow the process." (Ex. 101 at p. 7).

In the morning on April 3, 2025, Sipple emailed Rodney his suggestion regarding how to calculate damages from August 2019 to June 2021, and advised Rodney to put himself "in the jury's shoes," stating he "might have a better chance of getting more than you ask for (if we win) if you are modest." (Ex. 101 at pp. 4-5). Rodney replied, "Your [sic] close but your [sic] not there yet but you will get there, what has your research showed you in regards to 3 separate harms[?]" and referred to his demand for more than $4.7 million dollars in damages in the Amended Complaint. (Ex. 101 at pp. 3-4; Filing No. 21). Sipple told Rodney to "stay in your lane" as the "victim/witness," advised him that "[i]n a million years" he would not get $4.7 million, and asked Rodney to "help me help you." (Ex. 101 at pp. 1-2).

Rodney and Sipple exchanged more emails throughout the day into the evening on April 3, 2025, regarding damages. By the end of the day, Sipple stated he would "be happy to apologize for whatever I did to upset you," thanked Rodney for his work and said "we're making progress. I think you'll be happy on mediation day one way or the other." (Ex. 102 at p. 3). Rodney emailed

10

Sipple on April 4, and April 8, 2025, with information Rodney believed was relevant regarding Title VI Compliance and the City's reputation and threat to future funding if the City is "investigated" for such noncompliance, and wanted Sipple to include that letter with the "mediation report." (Ex. 103).

Sipple prepared a mediation statement (Ex. 128) setting forth BJ's positions and evaluation of the case, and emailed it to Rodney for his review in the afternoon on April 9, 2025. (TR. 15-16; Ex. 104-105). Sipple testified the mediation statement took an "aggressive position" of an opening demand of $1.7 million, which included Rodney's calculation of six-years of lost profits. (TR. 28; Ex. 128). The mediation statement also discussed all three bids BJ's submitted to the Parks Department for custodial services for the City's recreational centers, and the damages BJ's and Rodney incurred from the City's actions and disparate treatment of BJ's in handling those bids. (Ex. 108). In his email to Rodney, Sipple stated part of the settlement "should include a formal release of your performance bond," and expressed the opinion that "if they put you in a position to pocket $500,000 with a bond release, you should take it." (Ex. 104 at p. 5).

Although Sipple testified he did not recall whether Rodney had any specific disagreements with the mediation statement's contents, the email exchanges between Sipple and Rodney reflect Rodney was unhappy with Sipple's advice, stating, "I'm not moving for $500,000. I'm not moving at $1 million. Just prepare to win at trial. I can prove damages to the jury. . . $500k doesn't help me." (TR. 16-17; Ex. 104 at p. 3). Sipple responded, "Don't [take] for granted my willingness to go for the ride," followed by an email asking, "What number would you want to propose to the jury?" (Ex. 105). Rodney replied, citing the Amended Complaint's demand of $4.7 million in damages with bond and lost contracts, and referred to "two senators leading an investigation" into the City's discriminatory practices to "make the City pay back every dime they got from the state." (Ex. 104 at p. 1). Sipple responded, "This isn't a movie. If you ask for millions, you'll be more likely to either lose or get a year or two years of profits, $100,000 or something." (*Id.*). Rodney responded:

> I'll tell you a horror movie, finally after years and years of abuse you get your chance to right this wrong and the hero doesn't want to lace them up and dance. The hero can walk away with six figures tomorrow while the black guy is hit with a gag order and left to scrape and scrap with mere pennies.
>
> Listen I get it if you don't want to go forward with this case . . . and I'm at peace with that but on your way out please provide the city the letter to the state and I'll bring the [Senator Terrell McKinney] letter tomorrow. After that you can petition

11

the court to withdraw and I'll continue on this journey to rebuild my business and my name.

(Ex. 105 at p. 1). Sipple responded that there would be no gag order as the settlement "must be approved by Council and is therefore public record"; it is an "insult" to make it about his fee; and stated, "It's not that I don't want to dance," but Rodney was making it difficult. (*Id.*).

Rodney testified that he interpreted Sipple's statement about his "willingness to go for the ride" to mean, "That . . . if I didn't do mediation, he wasn't going to be my attorney for trial." (TR. 81). Rodney also interpreted Sipple's email about not wanting to "dance" as a threat to withdraw from his representation.[2] (TR. 120). Sipple testified he meant, "if [Rodney] wanted to take unreasonable positions and . . . be difficult to represent and refuse to kind of stay in his lane as a fact witness and continue to play lawyer, I guess would be the way to put it, then -- then I wasn't going to go through it." Sipple testified he was responding to "shape [Rodney's] behavior," and that he was not going to continue his representation if Rodney "was going to be out of his lane and taking positions at trial that I thought would kneecap the likelihood of a victory or a successful damages recovery." (TR. 31-35; Ex. 104).

Sipple ultimately believed settlement was preferable to trial "if we got to a certain number," discussing with Rodney that $600,000 was that number—with Rodney taking $500,000 and Sipple retaining $100,000 for fees. (TR. 14, 27). In calculating this number, Sipple testified he and Rodney discussed how to value lost profits. BJ's custodial contract was for three-years, but Rodney stated the City customarily renewed contracts for another three-years before rebidding, and therefore sought six-years of lost profits. Sipple testified that even if a jury only awarded three-years of profits, an award of $600,000 would leave about $250,000 for other damages, and he did not "like the likelihood of a jury awarding more than that." Therefore, Sipple was of the opinion that it would be "hard to risk trial" if they received an offer in the $80,000 to $85,000 range for lost profits per year over six years. (TR. 14, 27).

Mediation took place on April 10, 2025. The parties jointly hired Mark Christensen to act as the neutral. Sipple attended with Rodney on behalf of BJ's. (TR. 18, 20). Sipple testified that

---

[2] Rodney initially testified there was a third email from Sipple prior to mediation indicating Rodney had to settle or else Sipple would withdraw from his representation. In this email Sipple stated, "If you think this case is getting tried by anybody on May 12th, you're badly mistaken. (TR. 120-123; Ex. 111). However, that email was dated April 15, 2025, five days after Rodney signed the MSM; when that fact was pointed out to Rodney during cross-examination, he clarified there were only two occasions pre-mediation where he believed Sipple threatened withdrawal. (TR. 122-123).

12

Rodney's attitude during mediation "was the way it normally is, which is just very calm and professional." (TR. 18). Sipple testified that Rodney participated in the mediation, stated his opinions on the issues, and Sipple did not detect anything unusual about Rodney's demeanor until their break for lunch when Rodney declined to have lunch together. (TR. 18-19). The mediation lasted the entire day, and Sipple testified he does not recall any drama, anger, or anything unusual about how the mediation unfolded. (TR. 18-19).

An issue with respect to damages recoverable by BJ's arose during mediation. Sipple believes the mediator brought it to his attention, but the Amended Complaint only requested compensatory damages as to Rodney's individual claims. Because the Court dismissed Rodney's individual claims early in the case, there was a question as to whether BJ's could request or recover compensatory damages at trial, as BJ's did not separately demand compensatory damages in the Amended Complaint. (TR. 28-29; Filing No. 21 at pp. 31-32).

Sipple testified settlement in the amount of $575,000 was reached during the mediation. (TR. 19; Ex. 106). Sipple testified that although this was $25,000 short of what he had hoped for or reasonably anticipated, he felt it was a "good settlement" because it awarded Rodney "six years of profits, as he saw them, plus attorney fees." (TR. 26). Sipple testified he had a conversation with Rodney about what the settlement entailed, including discussing Sipple's fee because he "cut it" such that "the 575 would be divided . . . 500 to Mr. Johnson and 75 to me." (TR. 20).

Rodney testified about his view of the mediation. Throughout the day, Defendants made offers that Rodney deemed so low that Rodney told Sipple that he wanted to go home on four occasions. (TR. 78). Rodney testified that he believed he could separately sue for damages for the August 2019 bid, the March 2020 rebid, and for the August 2020 contract termination. His understanding of damages did not change when he was dismissed as an individual plaintiff. Rodney testified he has had difficulties obtaining performance bonds post-contract termination and suffered loss of business. (TR. 61-67).

Rodney testified his understanding of what he was settling at mediation was the "August 2020 custodial contract," and that he was told the defendants were "not taking into consideration either one of those two bidding cycles or the performance bond, and they [the mediator and Sipple] said we're not talking about that; we're only here to talk about the contract." (TR. 79, 110, 117). Rodney testified he had this belief despite the fact that he was aware his pleadings, written discovery, depositions, and mediation statement all referred to and included all three bids,

13

explaining he had "never been to mediation before" and that "the mediator said that, per my response to the City that they weren't willing to discuss the other bids." (TR. 110). Rodney also acknowledged there is nothing in writing from the mediation explicitly stating the mediation and settlement was limited to the August 2020 contract. (TR. 116). Nonetheless, the number in Rodney's mind to settle the lawsuit did not change. (TR. 80).

Rodney testified about his understanding of the issue of compensatory damages and the impact it had on the mediation. Rodney testified that he understood that compensatory damages were not available after he was dismissed as an individual plaintiff, and that damages for the entire case "were essentially capped." Rodney texted his family during mediation stating Sipple "screwed up" and "didn't list damages right." (TR. 84; Ex. 107). In the afternoon, Defendants increased their offer to $545,00; Rodney wanted the number to go up in order for Sipple to be paid, and when Defendants "went up to [5]75,000 . . . it was pretty much over at that point." (TR. 82-83). Rodney testified he communicated with family members during the mediation concerning the compensatory damages, took a lunch break, and accepted that that offer "was the best that was going to happen," and "just . . . sucked it up." (TR. 83-85; Ex. 107). Rodney texted family members that he was "beyond frustrated," and felt the mediation was going poorly, so he was going to sit in his car to think. (TR. 131). Rodney testified that he agreed to the $575,000 settlement number around four or five o'clock, saying "all right, just give me the paperwork. Let's go." (TR. 85-86).

Sipple testified the Mediated Settlement Memorandum ("MSM") represented his understanding of the settlement reached during mediation. Sipple provided a copy of the MSM to Rodney, and while Sipple did not "specifically recall [Rodney] reading through it," he would "be surprised if he didn't." (TR. 21). Sipple testified that Rodney signed the MSM and did not have "any questions indicating that he was confused about anything." From Sipple's perspective, Rodney understood and voluntarily signed the MSM, and "[t]here was no -- there was no coercion or force or any drama surrounding the signing of the memorandum." Sipple testified he would not let his client sign a settlement agreement against the client's will or if the client did not understand the settlement agreement. Sipple did note that Rodney's "affect had changed a little bit" at the time of signing, but attributed it to fatigue or Rodney receiving phone calls from his special needs son asking him to come home. (TR. 21-22). Rodney likewise testified he voluntarily signed the MSM. (TR. 111). Sipple emailed the Court the following day to notify it of the settlement. (TR. 22).

14

The MSM provides that the mediation session "involve[ed] all claims raised or that could have been raised in Case No. 8:22-cv-131 in the United States District Court for the District of Nebraska[.]"  The MSM sets forth the parties' agreement to resolve the dispute as follows:

1.  Defendants will pay BJ's $575,000.00.
2.  BJ's provides a release with the following material terms:
    A. "A full and complete release and discharge of all claims [BJ's] has, claims to have, or in the future may have against [Defendants], and their /its agents, employees, heirs, successors, assigns, and insurers arising out of the dispute.
    B. A warranty that BJ's is the sole owner of all such claims.
3.  The parties will share the mediation expenses 50-50.
4.  The pending litigation, including all claims, counterclaims and third-party claims, will be dismissed with prejudice.
5.  The terms of the settlement shall be confidential except that terms may be disclosed to the parties' attorneys, accountants, and financial advisors and as required by law.
6.  The parties agree that the settlement terms reflected herein are intended to be a final and enforceable settlement agreement, subject only to the preparation of the formal settlement documents incorporating all of the terms of the settlement.
7.  This settlement is subject to the approval of the Mayor of the City of Omaha and the Omaha City Council. The agreement will be presented for City Council approval no sooner than June 17, 2025.

(Ex. 106 at p. 1).  Rodney signed the MSM on behalf of BJ's, and Jeffrey Bloom, the Assistant City Attorney, signed on behalf of Defendants.  Both signatures are dated April 10, 2025, the date of the mediation.  (Ex. 106 at p. 2).

Sipple recalls discussing with Rodney the settlement release language after Rodney voiced concerns.  Sipple initially "jumped the gun" and was also concerned about the language, but after he looked at it closer and discussed it with the mediator, he concluded it was sufficient because it was limited to claims "arising out of the dispute." (TR. 20, 38-39).   Sipple also testified that the performance bond issue was important to Rodney, but that the settlement was not dependent or contingent upon it: "I just remember it being an issue; that it was discussed; and that the City's position was they would do whatever was – you know, if there was something necessary; that they weren't trying to hang him up on the bond."  (TR. 45).

In the evening on April 12, 2025, Rodney emailed Sipple and counsel for Defendants stating, "I am writing to formally request that we pause and re-evaluate the terms of the Mediated Settlement Memorandum dated April 10, 2025."  Rodney stated his concerns as follows:

15

> After reviewing the language in Paragraphs 2 and 6, I am concerned that the current scope of the release—particularly the phrase "all claims Releasor has, claims to have, or in the future may have arising out of the dispute"—may unintentionally waive or impair my ability to bring distinct and ongoing civil rights claims not raised in this litigation, including those involving the SEB program, solid waste contracting, bonding interference, and retaliation based on protected petitioning activity occurring after August 2020.

(Ex. 108). Rodney stated he was "not seeking to undo the agreement entirely" but was "requesting that the release language be clarified or narrowed to ensure that the settlement applies only to the custodial contracting dispute specifically at issue in Case No. 8:22-cv-131, and does not bar future or separate claims involving different facts, contracts, or forms of harm." Rodney testified he did not mean to send his email to anyone other than Sipple, and that he cc-ed the defense attorneys by accident. (TR. 115). Sipple responded, "The language in the MOU that you are concerned about is not the language that will define the scope of your release," and stated that once the formal draft of settlement documents was drafted they can "review and refine" the language if necessary. (Ex. 108).

Sipple testified it is "professional custom" for a formal settlement agreement to "use different words" than a memorandum of understanding; however, the scope of the formal settlement agreement and release should be the same as the negotiated settlement. (TR. 39-40). Sipple was of the opinion there was a "meeting of the minds with respect to the scope of the release" during mediation, so "if the scope of the release [in the formal settlement] was broader than just this case, then our position wouldn't have been that the negotiations continue; our position would have been that their release is not consistent with the agreement -- with the settlement that we reached." (TR. 41).

Sipple testified that prior to mediation he explained to Rodney that "the mediation concerned the whole series of events alleged in the lawsuit" and that the purpose of the mediation "would be to settle all matters regarding the custodial contract with the Parks Department." (TR. 17). Sipple testified that he does not recall any conversations or confusion with Rodney prior to or during mediation that indicated Rodney only wished to mediate part of the case. Sipple testified he "absolutely" did not tell Rodney the mediation would only discuss the August 2020 rebid, nor did anyone tell Rodney that during mediation. (TR. 17-18). Sipple testified that he does not recall Rodney indicating prior to, or at the mediation, an understanding that the MSM did not encompass all three bids for the janitorial service contract. Had Rodney indicated an understanding otherwise,

16

it would have "trigger[ed] a lot of conversation." (TR. 24). Sipple testified that during the mediation "there was no discussion, no confusion about the fact that we were there to settle all the matters in the lawsuit regarding the janitorial contract." (TR. 24). In Sipple's opinion, "certainly, there was a meeting of the minds" that "we were settling the janitorial case that was alleged in the lawsuit," and the only concerns Rodney appeared to have was over the release language. Sipple testified he would not have allowed his client to sign a settlement agreement if there was no meeting of the minds. Sipple explained to Rodney that he was just "settling this case" and that there was nothing about the settlement "that should prevent you from bringing claims regarding other matters[.]" (TR. 25-26). Sipple testified the "promise and understanding was that the release signed by [Rodney] would extend no further than the janitorial case, so to speak, regarding the cleaning the recreational facilities, the issues raised by the complaint." (TR. 25-26).

Rodney testified he was "super disappointed" with the outcome of mediation and felt "screwed over." Rodney also testified he would not have signed the MSM if the issue of compensatory damages and "possible cap" had not been brought up. Rodney testified he felt like Sipple would "walk away from representation" if he did not sign the MSM. (TR. 87-88). However, Rodney testified that Sipple did not actually say anything about withdrawing as counsel during the mediation. (TR. 80). Rodney also testified he never said Sipple "pressur[ed] or "coere[d]" him to settle, only that he "misunderstood or . . . was misled." (TR. 123-124). Specifically, he felt misled as to what the final release language would be and his ability to get compensatory damages. (TR. 140-141).

Rodney testified to his understanding that the release terms in the MSM would be refined, and that Sipple told him the MSM release language was "not the full and final terms." (TR. 86-87, 11-112). Rodney testified he was particularly concerned about releasing "future claims" because in his view, the City continued to discriminate against him in contract bids, and he believed the release would prevent him for pursuing claims related to any "SEB or bidding process" in the future. (TR. 88-91). Rodney testified that the proposed settlement agreement release language was concerning because not only did the release pertain to BJ's, but also to Rodney individually, and his next of kin, heirs, managers, and friends, and members, and because the release included "every allegation that we made in the 2022 lawsuit." Rodney felt like the language of the settlement agreement release was more broadly defined than the "lawsuit" and "thought that they were trying to say Dispute to involve all SEB kind of allegations, and I didn't like that." (TR. 95-99). Rodney

17

testified that no, he did not understand the "difference between releasing claims that are arising out of a dispute, as defined in the mediated settlement memorandum, and releasing all possible future claims unrelated to a lawsuit," although he did ask both his attorney and the mediator to clarify. (TR. 124-125).

Another sticking point for Rodney was that there was no language in the release regarding the performance bond "that stated, basically, the termination of the contract was . . . through error or mutual agreement." Rodney testified he believed this was important so that he did not "have that termination on his record" when applying for future bonds or funding. (TR. 99-101). Rodney testified that Sipple told him he was "going to get the performance bond released, and that he would not have signed the MSM if that was not going to be part of the agreement (TR. 102). After reviewing his amended complaint, he felt he could "prove more damages" than he settled for, and felt he was misinformed by Sipple during mediation both about available damages and the bond. (TR. 102). Rodney testified he discussed the release with the mediator, who stated the language was "boilerplate language and the final terms would be delivered for me to sign." (TR. 113).

Following the MSM, Rodney also began requesting several non-monetary items, including "policy changes, SEB advisory board formation, employee discipline, and possible employee firing and other terms," and believed the City employees involved should be punished. Rodney acknowledged those items were never agreed to during mediation or otherwise were left open for further negotiation, aside from Rodney's belief that Sipple told him after mediation that "the final terms were not delivered." (TR. 125-126, 129). Rodney testified he began looking for a new attorney about four days after mediation. (TR. at 94-95).

## DISCUSSION

Defendants have moved the Court to enforce the terms of the MSM, asserting it is an enforceable contract containing all the material terms of the parties' settlement of this lawsuit. (Filing No. 220). BJ's, on the other hand, asserts the MSM is unenforceable under various equitable principles of Nebraska contract law, including: there was no meeting of the minds as to material terms of the agreement; there was a mistake and/or misrepresentation as to the scope of the lawsuit and release; there was a lack of certainty and the MSM is an unenforceable agreement to agree; and duress because Rodney's attorney threatened to withdraw from his representation if Rodney did not settle.

18

"The district court has inherent power to enforce a settlement agreement as a matter of law when the terms are unambiguous." *Barry v. Barry*, 172 F.3d 1011, 1013 (8th Cir. 1999) (citing *Gatz v. Southwest Bank of Omaha*, 836 F.2d 1089, 1095 (8th Cir. 1988)). "Basic principles of contract formation govern the existence and enforcement of [an] alleged settlement[.]" *Chaganti & Assoc., P.C. v. Nowotny*, 470 F.3d 1215, 1221 (8th Cir. 2006).  Here, the parties are located in Nebraska, the underlying factual basis of the lawsuit arose in Nebraska, and the MSM at issue was negotiated and executed in Nebraska.  Both parties rely on Nebraska law in their briefs.  (Filing No. 220; Filing No. 223).  As such, the Court will also apply Nebraska law to the instant dispute. See, e.g., *Sheng v. Starkey Lab'ys, Inc.*, 117 F.3d 1081, 1083 (8th Cir. 1997) (applying Minnesota law to the enforceability of a Title VII settlement agreement because "[b]oth the parties and the district court . . . assumed that Minnesota law controls[.]").

"[A] settlement agreement is subject to the general principles of contract law." *In re Est. of Wiggins*, 992 N.W.2d 429, 435 (Neb. 2023).  "To have a settlement agreement, there must be a definite offer and an unconditional acceptance." *Smith v. King*, 953 N.W.2d 258, 278 (Neb. Ct. App. 2020).  "[T]here must also be a meeting of the minds or a binding mutual understanding between the parties to the contract," and specifically, "a meeting of  the minds 'as to the essential terms and conditions of the proposed contract.'" *Slama v. Slama*, 987 N.W.2d 257, 264 (Neb. 2023). "A binding mutual understanding or meeting of the minds sufficient to establish a contract requires no precise formality or express utterance from the parties about the details of the proposed agreement; it may be implied from the parties' conduct and the surrounding circumstances." *Linscott v. Shasteen*, 847 N.W.2d 283, 289 (Neb. 2014).  "To compel enforcement of a settlement agreement, its terms must be sufficiently specific and mutually agreed upon as to every essential element." *Green v. Beatty*, No. A-10-251, 2011 WL 474558, at *9 (Neb. Ct. App. Feb. 8, 2011). "Uncertainty as to nonessential terms or small items will not preclude enforcement of a settlement agreement." *Id.*  Nebraska law "favors and encourages settlements, and in the absence of fraud, error, or mistake, they should not be set aside." *Sebade v. Sebade*, 28 N.W.3d 19, 50 (Neb. 2025) (quoting *Fleischer v. Broders*, 135 N.W.2d 5, 9 (Neb. 1965)).

Because settlement agreements are "subject to the general principles of contract law," the equitable remedies of reformation and rescission/cancellation are available to "relieve a party from performing obligations under a contract or an apparent contract." *In re Est. of Wiggins*, 992 N.W.2d 429, 435 (Neb.  2023).  Rescission or cancellation of a contract "may be granted where the parties

have apparently entered into a contract evidenced by a writing, but owing to a mistake, their minds did not meet as to all the essential elements of the transaction, so that no real contract was made by them." *Id.* at 436. "[G]rounds for cancellation or rescission of a contract include fraud, duress, unilateral or mutual mistake, and inadequacy of consideration." *Id.* Rescission "sounds in equity," which is a flexible concept that "is determined on a case-by-case basis according to concepts of justice and fairness." *Id.* at 439.

BJ's advances a number of overlapping arguments to support both its position that the parties' signatures on the MSM did not form an enforceable contract, or if a contract was formed, the equitable remedy of recission/cancellation should relieve BJ's from performing its obligations under such unenforceable contract.

First, the undersigned magistrate judge finds the parties formed a settlement agreement when they signed the MSM, which terms are sufficiently specific and mutually agreed upon as to every essential element. The parties engaged in a full day of mediation with a neutral mediator, and both parties voluntarily signed the MSM after Rodney decided at the end of the day to accept the Defendants' offer to pay BJ's $575,000 to settle the case. The MSM signed by both parties states the mediation session "involve[ed] "all claims raised or that could have been raised in Case No. 8:22-cv-131 in the United States District Court for the District of Nebraska" and sets forth the parties' agreement as follows:

1. Defendants will pay BJ's $575,000.00.
2. BJ's provides a release with the following material terms:
   A. "A full and complete release and discharge of all claims [BJ's] has, claims to have, or in the future may have against [Defendants], and their /its agents, employees, heirs, successors, assigns, and insurers arising out of the dispute.
   B. A warranty that BJ's is the sole owner of all such claims.
3. The parties will share the mediation expenses 50-50.
4. The pending litigation, including all claims, counterclaims and third-party claims, will be dismissed with prejudice.
5. The terms of the settlement shall be confidential except that terms may be disclosed to the parties' attorneys, accountants, and financial advisors and as required by law.
6. The parties agree that the settlement terms reflected herein are intended to be a final and enforceable settlement agreement, subject only to the preparation of the formal settlement documents incorporating all of the terms of the settlement.
7. This settlement is subject to the approval of the Mayor of the City of Omaha and the Omaha City Council. The agreement will be presented for City Council approval no sooner than June 17, 2025.

20

(Ex. 106). The essential terms of the agreement are that Defendants will seek Mayoral and City Council approval, no sooner than June 17, 2025, of the settlement agreement (as required by law), and upon such approval will pay BJ's $575,000.00; in exchange, BJ's will warrant it is the sole owner of the claims in this lawsuit and will provide a "full and complete" release of BJ's claims that were, or could have been, raised in this lawsuit. The parties agreed to equally share the cost of mediation. The agreement itself states it is "intended to be a final and enforceable settlement agreement" subject only to the formalized settlement document containing the terms of the settlement.

Despite this fairly straightforward settlement agreement with unambiguous terms, BJ's argues the parties did not have a meeting of the minds regarding material terms due to "two unilateral mistakes (which may have been mutual mistakes) or misapprehensions" by Rodney that "induced him to sign the MSM[.]" (Filing No. 223 at p. 13). First, BJ's asserts he "signed the MSM based on the understanding that there were material terms related to the release language that would be further negotiated or clarified." (Id.). Specifically, BJ's cites to Rodney's belief that "the August 2020 bid was the only issue being settled" and that the settlement agreement would "not waive the Plaintiff's ability to seek further action" related to the August 2019 or March 2020 bids. (Filing No. 223 at pp. 13-14). BJ's also claims its attorney's "understanding was that the release was not a settled material term, but rather one open to further negotiation." (Filing No. 223 at p. 14).

BJ's asserts the second mistake "involved the scope of the lawsuit itself, and what issues would be presented to the jury" because Rodney was "under the misapprehension that, were this case to go to trial, a jury would only be able to consider the August 2020 contract, and would not be able to consider his other claims[.]" (Filing No. 223 at pp. 16-17). Rodney claims he was "erroneously advised by both his own counsel and the mediator that his counsel had failed to file for compensatory damages after Johnson, as an individual, was dismissed from the case, and that as a result, a jury would only be able to award damages relating to the August 2020 contract." BJ's asserts that if "one or both of the parties were mistaken as to the availability of trial damages for

the August 2019 and March 2020 bidding processes, recission is warranted under equitable principles of contract law."[3]  (Filing No. 223 at p. 17).

In the context of recission, a "mutual mistake" refers to "a mistake of fact 'in the making of the contract.'"  *In re Est. of Wiggins*, 992 N.W.2d 429, 436 (Neb. 2023).  Meaning, "If there has been any misunderstanding between the parties, or a misapprehension by one or both, so that there is no mutuality of assent, then the parties have not made a contract, and neither will the court do so for them."  *Id.*  A mutual mistake of fact for purposes of recission "must relate to either a present or past fact or facts that are material to the contract, and not to an opinion as to future conditions as the result of present known facts."  *Id.*

A unilateral mistake may also warrant recission "when the mistake is of so fundamental a nature that it can be said that the minds of the parties never met and that the enforcement of the contract as made would be unconscionable."  *Stitch Ranch, LLC v. Double B.J. Farms, Inc.*, 837 N.W.2d 870, 886-87 (Neb. Ct. App. 2013).  "Generally, the unilateral mistake of one party does not relieve that party from its obligation under a contract absent a showing of fraud, misrepresentation, or other inequitable conduct."  *Bachman v. Easy Parking of Am., Inc.*, 562 N.W.2d 369, 373 (Neb. 1997) (collecting cases); see also *In re Est. of Dueck*, 736 N.W.2d 720, 724 (Neb. 2007) ("A court may reform an agreement when there has been either a mutual mistake or a unilateral mistake caused by fraud or inequitable conduct on the part of the party against whom reformation is sought.").

Here, the undersigned magistrate judge finds there was certainly no mutual mistake because "it is clear that there was no shared belief or common misunderstanding" that was "not in accord with the facts."  *Stitch Ranch, LLC v. Double B.J. Farms, Inc.*, 837 N.W.2d 870, 886 (Neb. Ct. App. 2013).  As demonstrated by Defendants' motion and the text of the MSM, they do not share BJ's belief that mediation and the MSM only settled part of this lawsuit, that only the August 2020

---

[3] Relatedly, BJ's asserts Rodney's mistake of fact regarding the scope of the lawsuit could also be analyzed under the doctrine of misrepresentation because both Sipple and the mediator "misrepresented" the scope of the release and scope of the lawsuit to him. (Filing No. 223 at p. 18).  "A contract is voidable by a party if his or her 'manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which [he or she] is justified in relying.'"  *InterCall, Inc. v. Egenera, Inc.*, 824 N.W.2d 12, 20 (Neb. 2012) (citation omitted).  A misrepresentation "induces a party's manifestation of assent if it substantially contributes to [the party's] decision to manifest his [or her] assent."  *Id.*  A misrepresentation is defined as "an assertion that is not in accord with the facts."  *Id.* at 19 (quoting Restatement (Second) of Contracts § 159 at 426 (1981)).  "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so."  *Id.*

22

contract would be presented to the jury, or that the release of BJ's claims was open to further negotiation. The MSM itself states the mediation session "involve[ed] "all claims raised or that could have been raised in Case No. 8:22-cv-131" and that the "settlement terms reflected herein are intended to be a final and enforceable settlement agreement[.]"

Therefore, if there was a mistake about the scope of what was being settled in mediation, it was Rodney's unilateral mistake; however, it was not a reasonable mistake nor one that was so fundamental that it "can be said that the minds of the parties never met[.]" Rodney's testimony reflects he understood that his pleadings, written discovery, depositions, and mediation statement all included the August 2019 bid, the March 2020 rebid, and the August 2020 contract termination. Emails between Sipple and Rodney prior to mediation on this point reflect Sipple told Rodney he "specifically acknowledged three harms," but advised "you don't get to double up on damages[.]" (Ex. 101 at p. 7). Sipple's testimony also reflects he explained to Rodney that "the mediation concerned the whole series of events alleged in the lawsuit" and that the purpose of the mediation "would be to settle all matters regarding the custodial contract with the Parks Department." (TR. 17). Rodney reviewed Sipple's mediation statement prior to mediation, which included all the factual matters and bids as outlined in the pleadings.

During mediation, Rodney conflated Defendants "not wanting to talk about the previous bids" with those bids not being included in the settlement. (TR. 110). Sipple testified that he does not recall any conversations or confusion with Rodney prior to or during mediation that indicated Rodney only wished to mediate part of the case. Sipple testified he "absolutely" did not tell Rodney the mediation would only discuss the August 2020 rebid, nor did anyone tell Rodney that during mediation. (TR. 17-18). Sipple testified that during the mediation "there was no discussion, no confusion about the fact that we were there to settle all the matters in the lawsuit regarding the janitorial contract." (TR. 24). Rodney also acknowledged there is nothing in writing from the mediation explicitly stating the mediation and settlement was limited to the August 2020 contract. (TR. 116). Rodney also testified that he accepted the $575,000 offer because compensatory damages were no longer available and despite his feelings the mediation was not going well. (TR. 117-120; Ex. 128). Rodney's email two days post-mediation stated he did not want to undo the agreement entirely, but was concerned the release "may unintentionally waive or impair my ability to bring distinct and ongoing civil rights claims not raised in this litigation" and was concerned about his ability to bring future claims for future harms. (TR. 113-114: Ex. 108).

23

The issue of whether compensatory damages was still available to BJ's is not really an issue of fact, but is an issue of law.  In the Amended Complaint, BJ's requested economic damages including $4,762,500 for "reasonably anticipated lost income" or alternatively lost profits over a six-year period; expenses "incurred in the course of his participation in each of the three bidding processes"; punitive damages, and attorneys' fees.  BJ's did not explicitly demand compensatory damages; those were only sought by Rodney when he was still part of the lawsuit as an individual plaintiff.  (Filing No. 21 at p. 31).  Because the Court dismissed Rodney's individual claims early in the case, at mediation there was a question as to whether BJ's could request or recover compensatory damages at trial, as BJ's did not separately demand compensatory damages in the Amended Complaint.  (TR. 28-29; Filing No. 21 at pp. 31-32).  Although BJ's argues this issue regarding compensatory damages was "misrepresented" to Rodney, the undersigned magistrate judge cannot say for certain whether BJ's had or had not properly pled compensatory damages.  Regardless, parties regularly settle cases with uncertain legal issues outstanding, as both sides bear risks the court may disagree with their legal positions.  Prior to mediation and prior to that becoming an issue, Sipple was of the professional opinion that $600,000 was a good value to settle this case.  The final settlement offer by Defendants was $575,000, which was close enough to that number that Sipple felt Rodney should accept it; the net result was the same as Sipple agreed to cut his fee.

BJ's also claims the waiver and release in this case is "unconscionable" because it "[s]trip[s] Plaintiff of those constitutional protections" in its ongoing business relations with the City, and "would allow the City to discriminate and/or retaliate against Plaintiff with impunity."  (Filing No. 223 at pp. 15-16).  Relatedly, BJ's argues it "did not intentionally, knowingly and voluntarily waive the right to bring constitutional claims against the City and individual Defendants for discrimination or retaliation in its bidding process."  (Filing No. 223 at pp. 22-23).

"When the terms of a contract are clear, a court may not resort to rules of construction, and terms are accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them." *Strategic Staff Mgmt., Inc. v. Roseland*, 619 N.W.2d 230, 234 (Neb. 2000).  "In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the contract." *Id.*  Review of the unambiguous terms of the MSM plainly refutes BJ's position.  The MSM states the mediation session "involve[ed] "all claims raised or that could have been raised in Case No. 8:22-cv-131 in the United States District Court for the District of Nebraska[.]"  Although the MSM states BJ's will provide a complete release "[BJ's] has, or claims to have, or in

24

the future may have against Defendants…" that future release is limited to claims "arising out of the dispute." The dispute, as stated by the MSM, is limited specifically to the claims in this lawsuit. Meaning, the scope of the release only pertains to BJ's constitutional claims and other claims that were or could have been raised in this specific lawsuit as outlined by the factual allegations in his Amended Complaint. Defendants reasonably seek a release of BJ's claims arising out of this lawsuit in exchange for $575,000, which is a customary agreement when settling a case. BJ's assertion that this release will prevent him from suing the City in the future for new harms baseless.

BJ's further asserts the MSM was an unenforceable "agreement to agree" on a settlement and was not a final agreement. (Filing No. 223 at p. 18). BJ's also points to the scope of the release and his concern "that the City would attempt to construe his signature on the MSM as an unlimited waiver of his constitutional rights to be free of racial discrimination and first amendment retaliation in all of his past and future bidding and contractual relationships with the city of Omaha." (Filing No. 223 at pp. 18-19). BJ's also asserts the parties intended to negotiate the release of Plaintiff's performance bond, a material issue that was left open for future arrangement. (Filing No. 223 at p. 19).

"A contract is not formed if the parties contemplate that something remains to be done to establish contractual arrangements or if elements are left for future arrangement." *Gibbons Ranches, L.L.C. v. Bailey*, 857 N.W.2d 808, 812 (Neb. 2015). "When an agreement stipulates that certain terms shall be settled later by the parties, such terms do not become binding unless and until they are settled by later agreement." *Id.* However, a "contract provision to execute effectuating documents in the future is enforceable where all of the material terms are specified in the original contract and leave none to be agreed upon through future negotiations." *Strategic Staff Mgmt., Inc. v. Roseland*, 619 N.W.2d 230, 235 (Neb. 2000).

A similar situation was presented in *Roseland*. In that case, the parties attended mediation and "reached an accord that was reduced to a memorandum of agreement" reviewed and signed by representatives for both sides, and informed the court they had settled the case. 619 N.W.2d at 232. The plaintiff later attempted to back out of the mediated settlement agreement after the parties could not agree on language to be used in the general release because the plaintiff believed "the revised language of the general release was broader than that of the memorandum of agreement." *Id.* at 234. The final revision of the general release required the plaintiff to release all "claims, demands, damages or suits of any kind or nature, whether known or unknown, which they may

now or hereafter have as of the [mediation] date," subject to the same exceptions[.]" *Id.* The plaintiff argued "the memorandum of agreement was only an agreement to make an agreement" and that the parties' post-mediation dispute over the language of the general release "demonstrate[d] the parties' lack of intent to be bound by the [mediated] document." *Id.* The defendant filed a motion to enforce the mediated memorandum of agreement, which the district court granted.

On appeal, the Nebraska Supreme Court rejected the plaintiff's arguments against enforcement of the mediated memorandum of agreement because "none of the terms of the general release present[ed] materially new terms," as it was only "an elaboration of the terms" of the mediated memorandum of agreement. *Id.* at 235. The Nebraska Supreme Court also pointed out that the written terms of the mediated memorandum of agreement did not provide that "certain terms would be agreed upon later or that the terms of the memorandum of agreement would not take effect until the general release was executed." Had the parties intended to do so, "It would have been a simple matter to include such a provision in their agreement[.]" *Id.* at 235-236. Because "all of the material terms are set forth in the memorandum of agreement, without conditions, and the document was executed by counsel for both parties in the parties' presence," the plaintiff was bound by the mediated memorandum of agreement. *Id.* at 236.

Here, as in *Roseland*, the terms of the release and bond issue did not present materially new terms. Instead, these were the formalization memorializing the terms outlined in the MSM. Nor did the parties "provide in the memorandum of agreement that certain terms would be agreed upon later or that the terms of the memorandum of agreement would not take effect until the general release was executed." *Roseland*, 619 N.W.2d at 235. The MSM clearly provides that the parties agreed "that the settlement terms reflected herein are intended to be a final and enforceable settlement agreement, subject only to the preparation of the formal settlement documents incorporating all of the terms of the settlement." (Ex. 106). Had the parties intended otherwise, "[i]t would have been a simple matter to include such a provision in their agreement." *Id.* at 236.

The issues of the general release and bond release were not open terms still up for negotiation. Sipple recalls discussing with Rodney the settlement release language after Rodney voiced concerns. Sipple initially "jumped the gun" and was also concerned about the release language, but after he looked at it closer, he concluded it was sufficient because it was limited to claims "arising out of the dispute." (TR. 20, 38-39). Although Sipple advised Rodney, "The

26

language in the MOU that you are concerned about is not the language that will define the scope of your release," (Ex. 108), Sipple testified it is "professional custom" for a formal settlement agreement to "use different words" than a memorandum of understanding—but the scope of the formal settlement agreement and release should be the same as the negotiated settlement. (TR. 39-40). Sipple was of the opinion there was a "meeting of the minds with respect to the scope of the release" during mediation, so "if the scope of the release [in the formal settlement] was broader than just this case, then our position wouldn't have been that the negotiations continue; our position would have been that their release is not consistent with the agreement -- with the settlement that we reached." (TR. 41).

Sipple and counsel for Defendant's exchanged emails regarding the language for the release of the performance bond, but there was no evident dispute or actual negotiation left to be done over the bond release itself. Sipple testified that the performance bond issue was important to Rodney, but that the settlement was not dependent or contingent upon it, and the City indicated it would "do whatever" Rodney was requesting as to the bond release in the final formalization of the settlement. (TR. 45). "A contract provision to execute effectuating documents in the future is enforceable where all of the material terms are specified in the original contract and leave none to be agreed upon through future negotiations." *Roseland*, 689, 619 N.W.2d at 235; accord *Sheng v. Starkey Lab'ys, Inc.*, 117 F.3d 1081, 1083 (8th Cir. 1997) ("The fact that the parties left some details for counsel to work out during later negotiations cannot be used to abrogate an otherwise valid agreement.").

BJ's further asserts there was a "lack of certainty regarding the ratification of the agreement by the Omaha City Council" because it contains an open ended temporal clause provides, "The agreement will be presented for City Council approval no sooner than June 17, 2025." (Filing No. 223 at p. 20). BJ's asserts that the fact that the MSM provides it "will be presented for City Council approval no sooner than June 17, 2025" supports an "inference . . . that the Parties required more time to finalize the settlement terms, and that the MSM was not a final, enforceable settlement." (Filing No. 223 at p. 14).

The fact that the MSM required the defendants to obtain the approval of the Mayor of the City of Omaha and the Omaha City Council also did not prevent the formation of a binding contract. "An understanding that an agreement is subject to approval by a governing board or similar body does not necessarily make the agreement illusory. A condition precedent is something that is agreed

must happen or be performed before a right can occur to enforce the main contract." *Stephenson v. Young*, No. CIV.A. 10-2197-KHV, 2011 WL 2112021, at *3 (D. Kan. May 26, 2011). "A condition of board approval may be construed either as (1) a condition precedent to the initial formation of the contract or (2) a condition precedent to an obligation to perform under an existing contract." *Id.* "In the latter instance . . . a condition of board approval does not give either party an absolute right to escape its obligations under the agreement because the reserving party has an implied obligation to carry out the objectives of the contract in good faith including submitting the agreement to its board for approval." *Id.* "If reasonably possible, courts treat a condition of board approval as an enforceable obligation which the reserving party must act in good faith to satisfy." *Stephenson*, 2011 WL 2112021, at *3; accord *Unitarian Universalist Church of Minnetonka v. City of Wayzata*, 890 F. Supp. 2d 1119, 1125 (D. Minn. 2012) ("The parties clearly and unmistakably manifested their assent to all the material terms of a 'full and final' agreement on the record at the settlement conference. The "contingency" of City Council approval did not undermine the formation of that settlement agreement; it simply obligated the City to "act in good faith" to obtain the called-for approval."). In both *Stephenson* and *UUCM*, a plaintiff attempted to back out of an agreed settlement before the defendant could obtain approval from a governmental board; in both cases the court concluded such approval was a condition that did not give the plaintiff a right to "back out of the deal" before the board was provided an opportunity to formally approve the agreement.

The undersigned magistrate judge finds that the MSM's condition of City Council and Mayoral approval was not a condition precedent to the initial formation of the contract, but was instead a condition precedent to the obligation to perform under the existing contract. Regardless, even if the settlement truly had been contingent on such approval, that contingency was satisfied when the settlement was approved by the City Council and Mayor. (Ex. 125).

BJ's further argues the settlement agreement is "voidable based on duress because its terms are unjust and unconscionable" due to Sipple's "threats of withdrawal" if Rodney did not go to mediation. (Filing No. 223 at pp. 22-23). "[F]ormation of a contract can be prevented by duress exerted upon a party to the contract[.]" *Lustgarten v. Jones*, 371 N.W.2d 668, 672 (Neb. 1985). "The burden of proving duress is placed upon the party alleging it." *Kosmicki v. Nebraska*, 652 N.W.2d 883, 893 (Neb. 2002) (citing *Lustgarten*, 371 N.W.2d at 672). "To be voidable because of

duress, an agreement must not only be obtained by means of the pressure brought to bear, but the agreement itself must be unjust, unconscionable, or illegal." *Id.*

Review of Sipple's pre-mediation emails to Rodney do not establish Sipple threatened to withdraw from his representation if Rodney did not settle. At most, Sipple's pre-mediation emails to Rodney reflect Sipple attempting to manage Rodney's reasonable and realistic expectations of damages he could recover in this lawsuit. For example, immediately after Sipple's email saying, "Don't [take] for granted my willingness to go for the ride," he asked Rodney, "What number would you want to propose to the jury?" (Ex. 105). Rodney replied with several demands, including $4.7 million in damages and other demands, which prompted Sipple to state, "This isn't a movie. If you ask for millions, you'll be more likely to either lose or get a year or two years of profits, $100,000 or something." (Ex. 104). Sipple offering his professional opinion and legal advice regarding reasonable expectations of recoverable damages—even if it was advice Rodney did not agree with or want to hear—does not constitute coercion or duress.

Additionally, even if Rodney felt pressured by counsel to attend mediation, there is no evidence Sipple pressured or coerced Rodney to *sign* the MSM at mediation. At the evidentiary hearing, Rodney testified that Sipple did not say anything about withdrawing as counsel during the mediation. (TR. 80). Rodney also testified he never said Sipple "pressur[ed] or "coere[d]" him to settle, only that he "misunderstood or . . . was misled." (TR. 123-124). Rodney's testimony and contemporaneous text messages to his family reflect he was frustrated and felt mediation was going poorly and that Sipple "messed up" as to how damages were pled, but he otherwise expressed no feelings that Sipple was forcing Rodney to sign the agreement. (TR. 131). Rodney testified that he agreed to the $575,000 settlement number around four or five o'clock after thinking about it in his car, and that he voluntarily signed the MSM. (TR. 111). Therefore, to the extent Rodney asserts he signed the MSM under duress or coercion due to threats or coercion from his attorney, no evidence was presented to establish such duress or coercion.

It is clear Rodney was unhappy with the result of settlement, and wanted to punish the city employees involved in the case, (TR. 129), but buyer's remorse is not a valid reason for undoing a valid settlement agreement. For the foregoing reasons, the undersigned magistrate judge finds that a valid settlement agreement was entered into by the parties, the material terms of which are documented in the MSM. The undersigned magistrate judge also finds no equitable reason to order

29

recission of the MSM, and will therefore recommend the agreement be enforced according to its terms.  Therefore, upon consideration,

**IT IS HEREBY RECOMMENDED** to the Honorable Robert F. Rossiter, Jr., Chief United States District Court Judge, that:

1. Defendants' Motion to Enforce Settlement Agreement (Filing No. 219) be granted; and
2. That upon the Court's adoption of this Findings and Recommendation:
   a. Defendants may deposit a check in the amount of $575,000.00, with the Clerk of the Court for the United States District Court for the District of Nebraska.
   b. That upon such payment to the Clerk of Court, Defendants are released and discharge of all claims the Plaintiff has, claims to have, or in the future may have against the City Defendants and their/its agents, employees, heirs, successors, assigns and insurers that were raised or that could have been raised in this lawsuit;
   c. That the parties otherwise abide by and comply with the terms of the Mediated Settlement Memorandum; and
   d. That upon such payment to the Clerk of Court, this above-captioned lawsuit and all claims against the Defendants be dismissed with prejudice.

Dated this 20th day of February, 2026.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

### ADMONITION

A party may object to a magistrate judge's findings and recommendation by filing an objection within fourteen (14) days after being served with a copy of the findings and recommendation. NECivR 72.2.  Failure to timely object may constitute a waiver of any objection.